**SUMMONS ISSUED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
CLERK

2011 AUG -1 PM 3: 53

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

---------------------------------------------------------

MATI GILL,

                           Plaintiff,

         -against-

ARAB BANK, PLC,

                         Defendant.

:
:
:     **Case No.**
:     **COMPLAINT**
:
:
:     WEINSTEIN, J.
:
:
:     CARTER, M.J.
:

---------------------------------------------------------X

Plaintiff Mati Gill, by his attorneys, alleges the following upon information and belief:

## NATURE OF THE ACTION

1.      This is a complaint for damages and equitable relief arising out of the conduct of the Arab Bank, PLC ("Arab Bank") – a Jordanian bank headquartered in Amman, Jordan which currently maintains a Federal Agency in the State of New York that was formerly a federally licensed and regulated branch office in the State of New York – pursuant to which Arab Bank intentionally, knowingly (or consciously avoided knowing), recklessly, with willful blindness, and/or with general awareness, provided material support, including financial services, to HAMAS, a Foreign Terrorist Organization (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")).

2.      By these acts, defendant Arab Bank committed, aided and abetted, and/or conspired to commit acts of international terrorism, resulting in the killing, attempted killing and maiming of scores of American citizens in Israel since September 2000, and has violated the prohibitions on providing material support for acts of international terrorism set forth in the Anti-Terrorism Act as amended by the AEDPA ("ATA") (*see e.g.*, 18 U.S.C. §§ 2339A, 2339B and 2339C) and is civilly liable under 18 U.S.C. § 2333(a) of the ATA to the Plaintiff, an American citizen, who has been

injured by reason of an act of international terrorism perpetrated by HAMAS.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332(a)(2), and 18 U.S.C. §§ 2333(a) and 2334, as a civil action brought by a citizen of the United States, who has been injured by reason of an act of international terrorism. This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This Court also has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367(a).

4.     Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. §§ 1391(b) and 1391(d).

5.     Arab Bank is subject to personal jurisdiction in the State of New York pursuant to N.Y. CLPR § 301 because, among other things, it continuously and systematically does business in New York. Arab Bank also is subject to personal jurisdiction in the State of New York pursuant to N.Y. CPLR § 302 because, based on the facts alleged herein and upon information and belief, Arab Bank: (a) transacts business within the State of New York; (b) contracts to supply goods and services in the State of New York; (c) has committed tortious acts within the State of New York; and (d) has committed tortious acts outside the State of New York causing injury within the State of New York and: (i) derives substantial revenue from goods used or consumed in the State of New York; or (ii) expected or should reasonably have expected such acts to have consequences in the State of New York and derived substantial revenue from international commerce. Arab Bank also is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a).

## THE PARTIES

### A.   The Plaintiff

6.      Plaintiff Mati Gill, age 31, is a citizen of the United States, and is also a citizen and resident of the State of Israel.

7.      On April 4, 2008, Mr. Gill was employed as an aide to Israel's then-current Public Security Minister, Avi Dichter.  As alleged below, on that date, Mr. Gill was shot in a sniper attack for which HAMAS bears responsibility.

8.      On the morning of April 4, 2008, Mr. Gill was accompanying Mr. Dichter on a tour Mr. Dichter was leading for a delegation of the Board of Governors of the Canada-Israel Committee at an observation point inside the State of Israel's borders overlooking the Gaza Strip.

9.      During that visit, the delegation (including Mr. Gill) came under sniper fire coming from within the Gaza Strip that injured Mr. Gill.  Mr. Gill was shot in the leg, groin, and surrounding bodily areas.

10.     After being shot, Mr. Gill crawled behind a tour bus out of the line of fire, where he remained until he was evacuated to Barzilai Hospital, in Ashkelon, Israel.

11.     Following the attack, HAMAS' Izz Al-Din Al-Qassam Brigades issued a statement declaring joint responsibility for the attack together with the "al-Aqsa Protectors Brigade – Palestine," and boasted specifically about shooting Mr. Dichter's aide (Plaintiff Mati Gill).  The Arabic language version of HAMAS' statement (issued through HAMAS' website, (**www.alqassam.ps/arabic/statments.php?id=3681**) declared:

**Military Communiqué Issued by:**

**The Izz al-Din al-Qassam Brigades and the al-Aqsa protectors Brigades**

**An operation which targeted the convoy of the Zionist minister of Interior Security, our natural response to the crimes of the occupation**

With the help of the almighty Allah's strength and guidance, the Izz al-Din al-Qassam Brigades and the al-Aqsa Protectors Brigades – Palestine, announce their joint responsibility for the operation which targeted the convoy of the so called Zionist minister of internal security, Avi Dichter, and a host of the occupation army officials and other delegations in the vicinity of what is known as "Kibutz Nir Am" East of Beit Hanoun in the northern part of the Gaza Strip. Al-Qassam's and the al-Aqsa Protector's reconnaissance unites were able to monitor the preparatory Zionist movements for the arrival of this Minister. When the Minister arrived in person with the delegation, our warriors immediately began firing heavy machinegun fire from 10:20 to 10:30 on the morning of Friday the 28th in the month of Rabi' al-Awal 1429 which corresponds to 04/04/ 2008 of the Christian calendar. Our warriors were able to withdraw under the protection of the merciful one [Allah].

The Zionist enemy already admitted that the minister's aide was wounded. The delegation visit to the Gaza Strip's border was cancelled and chaos and terror reigned in the midst of the delegation which was comprised of many vehicles and dozens of people who immediately fled the scene and helicopters hovered over the skies of the northern area of the Gaza strip.

This operation is in response to the ongoing Zionist occupation's crimes and its incineration of the Gaza Strip and a response to the unjust Zionist siege on the Gaza strip.

We the Izz al-Din al-Qassam Brigades and the al-Aqsa Protectors Brigades announce our joint responsibility for this joint responsibility for this operation to stress the continuation of our Jihad and resistance against the enemy, the usurper and the targeting of every Zionist on our pure land.   We pledge to track down and target all the Zionist officials.

**Note: the operation was filmed.**

**This is the Jihad, victory or death…**

**The Izz al-Din al-Qassam Brigades and the al-Aqsa Protectors Brigades**

**Friday the 28th of Rabi' al-Awal 1429**

**Corresponding to 04/04/2008.**

12.     HAMAS issued an English language communiqué declaring that it (together with the

al-Aqsa Protectors Brigades) was responsible for the April 4, 2008 attack.  That communiqué, issued through another HAMAS-controlled website (http://www.qassam.ps/statement-1006-Al_Qassam_Brigades__Al_Aqsa_protectors_Brigades_targeted_the_convoy_of_the_Zionist_minister_of_interior_security.html) declared:

### Military Communiqué

### Al Qassam Brigades & Al Aqsa protectors Brigades targeted the convoy of the Zionist minister of interior security

In response to the Zionist aggression against the Palestinian people in the West Bank and the Gaza Strip, Al-Qassam Brigades & Al Aqsa protectors Brigades declared the following:

**Type of operation**: Launching heavy machinegun.

**Target**: The convoy of the Zionist interior security minister eastern Bait Hanoun.

**Day:** Friday Date: April 4th, 2008       **Time:** 10:20-10:30

Al Qassam Brigades and Al Aqsa protectors Brigades targeted the convoy of the Zionist minister of interior security with the heavy machinegun eastern Bait Hanoun area near to the Zionist borders, the Mujahideen withdrew from the area in peace. The Zionist sources said that the head of the Zionist Avi Dichter's office was injured in the incident. The Brigades announced that a huge chaos was in the area after the gunfire. The Brigades vowed to continue the resistance activities against the Zionist assaults and crimes in Gaza Strip and West Bank.

### Ezzedeen Al-Qassam Brigades
### Information Office

### April 4th, 2008

13.     HAMAS also released a tape showing gunmen firing automatic weapons at an Israeli army watchtower and also firing upon a convoy of vehicles near the Gaza Strip's border fence with Israel.

14.     As a result of the attack, Mr. Gill has suffered both physical and mental anguish and emotional distress.

B.     **The Defendant**

15.     Defendant Arab Bank is a Jordanian bank headquartered in Amman, Jordan.  Arab Bank's common stock is publicly traded on the Amman Stock Exchange.  Arab Bank is majority owned and controlled by the shareholders of Arab Bank Group, a Jordanian holding company.  Arab Bank and Arab Bank Group constitute a single Jordanian banking institution.  Arab Bank owns, controls and/or operates bank branches, agencies, and offices worldwide, including several branches that are situated in Palestinian Authority controlled territories and a wholly-owned office located at 520 Madison Avenue, New York, New York, that formerly operated as a branch, but has since 2005 operated as an agency as a result of a Consent Order entered into between the Defendant and the Office of the Comptroller of the Currency ("OCC") and the United States Treasury Department's Financial Crimes Enforcement Network ("FinCEN").  Arab Bank conducts business in, and is registered to conduct business under, the laws of the State of New York.

16.     Arab Bank formerly operated its federally chartered branch in New York from 1983-2005.  The New York branch was designated as a wholesale bank, and among the banking and financial services that it conducted in New York was the provision of clearing and correspondent bank services to its foreign bank branch offices and affiliated banking institutions that are also owned and/or controlled by the Arab Bank Group as well as other foreign banks.

17.     Arab Bank and Arab Bank Group are controlled by members of the Shoman family, including Abdel Hamid A.M. Shoman who is the Chairman of Arab Bank and Arab Bank Group.  During the years 2000-2005 Abdul Majeed A.H. Shoman, the father of Abdel Hamid A.M. Shoman, was the Chairman of Arab Bank and Arab Bank Group.

## **FACTUAL ALLEGATIONS**

### **The Islamic Resistance Movement (HAMAS)**

18.     Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably the Islamic Resistance Movement ("HAMAS"). HAMAS is an acronym for "Harakat al-Muqawama al-Islamiyya," the Islamic Resistance Movement, which was founded in December 1987.

19.     HAMAS is a radical Islamist terrorist organization that is committed to the globalization of Islam through violent "Jihad" or holy war.

20.     HAMAS is formally committed to the destruction of the State of Israel and to achieving its objectives by violent means, including acts of terrorism. The HAMAS Charter states that the very purpose of HAMAS is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad.

21.     The organization has two prime elements: its political and social infrastructure; and its paramilitary and terrorist infrastructure known as the Izz Al-Din Al-Qassam Brigades. Although these two components have separate responsibilities, the organization operates as a holistic whole, with each component working to bolster the success and enhance the popular support of the terrorist organization.

22.     HAMAS' social services are, in large part, administered by local "zakat" committees and other charitable organizations. These committees and organizations are controlled by HAMAS through, *inter alia*, HAMAS members, operatives and activists sitting as members of their governing committees.

23.     Due to the substantial expenditures of the HAMAS organization and the fungible nature of money, significant sums of monies collected externally under charitable and humanitarian

banners are routed for HAMAS' military and other operational uses, in addition to being used to free up other funds for specific terrorists acts. HAMAS uses its charitable and social infrastructure to, among other things, store weapons and explosives; provide safe houses; recruitment and training for the Izz Al-Din Al-Qassam Brigades; and provide salaries for its terrorist operatives and leadership.

24.     HAMAS is a foreign organization dedicated to radical Islamist principles and the State of Israel's destruction. HAMAS also uses violence, principally suicide bombings, shootings and rocket attacks and other threats of violence to pressure Israel to cede territory to the Palestinian people.

25.     HAMAS knowingly, willfully, and unlawfully combines, conspires, confederates and agrees to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder, terrorism financing, supporting, aiding and abetting, and conspiring with other terrorists and Foreign Terrorist Organizations, and numerous other acts of international terrorism activities as defined by 18 U.S.C. § 2331 and 18 U.S.C. § 2332 and other related acts of murder, attempted murder, solicitation to commit murder and providing material support to designated Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

26.     On January 25, 1995, HAMAS was designated as a Specially Designated Terrorist ("SDT") and, on October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization ("FTO") pursuant to Section 219 of the Immigration and Nationality Act (the "INA") and the AEDPA. HAMAS has continuously remained designated as an FTO since 1997 and was most recently so listed on a May 19, 2011 list published by the U.S. State Department's Office of the Coordinator of Counterterrorism. On October 31, 2001, pursuant to Executive Order 13224, HAMAS was designated as a Specially

Designated Global Terrorist ("SDGT").

27.    Since September 2000, HAMAS has launched hundreds of attacks targeting civilians that have resulted in the deaths and injury of hundreds of individuals, including over twenty (20) mass murders that have killed more than three hundred and seventy (370) civilians, including numerous American citizens.

**The Conspiracy to Finance The Intifada**

       **The Shoman Family**

28.    Arab Bank's own support and commitment to the violent goals of its co-conspirators is embodied by the personal commitment of Arab Bank's founder, Abdul Hameed Shoman, and its former chairman, Abdul Majeed A.H. Shoman.

29.    In 1984, the Shoman family, who owns and controls Arab Bank, published a biography of Abdul Hameed Shoman entitled, The Indomitable Arab that documents, consistently, Abdul Hameed Shoman's antipathy towards Jews, Zionists and the State of Israel.  In the book, Abdul Hameed Shoman also clearly describes his abhorrence for the United States, which he claimed to have once admired, but then loathed because of its support for Israel.

30.    The Indomitable Arab quotes Abdul Hameed Shoman as stating that, even prior to Arab Bank's founding, he held great anger toward Zionists, Jews, and others whom he believed stood in the way of the growth of the Arab economy.  In his biography he is quoted as saying that "…within a few years Zionism will have grown strong enough to control the entire economy.  I believe that all business dealings with the Jews – buying, selling or banking transactions – are damaging to our country's best interests."

31.    The book also quotes Abdul Hameed Shoman's final speech before four hundred employees of Arab Bank in 1974, during which he also explained his hatred for Americans that had

developed over the years:

> I liked the Americans. I once bore their nationality, and gathered my fortune in their country. But since they started to help the Zionists and supply them with arms to fight us, I have come to detest them. It was not the Jews, but the Americans, who fought us.

32.    Mr. Shoman's son Abdul Majeed A.H. Shoman ("A.M. Shoman"), the chairman of Arab Bank until his death in 2005, was a vocal supporter of the Second Intifada.

33.    A.M. Shoman was, for example, the chairman of the Popular Committee in Support of the Palestinian Intifada ("Popular Committee") which was established during the First Intifada in 1987-1988. The Committee managed to raise approximately eight million Jordanian Dinar (JOD 8,000,000) or approximately $11,000,000 for "martyrs' families," paying 1,000 JOD ($1,400) to each martyr's family and 300 JOD ($425) to each Palestinian injured in the violence. From 1995 to 2000, the Popular Committee raised an additional 1,200,000 JOD for the martyrs' families of the First Intifada.

34.    At an October 2000 meeting, the Popular Committee's chairman, A.M. Shoman, and its other members discussed the need for a new mechanism to distribute the new donations to the Second Intifada which had not yet been transferred to the martyrs' families and the injured of the Intifada as of that date.

35.    The Popular Committee decided to bestow financial support to the martyrs' families on the same terms as before and called upon the Jordanian government to make the donations tax-exempt. A.M. Shoman, opened the meeting saying:

> After the blessed Intifada [erupted] I thought that we should discuss what to do about it. There are some organizations which are fundraising donations including the Welfare Association [headed by Mr. Shoman]. The Welfare Association received donations and it has funds. I received phone calls and donations from benevolent people and the Arab Bank's board and bank's employees decided to donate 5% from October's salaries [for the Intifada]. In spite of the fact that donations were collected

and are available nothing was transferred to anybody. It is our duty to act and therefore I summoned this meeting to hear from you.

36.     A.M. Shoman objected to locating the Popular Committee's office in Arab Bank's Amman headquarters building but left open the possibility of "loaning" an accountant to the committee.

37.     Ultimately, it was decided that the committee's office would be located in the Amman Chamber of Industry headquarters, where it in fact opened on November 1, 2000.

38.     As referenced by A.M. Shoman in his speech, on or about October 7, 2000, Arab Bank announced that it would bestow financial donations to Palestinians injured during the Second Intifada. Its employees donated 5% of their monthly salary (for the month) to the Palestinian cause.

39.     On November 22, 2000, Arab businessmen held a meeting with Yassir Arafat, the-then head of the Palestinian Authority, at which time a new entity was formed, the Fund for Support of the Persistence of the Palestinian People, to further bankroll the Palestinian Authority and the Second Intifada.

40.     Defendant Arab Bank pledged $2,000,000.00.

41.     A.M. Shoman pledged $500,000.00, personally.

42.     The Shoman family's contribution toward the Second Intifada continued in June of 2001 when the Cultural Center of the Abdul Hameed Shoman Institute launched an exhibition on the subject of "the martyrs of the Palestinian Intifada." The stated purpose of the exhibit was to "honor to the martyrs of the blessed al-Aqsa Intifada" by means of conveying the human and spirited image of their lives. The exhibit featured presentations of the martyrs' personal belongings that had been collected, such as clothing and "tools" they used, along with an introduction to their lives and deeds until the day of their 'martyrdom.'

11

43.     Accordingly, the Bank's financial and ideological support for the Second Intifada and its antipathy toward the State of Israel is a matter of public record and is amplified by statements contained in its Annual Reports.

44.     For example, the Arabic version of the Bank's 2003 Annual Report states "Our branches active in Arab Countries were exposed to numerous factors of negative pressure, first among them the continuation of harsh conditions from which our brothers in Palestine suffer and the continuation of the **occupying enemy's** insistence and injustice, which had a negative effect on the economic activity, not just in Palestine but also in Jordan and other Arab countries."

**The Saudi Committee in Support of the Intifada Al Quds**

45.     On or about October 16, 2000, the Saudi Committee in Support of the Intifada Al Quds (hereinafter referred to as "Saudi Committee") was established as a private charity registered with the Kingdom of Saudi Arabia.

46.     According to the Saudi Committee, its purpose was to support the "Intifada Al Quds" and "all suffering families – the families of the martyrs and the injured Palestinians and the disabled."

47.     In practice, the Saudi Committee constituted a professional fundraising apparatus that subsidized the Second Intifada, *i.e.*, subsidized the Palestinian terror campaign and bankrolled HAMAS through its front organizations in the West Bank and Gaza.

48.     This was accomplished in two ways, both of which depended on the knowing participation and substantial assistance of the defendant Arab Bank.

49.     First, the Saudi Committee provided millions of dollars as benefits to the families of the so-called "martyrs," *i.e.*, the families of suicide bombers, and individuals killed by Israeli forces during the commission or attempted commission of terrorist acts, and to the families of Palestinians

12

wounded during violent confrontations with Israel's security forces, as well those HAMAS activists and other terrorists held in Israeli or Palestinian custody.

50.     HAMAS organizations, including the Islamic Charitable Society – Hebron and al-Salah Society in Gaza, submitted the names of the proposed beneficiaries to the Saudi Committee for payment.

51.     This type of support was critical to HAMAS' efforts to win the hearts and minds of the Palestinian people and to create an infrastructure solidifying HAMAS' position within Palestinian society.

52.     Second, the Saudi Committee donated funds directly to HAMAS-controlled entities.

53.     Through the program administered by Arab Bank, the Saudi Committee paid and transmitted death benefits to at least approximately 200 fallen "martyrs" in the first year of its existence alone.  As of November 2001, the Saudi Committee paid more than forty-two million dollars ($42,000,000) to various beneficiaries, including prominent terrorists and/or their relatives. According to Arab Bank's former Chief Banking Officer, Shukry Bishara, Arab Bank has transmitted $90,000,000.00 to Palestine on behalf of the Saudi Committee to "institutions and individuals alike."

54.     In fact, Arab Bank served as the exclusive administrator for the Saudi Committee's payment plan for Palestinian terrorists and their families.

55.     Indeed, the Saudi Committee's original website openly declared that its funds were transmitted and distributed to the families of martyrs through local branches of the Arab Bank in Palestine.  Although it has since been removed from the internet, the original archived webpage located at www.alquds-saudia.org\indexa.htm provided a list under the caption: "What has been done with your donations?"

13

56.     Item number ten (10) on the web page responds with the answer: "Opening a bank account for every entitled [Palestinian] through the Arab Bank in Palestine."

57.     The website further listed numerous "martyrs" whose cause of death was listed as "suicide attack."

58.     Similarly, in the annual report issued by the Saudi Committee and published in the Saudi newspaper *Al-Jazira* on February 11, 2001, the Saudi Committee identified payments made to Palestinian prisoners as well as Palestinian "martyrs." Notably, Table 4, Column 10 of the report helpfully identifies the cause of death for each martyr.

59.     For example, the families of Muhanad Hafez al-Taher, a prominent HAMAS bomb-maker, and Jamal Abd al-Rahman Muhammad Mansur, a senior HAMAS leader in Nablus, received Saudi Committee payments.

60.     Defendant Arab Bank provided a convenient means for transmitting and distributing these payments across Palestinian controlled territories that would be far more difficult if attempted by other means such as courier. (Israeli territory separates the Gaza Strip from the West Bank, and Israeli military checkpoints often separate one Palestinian city from another.)

61.     The Saudi Committee and local HAMAS charitable front organizations have publicly and repeatedly advertised that purpose in both Saudi and Palestinian newspapers, on television and on the Saudi Committee's website, all of which are known to or should be known to Arab Bank and all of which are calculated to – and do – reach terrorists and potential terrorists. For instance:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazirah*, the Saudi Committee published an annual report in which it listed the names of Palestinian prisoners to whom it provided terrorism benefits as well as the names of the Palestinian martyrs (including the names of those killed in suicide bombings) whose families received terrorism death benefits;

- In a November 23, 2001 edition of the Palestinian newspaper, *Al Quds*, the Saudi Committee placed an announcement listing the names of more than 1,000 individuals who had been

injured during the Second Intifada or held in Israeli custody and invited them or their families "to go to the branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee..."; and

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a HAMAS charitable front organization in Ramallah announced that the Saudi Committee "requests that the families of the martyrs whose names are listed herein to go to a branch of the Arab Bank in their place of residence to receive the tenth payment offered by the Saudi Committee in the amount of $5,316.06 ...."

62.    Because the Saudi Committee raised its funds in Saudi currency, which cannot conveniently be converted into Israeli currency (most commonly used in Palestinian controlled areas), those funds were primarily converted into U.S. dollars through the-then active New York branch of Arab Bank and then routed to the local branches of Arab Bank in the West Bank and Gaza Strip.

**The Al-Ansar Society and the Al-Shahid Foundation**

63.    In addition to the Saudi Committee, there were other organizations that transferred money in direct support of the families of "martyrs" and prisoners, aiming at strengthening and encouraging the Palestinians to continue the violence. Two of the organizations that worked together in this regard are the Lebanese-based *Al-Shahid* Foundation (the "*Shahid* Foundation"), an entity designated by the U.S. government in July 2007 as an SDGT, and the Gaza-based *Al-Ansar* society ("*Ansar* Society"), an entity designated an illegal association in Israel on October 24, 2003.

64.    According to the October 23, 2001 edition of the Palestinian daily newspaper *Al-Hayat Al-Jadida*, the *Ansar* Society received $1,000,000 from the *Shahid* Foundation in Lebanon and distributed the money among families of martyrs through Arab Bank's branches in the Palestinian Territories.

65.    Like the Saudi Committee, the *Shahid* Foundation published on its internet website lists of Palestinian martyrs who received support from the foundation. The lists included the dates of

the martyr's birth and death, as well as his organizational affiliation or a statement, according to which the martyr was allegedly a civilian, who was purportedly not involved with one of the terrorist organizations' activities. Thus, the *Shahid* Foundation explicitly made payments to the families of HAMAS members killed in the Intifada – including the families of senior leaders of the Izz Al-Din Al-Qassam Brigades.

66.    An announcement appearing in the name of the *Ansar* Society in *Al-Hayat Al-Jadida* on July 1, 2001 called on the residents of the southern Gaza Strip to come and collect their due payments in the *Ansar* Society's offices in Gaza. Residents of the West Bank, as well as the northern Gaza Strip, were asked to arrive at the Arab Bank branch in which their account was managed in order to collect their funds.

67.    At the time, the *Ansar* Society maintained a website proclaiming that:

Al-Ansar Society opens its doors to the families of the martyrs who intend to register their dead who, with their splendid pure Palestine and drew the lines of liberty and the coming dawn. The Al-Ansar Society is following in their footsteps and shares in the sorrow and the hopes of the families of the martyrs and their relatives.

68.    The *Ansar* Society's website further boasted that it has given money to Palestinians who were wounded, incarcerated or killed during the Second Intifada, including $6,000.00 to the family of Iz Aldin (also spelled: "Azzadin") Al Masri, the suicide bomber who massacred 15 people, including 7 children, at the Sbarro pizzeria in downtown Jerusalem on August 9, 2001.

69.    The *Ansar* Society's website helpfully explained that:

The Director General of the Al-Ansar Charitable Society and the person in charge of the portfolio for the care of the martyrs at the Society's website said that the Society has furnished the management of the Arab Bank with lists of names of the martyrs and the families of the entitled beneficiaries, in order to pay the monies to which the martyrs are entitled.

70.    The *Ansar* Society's website also publicly denounced the targeting of its account by

16

Israeli security forces when they raided Arab Bank's branch in Ramallah in 2004. The website stated:

> Al-Ansar Charitable Society denounces and condemns the criminal, sinful attacks of insane piracy committed by the forces of the occupation against the Palestinian banks in the city of Ramallah, which robbed the banks' money that included, inter alia, the money of the martyrs who are sponsored by the society.

71. The *Ansar* Society maintained an account with the Arab Bank in Gaza and another account with Arab Bank in Ramallah.

## Defendant Arab Bank Provides Material Support To HAMAS

### 1.     The Middle East

72. As alleged above, HAMAS operates a social service network through local "zakat" committees and other charitable organizations. Arab Bank intentionally, knowingly, recklessly, or with willful blindness provided banking services to these zakat committees and charitable organizations and affirmatively assisted them in collecting, receiving, transmitting and distributing funds to support HAMAS' terror campaign.

73. Arab Bank intentionally, knowingly (or with the conscious avoidance of knowledge), recklessly, with willful blindness, and/or with general awareness, provided banking services to HAMAS directly through HAMAS' Al-Mazra Branch Account # 3-810-622473-0330 in Beirut which collected funds directly in the name of HAMAS, and through charitable front organizations controlled by HAMAS which Arab Bank affirmatively assists in distributing funds to support the terror campaign.

74. The United States Department of Justice has, for example, identified the website: www.palestine-info.com as the "official" website of HAMAS.[1] The website itself solicited funds

---

[1]     The website has since migrated to a new "URL" and can be found at www.palestine-info.info.

and asked contributors to send money to its Al-Mazra Branch Account # 3-810-622473-0330 at the Arab Bank in Beirut, but it also asked donors "to cite only the account number and not the name of the [Palestine Information] Center or any other names."

75.     To assist it in carrying out its terrorist activities, HAMAS has established numerous front organizations, including, but not limited to:

     i.      *Al Mujama Al-Islami*;

     ii.     The Islamic Association (Gaza) a/k/a *Al Jamaya Al-Islamiya*;

     iii.     *Al Salah* Society (Gaza);

     iv.     The Islamic University (Gaza);

     v.     Ramallah Charitable Committee;

     vi.     Tulkarem Charitable Committee;

     vii.     Nablus Charitable Committee;

     viii.     Jenin Charitable Committee;

     ix.     Islamic Charitable Society – Hebron;

     x.     Islamic Charitable Society Al-Bireh;

     xi.     *Al Islah* Charitable Society; and

     xii.     *Dar al-Sunna* Society (Gaza).

76.     *Al Salah* Society (Gaza) was designated by the United States government as an SDGT in August 2007.   According to the U.S. Treasury Department Press Release announcing the designation of *Al Salah* Society, "Hamas has used the Al-Salah Society, as it has many other charitable fronts, to finance its terrorist agenda …"  The Press Release further noted:

> The Al-Salah Society supported Hamas-affiliated combatants during the first Intifada and recruited and indoctrinated youth to support Hamas's activities.  It also financed commercial stores, kindergartens, and the purchase of land for Hamas.  One of the

most senior Gaza-based Hamas leaders and founders, Ismail Abu Shanab, openly identified the Al-Salah Society as "one of the three Islamic charities that form Hamas' welfare arm."

77.     All 12 of these entities were all designated as "Unlawful Organizations" by the State of Israel in February 2002 because of their connection to HAMAS.

78.     Arab Bank intentionally, knowingly (or with the conscious avoidance of knowledge), recklessly, with willful blindness, and/or with general awareness, provided financial services to agents of HAMAS through the following accounts in the West Bank and Gaza Strip:

(1)     Tulkarem Charity Committee a/k/a Lajna Zakat Tulkarem
        Account No. 9070-500010-6-510.

(2)     Tulkarem Charity Committee
        Account No. 510/0/500010/970.

(3)     Tulkarem Charity Committee (Jordanian Dinar)
        Account No. 500/0/106500.

(4)     Tulkarem Charity Committee (Euro Account)
        Account No. 500010-6/596.

(5)     Charity Committee of Ramallah a/k/a Ramallah Zakat Committee
        Account No.510/0/610686.

(6)     Charity Committee of Ramallah
        Account No. 510/0/610686-9030.

(7)     Charity Committee of Ramallah
        Account No. 510/2/610686.

(8)     Nablus Zakat Committee
        Account No. 500/0/400336-0193.

(9)     Islamic Charitable Society Al-Bireh
        Account No. 510/7/602835.

(10)    *Al-Mujama al-Islami*
        Account No. 6-5/500.

(11) *Al-Mujama al-Islami*
Account No. 6-0/510.

(12) Islamic Charitable Society – Hebron
Account No. 510/0/9040-750049.

(13) Islamic Charitable Society – Hebron
Account No. 510/2/9030- 610686.

(14) *Al Salah* Society (Gaza)
Account No. 9500-5600/6.

(15) *Dar al-Sunna* Society (Gaza)
Account No. 9500-4021/510

(16) *Dar al-Sunna* Society (Gaza)
Account No. 9500-4021/500

(17) *Dar al-Sunna* Society (Gaza)
Account No. 9500-4021/570

79.     The account for *Al Salah* Society (Gaza) remained active through at least March of 2005.

80.     The account for *Dar al-Sunna* Society (Gaza) remained active as of 2006.

81.     In addition to the front organizations that Arab Bank has intentionally, knowingly (or with the conscious avoidance of knowledge), recklessly, with willful blindness, and/or with general awareness, provided financial services to, Arab Bank has also – with the requisite mental state – maintained accounts for well known HAMAS leaders and terrorists.

82.     Among the HAMAS leaders who maintained an account at Arab Bank was Sheikh Ahmed Yassin, the spiritual leader and founder of HAMAS until his death in 2004.  According to publicly available sources, Yassin maintained account 36444 at Arab Bank in Gaza.

83.     On August 22, 2003, the U.S. government designated Yassin as an SDGT.  The U.S. Treasury Department press release announcing the designation stated "He maintains a direct line of

communication with other HAMAS leaders on coordination of HAMAS's military activities and openly admits that there is no distinguishing the political and military wings of Hamas."

84.     Additionally, Arab Bank intentionally, knowingly (or with the conscious avoidance of knowledge), recklessly, with willful blindness, and/or with general awareness, maintained an account for Abdallah Barghuti, the HAMAS bomb-maker who built the bombs used to carry out several bombings including the Sbarro Pizzeria Bombing on August 9, 2001, the Ben Yehuda Bombings on December 1, 2001, and the Café Moment Bombing on March 9, 2002.

85.     Arab Bank also intentionally, knowingly (or with the conscious avoidance of knowledge), recklessly, with willful blindness, and/or with general awareness, maintained an account for Jamal Abd al-Rahman Muhammad Mansur, a prominent HAMAS leader in Nablus, who was killed by Israel in July 2001.

86.     As of December, 2007, Arab Bank also intentionally, knowingly (or with the conscious avoidance of knowledge), recklessly, with willful blindness, and/or with general awareness, maintained an account for Anwar Mohammad Abd al-Rahman al-Zaboun, a HAMAS senior activist and member of the Palestinian Legislative Council on behalf of the Reform and Change Party (HAMAS). Zaboun also served as chairman of the *al-Islah* Charitable Society – a part of HAMAS' civilian infrastructure in the West Bank.

87.     As of the same time period, Arab Bank also intentionally, knowingly (or with the conscious avoidance of knowledge), recklessly, with willful blindness, and/or with general awareness, maintained an account for Yasser Daud Suliman Mansour in Nablus. Mansour is a senior HAMAS activist and member of the Palestinian Legislative Council on behalf of the Reform and Change Party (HAMAS). He was previously deported by Israel to *Marj al-Zuhur* in 1992.

2.      **Europe and the United States**

88.      Arab Bank intentionally, knowingly (or with the conscious avoidance of knowledge),

recklessly, with willful blindness, and/or with general awareness, provided financial services to

agents of HAMAS by maintaining bank accounts and/or providing financial services for Specially

Designated Global Terrorists affiliated with HAMAS, including but not limited to:

(1)      Holy Land Foundation For Relief and Development ("HLF");

(2)      The Al Aqsa Foundation (Holland);

(3)      The Palestine Relief and Development Fund a/k/a Interpal;

(4)      The Association de Secours Palestinien ("ASP") – Zurich;

(5)      Comité de Bienfaisance et de Secours aux Palestiniens ("CBSP") – Paris;

(6)      Palestinian Association in Austria (PVOE); and

(7)      The Union of Good / 101 Days – Lebanon

89.      The services provided by Arab Bank to these SDGTs were conducted through Arab

Bank branches located in New York, New York, London, United Kingdom, and Paris, France, and

through sister, subsidiary and associated companies including Arab Bank (Switzerland) and Arab

Bank AG located in Frankfurt, Germany.

90.      Upon information and belief, prior to 2005, defendant Arab Bank intentionally,

knowingly (or with the conscious avoidance of knowledge), recklessly, with willful blindness, and/or

with general awareness, transferred funds for SDGTs affiliated with HAMAS through its New York

branch.

91.      Upon information and belief, defendant Arab Bank intentionally, knowingly (or with

the conscious avoidance of knowledge), recklessly, with willful blindness, and/or with general

awareness, processed hundreds (if not thousands) of transactions on behalf of HAMAS knowing that

its customers and/or counter-parties were leaders of or agents of HAMAS and in many cases, processed transfers for SDGTs affiliated with HAMAS after the Bank knew those entities or persons were designated.

92.     Numerous examples demonstrate information available to the Defendant since the mid-1990s tying Arab Bank's customers and/or counter-parties to HAMAS.

93.     For example, on March 15, 1996, a feature article in <u>The New York Times</u> detailed the financing of HAMAS by so-called charitable organizations. The article specifically discussed Israeli government claims that HLF was a "key fundraising operation" for HAMAS.

94.     On May 6, 1997, the government of Israel designated the Holy Land Foundation ("HLF"), based in Richardson, Texas, as a HAMAS front organization and declared that HLF "deals in the practice of transferring monies to families of HAMAS activists, who carried out deadly attacks …."

95.     On September 25, 1997, the Palestinian Authority closed what it identified as 16 HAMAS institutions and associations. HLF's Gaza office was one of the entities (temporarily) closed by the Palestinian Authority. The closure, including identification of HLF as a targeted HAMAS entity, was detailed in a <u>Jerusalem Post</u> news account on September 28, 1997.

**Cultivation of the Culture of Death**

96.     The charitable front organizations play a central role in financing the terror campaign by providing the means of raising funds to maintain the institutions that serve as recruiting grounds for HAMAS.

97.     As set forth in an internal HAMAS memorandum captured by the Israeli army during a raid of the offices of the Hebron Charitable Committee, HAMAS has arranged for the "transfer [of] large sums" to the charitable committee and other HAMAS front organizations through the "charity

activities" of their operatives abroad.

98.    The memorandum emphasizes that HAMAS "require[s] new bank account numbers for money transfers" and promises that HAMAS will:

> invest efforts to transfer money for the martyrs (the shahids) and prisoners, via the transfer [to] charitable institutions.  This is a primary goal in the framework of the effort to transfer aid money to these institutions, so that these budgets are released in the best manner and in order to bring about an improvement in the level of the movement's performance.

99.    The memorandum concludes with the promise that HAMAS will continue to "build up the activities and operations" of its front organizations by, among other things, "*taking advantage of the conditions and the atmosphere of death*."

100.    The financial support provided by the Saudi Committee via Arab Bank as well as the accounts maintained by HAMAS' charitable fronts constitutes the backbone of HAMAS' donor base and operational budgets, and has allowed HAMAS to expand its operations, attract more recruits, and professionalize its financial distribution channels.

101.    Through its network of charitable organizations, since the early 1990s HAMAS has intensified its efforts to consolidate its position within Palestinian society via its social and welfare projects.

102.    Although these organizations do perform actual social work and provide charitable services, they also raise funds for HAMAS and its political (and military) infrastructure.

103.    These charitable organizations provide streams of income to HAMAS operatives, assist HAMAS in recruiting new supporters, generate and disseminate HAMAS propaganda and compete with the Palestinian Authority in delivering social services and facilitating payments of honorariums (including "martyr" payments) to families of HAMAS operatives killed, injured or

imprisoned as a result of their terrorist activities.

104.    Funds raised by the charitable front organizations are fungible and are allocated in part to terrorist activities (including violent operations, recruitment, training, and propagandizing) or used to free up other funds that are then allocated for terrorist activities, including planning and carrying out suicide bombings and other violent attacks.

105.    Contributions from individual and corporate sponsors abroad are primarily made to the charitable front organizations.  The front organizations make those contributions available to HAMAS in accordance with the instructions of its leaders.  These organizations then disburse a percentage of the funds they receive from their front organizations to purchase weapons and explosive materials, to recruit and train operatives and otherwise to plan and carry out terrorist attacks.

106.    By intentionally, knowingly (or with the conscious avoidance of knowledge), recklessly, with willful blindness, and/or with general awareness providing banking and administrative services to charitable front organizations that are controlled and directed by HAMAS, including collecting, transferring and laundering funds for HAMS through its former New York branch, Arab Bank has both committed acts of international terrorism, and substantially assisted and conspired with HAMAS in the furtherance of a murderous conspiracy to commit multiple acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2332 and has committed numerous overt acts in furtherance of the conspiracy.

107.    Indeed, had the doors of Arab Bank not been opened to HAMAS during the Second Intifada, the leaders of these terrorist organizations would have had to make far more onerous arrangements for transfer of foreign contributions to terrorists within Palestinian-controlled territory and the great bulk of those funds would likely have never reached their destination.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## AIDING AND ABETTING THE MURDER, ATTEMPTED MURDER AND SERIOUS BODILY INJURIES TO UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c) AND 18 U.S.C. § 2333(a)

108.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

109.    Plaintiff has been injured in his person, property or business by reason of acts committed by HAMAS that involve violence or are dangerous to human life and that violate the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

110.    The acts of HAMAS in killing, and attempting to kill U.S. nationals and other persons were, are, or appear to be intended to: (a) intimidate or coerce the civilian population of Israel, (b) influence the policy of the government of Israel by intimidation or coercion, and (c) affect the conduct of the government of Israel by mass destruction and murder.

111.    The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack.

112.    The extraordinary financial and administrative services that Arab Bank has provided to terrorists and HAMAS, provides substantial assistance to HAMAS in recruiting and incentivizing suicide bombers and other terrorists and because money is fungible, frees up funds for use in military operations and the commission of violent acts resulting in death and injury, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to Plaintiff.

113. Defendant Arab Bank intends, knows (or consciously or recklessly avoided knowing), is generally aware, or is willfully blind to the fact that it is providing material support for acts of international terrorism, as is evidenced by its close contact with the Saudi Committee during the Second Intifada and its coordination of the payments and the repeated public advertisement of the activities of the Saudi Committee in various Palestinian newspapers as set forth above.

114. Throughout the period in which it has provided these extraordinary financial and administrative services to HAMAS, Arab Bank knew, was generally aware, was willfully blind, or consciously or recklessly avoided knowing that the charitable front organizations of the terrorist organizations have played a major role in raising funds for HAMAS, which has committed numerous criminal acts including suicide bombings intended to intimidate and coerce the civilian population of Israel and to influence the policy of the Israeli Government.

115. Throughout the period in which it has been involved in activities assisting HAMAS, Arab Bank knew, was generally aware, was willfully blind, or consciously or recklessly avoided knowing that those activities have substantially assisted and encouraged dangerous and criminal acts set forth herein.

116. By aiding and abetting violations of 18 U.S.C. § 2332 that has caused Plaintiff to be injured in his person, property, or business, Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that Plaintiff has sustained as a result of such injuries.

## SECOND CLAIM FOR RELIEF

### CONSPIRACY TO COMMIT MURDER AND ATTEMPTED MURDER OF UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. §§ 2332(b) AND 2333(a)

117. Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

118.    Plaintiff has been injured in his person, property or business by reason of acts committed by HAMAS that involved murder or attempted murder in violation of the criminal laws of the United States, including the prohibition on killing or attempting to kill U.S. citizens as set forth in 18 U.S.C. § 2332.

119.    The acts of HAMAS in killing or attempting to kill U.S. citizens and other persons were or appear to be intended to: (a) intimidate or coerce the civilian population of Israel, (b) influence the policy of the government of Israel by intimidation or coercion, and (c) affect the conduct of the government of Israel by mass destruction and murder.

120.    The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of, and intention to, cause extreme physical pain and suffering to any and all persons within the close proximity of the attack and extreme emotional distress to the family members of those who were injured or killed by reason of those acts.

121.    Arab Bank agreed to combine with other persons to act unlawfully, in the manner set forth in this complaint and committed overt acts in furtherance of the conspiracy.  At all relevant times, Arab Bank knew of the conspiracy, knew, knows, or consciously or recklessly avoided knowing of the conspiracy's objects, and knew, knows, or consciously or recklessly avoided knowing, in particular, of the roles of the charitable front organizations and their leaders in furtherance of that conspiracy.  Arab Bank knowingly and purposefully agreed to perform extraordinary banking and administrative services for HAMAS with the knowledge (or conscious or reckless avoidance of knowledge), and for the purpose, that such services facilitate the activities of its leaders and support terrorist activities pursuant to a common scheme to encourage and incentivize acts of terrorism.

122.    By conspiring to act with HAMAS and its respective charitable front enterprises to

28

support, encourage and facilitate violations of 18 U.S.C. § 2332 that have injured Plaintiff's respective person, property, or business, Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that Plaintiff has sustained as a result of such injuries.

## THIRD CLAIM FOR RELIEF

### PROVISION OF MATERIAL SUPPORT TO TERRORISTS
### IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333(a)

123.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

124.    The extraordinary financial and administrative services that Arab Bank has knowingly (or with the conscious avoidance of knowledge), recklessly, with willful blindness, and/or with general awareness provided to the terrorists, their families, and HAMAS, provides material support to the preparation and carrying out of numerous acts of international terrorism which have caused direct injury to the Plaintiff.

125.    The acts of Arab Bank in providing material support to terrorists in violation of 18 U.S.C. §2339A were or appear to be intended to: (a) intimidate or coerce the civilian population of Israel, (b) influence the policy of the government of Israel by intimidation or coercion, and (c) affect the conduct of the government of Israel by facilitating terrorists' ability to carry out mass destruction and murder.

126.    By intentionally, knowingly (or with the conscious or reckless avoidance of knowledge), with willful blindness, and/or general awareness participating in the commission of violations of 18 U.S.C. § 2339A that have caused Plaintiff to be injured in his person, business or property, defendant Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that Plaintiff has sustained as a result of such injuries.

## FOURTH CLAIM FOR RELIEF

## COMMITTING ACTS OF INTERNATIONAL TERRORISM
## IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

127.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

128.    By knowingly, recklessly, or with willful blindness transferring funds from and to agents of HAMAS, including the Holy Land Foundation; maintaining accounts for and collecting, receiving and transmitting funds for designated SDGTs affiliated with HAMAS such as the Al Aqsa Foundation, Interpal, the Association de Secours Palestinien (ASP), the Comité de Bienfaisance et de Secours aux Palestiniens (CBSP), the Palestinian Association in Austria (PVOE), the Union of Good, and the Al-Salah Society (Gaza); by maintaining accounts for and collecting, receiving and transmitting funds for known agents of HAMAS such as *al-Mujama al Islami,* the Islamic Association or Islamic Society (Gaza) a/k/a *al-Jamaya al-Islamiya* and *Al Salah* Society (Gaza); and maintaining accounts for senior HAMAS leaders including Ahmed Yassin, Anwar Mohammad Abd al-Rahman al-Zaboun, and Yasser Daud Suliman Mansour, defendant Arab Bank and its New York branch office have provided material support to designated Foreign Terrorist Organizations under the Anti-Terrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. § 2339B(a)(1).

129.    At all relevant times, Defendant knew and knows (or consciously or recklessly avoided knowing) of HAMAS' terrorist activities.

130.    At all relevant times, Defendant knew and knows (or consciously or recklessly avoided knowing) that HAMAS was designated an FTO by the U.S. Government.

131.    Based on Arab Bank's level of sophistication and presence as a federally regulated financial institution in the United States, defendant Arab Bank not only knew (or consciously or

recklessly avoided knowing) of the unlawful activities of HAMAS, but also knew (or consciously or recklessly avoided knowing) its actual designation as a Foreign Terrorist Organization and the subsequent designations of the Al Aqsa Foundation, Interpal, Association de Secours Palestinien ("ASP"), the Commite de Bienfaisance et de Secours aux Palestiniens ("CBSP"), and the Palestinian Association in Austria (PVOE) as Specially Designated Global Terrorists.

132.    Based on Arab Bank's level of sophistication and presence as a federally regulated financial institution in the United States, at the time Arab Bank maintained accounts for them, defendant Arab Bank knew that Ahmed Yassin was the founder and spiritual leader of HAMAS, and also knew that Anwar Mohammad Abd al-Rahman al-Zaboun and Yasser Daud Suliman Mansour were senior HAMAS leaders.

133.    The acts of Arab Bank in providing material support to the designated Foreign Terrorist Organization HAMAS in violation of 18 U.S.C. § 2339B were or appear to be intended to: (a) intimidate or coerce the civilian population of Israel, (b) influence the policy of the government of Israel by intimidation or coercion, and (c) affect the conduct of the government of Israel by facilitating Foreign Terrorist Organization's ability to carry out mass destruction and murder.

134.    By intentionally, knowingly (or with the conscious or reckless avoidance of knowledge) with willful blindness, and/or general awareness providing material support to a designated Foreign Terrorist Organization, Arab Bank is civilly liable for damages to Plaintiff for his injuries pursuant to 18 U.S.C. § 2333(a).

## FIFTH CLAIM FOR RELIEF

### FINANCING OF TERRORISM IN VIOLATION OF 18 U.S.C. § 2339C AND 18 U.S.C. § 2333(a)

135.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs

31

as if fully set forth herein.

136.    The financial services that Arab Bank has willfully and unlawfully provided to HAMAS include the giving, raising, collecting and transmitting of funds with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint, who were not taking part in any armed conflict.

137.    The acts of Arab Bank in willfully and unlawfully providing financial services to HAMAS in violation of 18 U.S.C. § 2339C were or appear to be intended to: (a) intimidate or coerce the civilian population of Israel, (b) influence the policy of the government of Israel by intimidation or coercion, and (c) affect the conduct of the government of Israel by facilitating HAMAS' ability to carry out mass destruction and murder.

138.    By willfully violating 18 U.S.C. § 2339C, Arab Bank is therefore jointly and severally liable to the Plaintiff who has suffered injuries to his business, person or property by reason of such acts under 18 U.S.C. § 2333(a).

## SIXTH CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2333(a)

139.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

140.    Defendant Arab Bank's acts of providing banking and other services to HAMAS were "a criminal violation if committed within the jurisdiction of the United States or of any State" and "appear to be intended to intimidate or coerce a civilian population . . . to influence the policy of a government by intimidation or coercion or to affect the conduct of a government by mass

destruction" within the meaning of 18 U.S.C. § 2331.

141.    The extraordinary financial and administrative services that Arab Bank has provided to terrorists and HAMAS provides substantial assistance to HAMAS in recruiting and incentivizing suicide bombers and other terrorists and thereby preparing and facilitating acts of international terrorism in violation of 18 U.S.C. § 2333(a) that have caused injuries to the Plaintiff.

142.    Arab Bank's acts were dangerous to human life, by their nature and as evidenced by their consequences.

143.    Arab Bank's acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

144.    Accordingly, Arab Banks' acts constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333(a).

145.    Arab Bank intentionally, knowingly (or with the conscious avoidance of knowledge), recklessly, with willful blindness, and/or with general awareness provided substantial assistance to acts of international terrorism and accordingly its acts also constitute aiding and abetting acts of international terrorism.

146.    Arab Bank also agreed to combine with other persons to act unlawfully in the manner set forth above and committed overt acts in furtherance of the conspiracy. At all relevant times, Arab Bank knew of the conspiracy, knew, knows, or consciously or recklessly avoided knowing of the conspiracy's objects, and knew, knows, or consciously or recklessly avoided knowing, in particular, of the roles of the charitable front organizations and their leaders in furtherance of that conspiracy.

147.    The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all

33

persons within close proximity of the attack.

148.    Throughout the period in which it has been involved in activities assisting HAMAS and individual terrorists, Arab Bank knew, consciously or recklessly avoided knowing), was willfully blind to, or was generally aware of the fact that those activities have substantially assisted and encouraged dangerous and criminal acts set forth herein.

149.    For the reasons set forth above, Arab Bank is therefore civilly liable for damages to Plaintiff for injuries to his person, property or business by reason of the acts of international terrorism it has committed, conspired to commit, or aided and abetted, pursuant to 18 U.S.C. § 2333(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

(a)    Accept jurisdiction over this Action;

(b)    Enter judgment against Arab Bank and in favor of Plaintiff for compensatory damages in amounts not less than those set forth herein and additional sums in amounts to be determined at trial;

(c)    Enter judgment against Arab Bank and in favor of Plaintiff for treble damages pursuant to 18 U.S.C. § 2333(a);

(d)    Enter judgment against Arab Bank and in favor of Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

(e)    Enter an Order declaring that Arab Bank has violated, and is continuing to violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.; and

(f)     Grant such other and further relief as justice requires.

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.


Dated: August 1, 2011
          Oradell, New Jersey

                                        OSEN LLC

                              By        _Aaron Schlanger_
                                        Aaron Schlanger
                                        Gary M. Osen
                                        Ari Ungar
                                        Joshua D. Glatter
                                        Peter Raven-Hansen, Of Counsel
                                        700 Kinderkamack Road
                                        Oradell, New Jersey 07649
                                        (201) 265-6400

                                        Attorneys for Plaintiff


KOHN, SWIFT & GRAF, P.C.
Steven M. Steingard
Stephen Schwartz
Neil L. Glazer
One South Broad Street
Philadelphia, PA 19107
(215) 238-1700

TURNER & ASSOCIATES, P.A.
C. Tab Turner
4705 Somers Avenue
Suite 100
North Little Rock, AR 72116
(501) 791-2277

ZUCKERMAN SPAEDER LLP
Aitan D. Goelman
Peter R. Kolker
Semra A. Mesulam
1800 M Street, Suite 1000
Washington, D.C. 20036