

**DLA Piper** LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
www.dlapiper.com

Kevin Walsh
kevin.walsh@dlapiper.com
**T**  212.335.4571
**F**  212.884.8463

September 4, 2012

**BY ECF AND HAND DELIVERY**

Hon. Jack B. Weinstein
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

> **Re:** *Mati Gill v. Arab Bank, PLC*, **11-CV-3706 (JBW) (VVP) (E.D.N.Y. filed Aug. 1, 2011)**

Dear Judge Weinstein:

We represent Defendant Arab Bank plc ("the Bank"). Pursuant to your Honor's Scheduling Order of August 22, 2012, enclosed please find copies of the Bank's Rule 26 expert reports. Two of these reports are unique to this case: the Supplemental Expert Report of Professor Beverly Milton-Edwards, an authority on Hamas and Palestinian militant groups, and the Expert Report of Col. (Ret.) Yohai Bar Zakay, who served in senior positions within Israel's Ministry of Defense and Military Intelligence Directorate over the course of his 25-year career in the Israel Defense Forces, and possesses expert knowledge concerning security and intelligence collections, operations and analyses.

Professor Milton-Edwards offers opinions with respect to Hamas's lack of ability to exercise control over the Gaza Strip during the relevant time period; the activities of non-Hamas affiliated militant forces, including the organizations that issued competing claims of responsibility for the attack at issue; and the reliability of claims of responsibility issued by Hamas and other militant forces operating in the Gaza Strip. Col. Bar Zakay offers opinions about the state of the conflict between Israel and militant forces operating within the Gaza Strip during the relevant time period, and defines terms relevant to the Bank's ability to prove that the attack at issue occurred as part of a broader armed conflict that was particularly acute at the location and time that the Plaintiff was injured.

In addition to these reports, the Bank also encloses expert reports that it previously submitted in the *Linde* actions. With respect to these reports, however, it is important to note that Plaintiff, who was injured on April 4, 2008, has filed an Amended Complaint that incorporates and repeats allegations from the complaints filed in the *Linde* actions, involving



Hon. Jack B. Weinstein
September 4, 2012
Page Two

injuries that occurred between 1995 and 2004. As the Bank discussed in its motion to dismiss this action, it does not believe that allegations involving alleged conduct pre-dating Plaintiff's injuries by *years* is capable of establishing causation under applicable legal standards. For example, Plaintiff's substantial reliance on allegations relating to alleged banking conduct dating back to 2001, and a Saudi Committee payment program that allegedly incentivized Palestinians to commit terrorist attacks during the Second Intifada (2000-2004), are, we submit, entirely irrelevant to this Plaintiff's claims. Accordingly, at the appropriate time, the Bank will move *in limine* to exclude all such irrelevant and prejudicial evidence. In the interim, however, to preserve its rights, the Bank must submit the opinions of its experts that respond to the allegations Plaintiff has chosen to repeat from the *Linde* actions.

The Bank specifically encloses a subset of the expert reports that it filed in the *Linde* actions that were authored by the following individuals: Paul Allan Schott, Esq., Anne T. Vitale, Esq., The Honorable William M. Isaac, Dr. George T. Abed, Dr. Marwan Nsouli, Chakib Cortbaoui, Yair Dagan, Jonathan Benthall, Professor Beverly Milton-Edwards, Brig. Gen. (Ret.) Ilan Paz, Robert Lacey, Pinhas Shmilovitch, and Lt. Col. (Ret.) Barouch Yadid.[1] For the convenience of the Court, the Bank attaches hereto a copy of its "Revised Expert Witness List" that it filed in *Linde* which provides a short biography for each of these individuals, together with a synopsis of how their opinions respond to the *Linde* plaintiffs' allegations, which have been repeated by this Plaintiff.[2] With respect to the opinions offered by Messrs. Nsouli, Shmilovitch and Dagan, the Bank is only designating the following portions of their reports for the purposes of this proceeding: Nsouli ¶¶ 1-59; Shmilovitch ¶¶ 1-33[3]; and Dagan ¶¶ 1-59.

The Bank acknowledges that the *Linde* Court excluded in whole, or in part, the expert reports of Messrs. Nsouli, Cortbaoui, Abed, Paz, and Shmilovitch in an unpublished

---

[1]     Because Brig. Gen. Paz and Dr. Abed will be offering both expert and fact testimony, these witnesses will also be included in the Bank's trial witness disclosure that will be filed on September 10, 2012.

[2]     The only Bank witness not referenced on this list is Barouch Yadid. Lt. Col. Yadid, who served in the Israel Defense Forces for 23 years, offers opinions in response to Matthew Levitt and Arieh Dan Spitzen, the *Linde* plaintiffs' proposed experts on Hamas's activities in the West Bank and Gaza.

[3]     This partial designation relates only to Mr. Shmilovitch's report dated February 22, 2011. Also enclosed is his rebuttal expert report, dated April 14, 2011, which is being designated in its entirety.



Hon. Jack B. Weinstein
September 4, 2012
Page Three

opinion dated December 5, 2011 (*Linde* ECF No. 773). The Bank respectfully disagrees with that decision. Specifically, Messrs. Nsouli, Cortbaoui and Abed do not offer opinions about controlling issues of foreign law, as the *Linde* Court held. There is no dispute that the Anti-Terrorism Act ("ATA") controls this action—not foreign law. However, in support of the Bank's defense that it did not possess the requisite *mens rea* to violate the ATA, it will seek to demonstrate that its foreign operations acted to comply with governing foreign banking laws and regulations, including those foreign laws and regulations relating to anti-money laundering and anti-terrorism financing. Messrs. Nsouli, Cortbaoui and Abed discuss these laws and regulations as adopted in Lebanon and the Palestinian Territories and evaluate the Bank's related compliance. This information is probative, although not dispositive, of the Bank's state of mind in performing the foreign financial services at issue.[4]

The Bank also respectfully disagrees with the *Linde* Court's decision to exclude the expert report of Brig. Gen. Paz, and substantially all of the expert report of Pinhas Shmilovitch. Brig. Gen. Paz, who served as the Head of the Civil Administration in the West Bank during the Second Intifada, offers opinions with regard to Israel's control over the West Bank, the dire need for humanitarian aid in the West Bank during the Second Intifada, and the essential nature of the services provided by local Palestinian charities in attempting to alleviate the humanitarian crisis that existed at the time. These opinions directly support the Bank's defense that it believed, in good faith, that the charities it provided banking services to, which were permitted by Israel to continue operating and to receive shipments of international assistance through Israeli-controlled checkpoints, were legitimate, and not known Hamas "front organizations," as Plaintiff alleges.

Mr. Shmilovitch, who served in the Israel Security Agency (ISA) for more than two decades, opines on the ISA's effectiveness in monitoring, investigating and preventing terrorist activity. He opines, *inter alia*, that the ISA viewed Palestinian charitable organizations to be an important part of Palestinian life and concludes that absent the resources available to the ISA, it would be extremely difficult to detect any alleged terrorist activity on the part of any such organizations. Mr. Shmilovitch's report also refutes Plaintiff's allegations that Palestinian

---

[4] The designated portion of Mr. Dagan's report, which addresses Israeli banking laws and regional banking standards, is being submitted to rebut Plaintiff's contention that the Bank acted with willful blindness to provide financial services to organizations declared "unlawful" by the Israeli government. As the designated portion of Mr. Dagan's report makes clear, this list of entities was not even consulted by Israeli banks at the time when the alleged banking conduct occurred, nor was it made available in Arabic, or otherwise implemented in the Palestinian Territories.



Hon. Jack B. Weinstein
September 4, 2012
Page Four

terrorists were incentivized to commit acts of terrorism by promises of post-mortem financial rewards, such as the alleged benefits provided to Palestinian families by the Saudi Committee from 2000 through 2004.

   The parties are scheduled to meet and confer tomorrow in an attempt to resolve their ongoing dispute with regard to establishing a briefing schedule for new *Daubert* challenges, as well as the remaining pre-trial motions that need to be filed over the course of the next ten weeks.  The parties have agreed, however, to provide the Court with courtesy copies of the *Daubert* motion papers that were filed in the *Linde* actions by tomorrow.  We will then electronically file these briefs in the coming days.

   We hope to provide the Court with a proposed Scheduling Order for the briefing of new *Daubert* challenges, summary judgment, and non-*Daubert in limine* motions in the immediate future.  If the parties cannot resolve their dispute over this issue by tomorrow, they intend to seek guidance from the Court.

       Respectfully submitted,

       */ DWM*

       Kevin Walsh

Encls.

cc: Magistrate Judge Viktor V. Pohorelsky (by hand delivery) (w/encls.)
  All Counsel (by email) (w/encls.)

# Attachment

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
COURTNEY LINDE, et al.,                             :
                                                    :
                           Plaintiffs,              :        CV-04-2799 (NG)(VVP)
                                                    :        and all related cases[1]
       - against -                                  :
                                                    :
ARAB BANK, PLC,                                     :
                                                    :
                           Defendant.               :
                                                    :
- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- --- -- X

## DEFENDANT ARAB BANK PLC'S
## REVISED EXPERT WITNESS LIST SUBMITTED
## PURSUANT TO THE COURT'S MINUTE ORDER DATED JULY 22, 2010

---

[1]      *Litle, et al. v. Arab Bank, PLC,* No. CV-04-5449 (E.D.N.Y. 2004) (NG) (VVP); *Almog v. Arab Bank, PLC,* No. CV-04-5564 (E.D.N.Y. 2004) (NG) (VVP); *Coulter, et al. v. Arab Bank, PLC,* No. CV-05-365 (E.D.N.Y. 2005) (NG) (VVP); *Afriat-Kurtzer v. Arab Bank, PLC,* No. CV-05-388 (E.D.N.Y. 2005) (NG) (VVP); *Bennett, et al. v. Arab Bank, PLC,* No. CV-05-3183 (E.D.N.Y. 2005) (NG) (VVP); *Roth, et al. v. Arab Bank, PLC,* No. CV-05-3738 (E.D.N.Y. 2005) (NG) (VVP); *Weiss, et al. v. Arab Bank, PLC,* No. CV-06-1623 (E.D.N.Y. 2006) (NG) (VVP); *Jesner, et al. v. Arab Bank, PLC,* No. CV-06-3869 (E.D.N.Y.) (NG) (VVP); *Lev, et al. v Arab Bank, PLC,* No. CV-08-3251 (E.D.N.Y. 2008) (NG) (VVP); and *Agurenko v. Arab Bank, PLC*, No. CV-10-626 (E.D.N.Y. 2010) (NG) (VVP).

Pursuant to the Court's Minute Order dated July 22, 2010, Defendant Arab Bank plc ("Arab Bank" or the "Bank") hereby submits a revised preliminary disclosure statement of expert witnesses that it may call at trial. This submission assumes that Plaintiffs will be permitted to present evidence in support of the liability allegations stated in their complaints at the first trial ordered by the Court, and that Arab Bank will be permitted the opportunity to fully respond to that evidence without any limitations.

This statement describes the substance of each witness's anticipated testimony, as well as the relevance of that testimony to the claims at issue. In accordance with the observations of Magistrate Judge Pohorelsky at a hearing held on May 27, 2010, the Bank understands that it will be afforded the opportunity to revise and supplement this list as appropriate.

The Bank's preliminary list of expert witnesses is based upon the current state of the record. Notably, fact discovery is not yet concluded, and to date Plaintiffs have themselves tendered to the Bank only a preliminary list of experts that Plaintiffs "may call." Accordingly, the Bank reserves the right to supplement this list, either by the designation of additional expert witnesses or the modification of the scope of each expert's contemplated testimony.

Dated: New York, New York
     November 5, 2010

Respectfully submitted,

Kevin Walsh
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 259-8000

Attorneys for Arab Bank plc

2

## PLAINTIFFS' "PREFERRED CHANNEL" THEORY OF LIABILITY

Plaintiffs allege that Arab Bank was a "preferred channel" for the transfer of terrorist funds and that its conduct did not constitute the provision of "routine banking services" because, among other things, it failed to comply with "standards applicable to financial institutions, including Arab Bank," such as:

- provisions of the Bank Secrecy Act and related "regulations that the [U.S.] Department of Treasury has issued . . . to all financial institutions" (Plaintiffs contend that such failure is evidenced by the Consent Order entered into between Arab Bank New York and the Office of the Comptroller of the Currency ("OCC") in February 2005);

- "international standards applicable to the financial services industry," including recommendations issued by the Financial Action Task Force ("FAFT") and the anti-money laundering principles established by the Wolfsberg Group;

- Know Your Customer ("KYC") requirements, established by the Basel Committee in 1998; and

- formal designations of "Unlawful Organizations" issued by the government of Israel.

*See, e.g.*, *Almog* First Am. Compl. ¶¶ 38, 79-105; *Litle* [Corrected] Second Am. Compl. ¶¶ 395, 495, 513.

In response, Arab Bank will establish through expert testimony, among other evidence, that:

- anti-money laundering and anti-terrorist financing regulations evolved throughout the relevant period of time and became applicable at different periods of time in the jurisdictions at issue;

- it complied with applicable banking regulations in each of the jurisdictions in which it operates, including the U.S., Jordan, Lebanon and the Palestinian Territories;

- its compliance procedures were adequate and in conformity with, or exceeded, those of its peer institutions within the jurisdictions at issue;

- the terms of the Consent Order entered into between Arab Bank New York ("ABNY") and the OCC—to the extent that it is deemed admissible—does not support Plaintiffs' claim that the Bank provided financial services to terrorists or terrorist organizations, but rather reflected the imposition of a new and previously unannounced expectation that banks should perform Know Your Customer's Customer ("KYCC") procedures;

3

- the compliance practices employed by its Middle East branches met or exceeded the practices of other Middle Eastern banking institutions, including the leading Israeli banks, thus demonstrating that the Bank's internal controls were consistent with industry practices and that any inference that they evidenced support for terrorism, or were designed to facilitate such support, is unreasonable;

- Jordan shares a commonality of interest with the U.S. in wishing for a peaceful resolution to the long-standing Arab-Israeli conflict and therefore would not permit Arab Bank, a bank headquartered in and regulated by Jordan, to act contrary to that interest;

- Israel's own banks were not expected to, nor did they, perform ongoing vetting of their customers or transactions against Israeli lists of "Unlawful Organizations" during the time period at issue, thus demonstrating the falsity of Plaintiffs' allegations that Arab Bank should have applied these lists and that its failure to do so reflected an intention to support terrorism, especially in light of the fact that Arab Bank did not conduct banking operations in Israel;

- if Arab Bank were the "preferred channel" for the transfer of terrorist funds, as Plaintiffs allege, Israeli intelligence and security forces would have been aware of that fact and would have forced the Bank to cease permanently its operations in the West Bank and Gaza; and

- Arab Bank justly deserves its reputation as a leading global financial institution, as well as one of the most important banks in the Middle East.

In support of these defenses, Arab Bank will introduce the following expert testimony:

- Arab Bank's Adherence to Evolving Anti-Money Laundering and Anti-Terrorist Financing Regulations: U.S. and Global Standards

  o *Paul Allen Schott, Esq.*

  Mr. Schott has over 30 years of experience in the financial services sector. He has served as Assistant General Counsel of the Treasury Department and Chief Counsel of the Comptroller of the Currency. He is currently a principal of WBC Financial Group and also acts as a consultant to the World Bank, working principally with developing countries in establishing anti-money laundering programs and enhancing bank regulatory systems.

  Mr. Schott will apply his extensive experience with the regulatory oversight of financial institutions to review the compliance policies and practices of Arab Bank. He will evaluate, from the perspective of a United States regulator, Arab Bank's compliance policies and practices as measured against U.S. rules and standards. In addition, in the event that the Consent Order which ABNY entered into with the

4

OCC is admitted into evidence, Mr. Schott will opine on its contents as well as the contents of the Civil Money Penalty assessed by FinCEN against ABNY.

    o    ***Anne T. Vitale, Esq.***

Ms. Vitale is a consultant to financial institutions, government agencies, law firms and international businesses on money laundering and terrorist financing issues, as well as banking and securities fraud. She is the former head of global compliance for Republic National Bank and for a number of years served in the United States Attorney's Office in the Southern District of New York, where she served as Chief of the General Crimes Unit and Assistant U.S. Attorney in the Organized Crime Unit.

Ms. Vitale will describe the evolution of anti-money laundering and anti-terrorist financing rules and regulations, in the U.S. and internationally, as well as the evolution of anti-money laundering and anti-terrorist financing compliance practices of financial institutions. Ms. Vitale will opine on the sufficiency of Arab Bank's controls to comply with the prevailing statutory and regulatory requirements in the jurisdictions in which it operated. Ms. Vitale will also address issues of customary practice relating to correspondent banking and international wire transfers, and in that context will review specific financial transactions at issue in this litigation, opine on their routine nature, and opine on whether those transactions reflect support for terrorism.

    o    ***The Honorable William M. Isaac***

Mr. Isaac is chairman of LECG's global financial services division. He provides regulatory counseling, risk management services, strategic studies and management consulting for financial institutions, governments, and other clients. He also serves as Chairman of Fifth Third Bancorp, one of the nation's largest banks. Mr. Isaac is the former Chairman of the Federal Deposit Insurance Corporation, serving under Presidents Carter and Reagan from 1978 through 1985.

Mr. Isaac will testify about international banking practices, including the oversight of international transfers by diverse regulatory authorities and the role and function of these authorities with regard to each other and to the banks subject to their oversight. Mr. Isaac will address the need to view Arab Bank's conduct in the context of the various jurisdictions in which it operates and the regulations applied within each jurisdiction at issue.

-     Middle Eastern Banking Practices and the Institutional Reputation of Arab Bank

    o    ***Stephen Timewell***

Mr. Timewell is currently Editor Emeritus of The Banker, the global monthly banking magazine of the Financial Times Group. Mr. Timewell joined The Banker in 1990 and served as Editor from 1992 through 2003 and as Editor-in-Chief from

2003 through 2008. As Editor and Editor-in-Chief, he was responsible for The Banker's coverage of the global financial industry, which included reportage on all areas of banking, from investment to retail and commercial banking and technology. Before joining The Banker, Mr. Timewell was the Finance Editor of Middle East Economic Digest, from 1983 through 1988, and Editor of Arab Banker, the magazine of the London-based Arab Bankers Association, from 1988 through 1990.

Mr. Timewell will testify about the development and practices of the banking industry in the Middle East to establish a context in which to assess the banking and compliance practices of Arab Bank. He will also specifically testify with regard to the institutional reputation of Arab Bank and its standing within its peer group.

- Anti-Money Laundering Regulations in the Palestinian Territories

  o **Dr. George T. Abed**

  Dr. Abed is Senior Counselor and Director for Africa and the Middle East at the Institute of International Finance ("IIF"), a Washington-based organization created in 1983 to serve as the world's only global association of financial institutions. Members of the IIF include most of the world's largest commercial banks and investment banks, and various other categories of financial institutions.

  Dr. Abed served as the Governor and Chairman of the Palestinian Monetary Authority ("PMA") from 2005 through 2007. Prior to his appointment to that position, Dr. Abed served as Director of the Middle East and Central Asia Department of the International Monetary Fund ("IMF") from 2002 through 2003 and as Special Advisor to the Managing Director of the IMF until July 2004.

  Dr. Abed will testify about the history of the PMA, including the role played by the international community in its formation, and the nature of its regulatory oversight of banks operating within the Palestinian Territories, including Arab Bank. He will also address the development by the PMA of anti-money laundering regulations applicable to Arab Bank with respect to its operations within the Palestinian Territories.

- Anti-Money Laundering and Anti-Terrorist Financing Regulations in Jordan

  o **Governor Umayya Toukan**

  Governor Toukan has served as the Chairman and Governor of the Central Bank of Jordan since January 1, 2001. Prior to assuming his present responsibilities at the Central Bank of Jordan, he served as Jordan's Ambassador to the Netherlands, Belgium, Luxembourg and the European Union. Governor Toukan has also served as the Director General of the Amman Financial Market (the Jordanian Stock Exchange), the Chair of the Union of Arab Stock Exchanges, the Senior Economist

6

of the Arab Monetary Fund and as Jordan's representative to the United Nations, in which he was appointed to the Economic and Financial Committee of the General Assembly.

Governor Toukan will testify about banking laws and practices in Jordan and, in particular, the history and nature of the anti-money laundering and anti-terrorist financing regulatory supervision to which Arab Bank has been subject as a bank operating and headquartered in Jordan.  Governor Toukan will also testify with regard to Arab Bank's standing in Jordan from the perspective of the Central Bank of Jordan.

- Anti-Money Laundering and Anti-Terrorist Financing Regulations in Lebanon

  o  **Dr. Marwan Nsouli**

  Dr. Nsouli received a Master of Comparative Jurisprudence from New York University Law School and a Doctorate of Laws from the University of Paris V – René Descartes, and holds both French and Lebanese Licenses in Law.

  Dr. Nsouli served as a Vice-Governor of the Central Bank of Lebanon from 1998 through 2008 where, among other duties, he was responsible for the supervision of the Central Bank's legal department.  Dr. Nsouli also chaired the National Coordination Committee on Fighting Money Laundering from 2002 through 2008. Prior to his appointment as Vice Governor, Dr. Nsouli served in Washington D.C., as Chief Counsel of the International Finance Corporation, a member of the World Bank Group.

  Dr. Nsouli will testify about the evolution of anti-money laundering practices and procedures in Lebanon relevant to the Lebanese accounts and transactions at issue in these actions, including, in particular, the role of the Special Investigation Commission of the Central Bank of Lebanon.  Dr. Nsouli will also address the cooperation between the United States and Lebanon concerning anti-money laundering matters to place in context the policies and principles underlying Lebanon's financial regulatory regime.

  o  **Chakib Cortbaoui**

  Mr. Cortbaoui is a senior partner at Ramzi Joreige & Partners, a law firm based in Beirut, Lebanon.  He has been a member of the Beirut Bar Association since 1967, served as its President from 1995 through 1997, and is a leading authority on Lebanese banking law and regulation.

  Mr. Cortbaoui will testify about the legal and regulatory obligations of a Lebanese bank toward its customer when a bank chooses to close a customer's account.  He will specifically address the regulatory procedures applicable to Lebanese banks upon closure of an account that may be suspicious in nature.

- The Development of Anti-Money Laundering and Anti-Terrorist Financing Regulations in Israel, Including Practices Relating to Unlawful Organization Lists Referenced in Plaintiffs' Complaints

  o   *Michael Herzberg, Advocate*

  Mr. Herzberg served for five years as Israel's representative to the United Nations in its Working Group on International Payments and for nearly ten years on the Board of the Israeli Securities Authority. Additionally, he has served on many committees constituted to draft and advise upon banking laws and regulations within Israel. Mr. Herzberg currently practices law at J. Richter, Herzberg, Yogev & Co. Law Offices.

  Mr. Herzberg will testify about the development in Israel of anti-money laundering and anti-terrorist financing banking laws and regulations as they applied to both Israeli banks and to banks operating in the West Bank and Gaza, with special emphasis on the relationship between the Central Bank of Israel and the Palestinian Monetary Authority. Mr. Herzberg will also testify about the development and promulgation by various authorities in Israel of the Unlawful Organization designations to which Plaintiffs refer in the allegations of their complaints, in order to establish the proper context in which to assess the Plaintiffs' allegations regarding Arab Bank's alleged failure to comply with such lists.

  o   *Yair Dagan*

  Mr. Dagan has served as a consultant to the banking industry in Israel for approximately 20 years, with an emphasis on electronic banking, SWIFT systems, and prohibited-party transfers. He has served as a systems analyst for the Israeli Defense Forces ("IDF") and as the Head of Foreign Trade Systems for Bank Hapoalim, among numerous other positions. Mr. Dagan developed the software utilized by many Israeli banks to screen financial transactions. He is currently the General Manager of Amnet Ltd., a company that specializes in the prevention of money laundering and terrorist financing through the provision of services and counseling to a variety of financial institutes such as banks, insurance companies and other companies that are subject to orders and regulations designed to counter money laundering and terrorist financing.

  Mr. Dagan has authored numerous articles on bank compliance issues and has recently authored a guide on anti-money laundering and anti-terrorist financing compliance, to which a Justice of the Supreme Court of Israel and a former head of the Mossad, Israel's national intelligence agency, have contributed forwards.

  Mr. Dagan will testify as to Arab Bank's reliance upon correspondent banking relationships with Israeli banks and will opine as to whether such relationships could exist in the absence of adequate compliance protocols on the part of Arab Bank. He will also testify about the jurisdiction of the Israeli military over the Bank, and the applicability of anti-terrorism regulations to the Bank's operations in

8

the Palestinian Territories.  He will also discuss the significance of the fact that there are no charges in Israel brought against the Bank or its personnel with regard to the conduct alleged by Plaintiffs.  Mr. Dagan will further testify as to the historic ability of Israeli financial institutions to comply with Israeli anti-money laundering and anti-terrorist financing regulations, with a particular focus upon the difficulties faced by banks with regard to the screening of transactions against Israeli Unlawful Organization designations, in order to establish the reasonable expectations of Israel with regard to financial institutions' compliance with those designations in contrast with Plaintiffs' allegations.

- Jordan's Cooperation With the United States in Detecting and Deterring Terrorist Activity

  o *The Honorable Edward W. Gnehm, Jr.*

Ambassador Gnehm is the Kuwait Professor of Gulf and Arabian Peninsula Affairs and Director of the Middle East Policy Forum at the Elliott School of International Affairs of George Washington University in Washington, DC.  Prior to accepting his current position at the Elliott School in 2004, Ambassador Gnehm served for 36 years in U.S. Foreign Service, where he was a member of the Senior Foreign Service and held the rank of Career Minister.  He served as U.S. Ambassador to Jordan from 2001 to 2004, U.S. Ambassador to Australia from 2000 to 2001, Director General of the Foreign Service and Director of Personnel for the Department of State from 1997 to 2000, Deputy Permanent Representative of the United States to the United Nations (New York) from 1994 to 1997, and U.S. Ambassador to Kuwait from 1991 to 1994.

Ambassador Gnehm received the Presidential Distinguished Service Award in 2000. In 2004, Secretary of State Powell awarded Ambassador Gnehm the Secretary of State's Distinguished Service Award for his work in Jordan.  Ambassador Gnehm also received two Presidential Meritorious Service Awards in 1990 for his public service as Deputy Assistant Secretary of Defense, and in 1991, for his service as Deputy Assistant Secretary of State.  Ambassador Gnehm has received numerous other State Department awards in connection with his service in Kuwait, Riyadh, Damascus and Beirut, and in the U.S. as Deputy Assistant Secretary of State.

Ambassador Gnehm will testify that the cooperative relationship between the United States and Jordan is a matter of strategic importance to both countries, based on common interests, including Jordan's historic support of U.S. efforts to reach a peaceful resolution of the Palestinian-Israeli conflict.  Ambassador Gnehm will also testify about Jordan's extensive cooperation with its regional neighbors, including Israel, and the U.S. to fight terrorism.

Ambassador Gnehm will further testify that Jordan, which is surrounded by violence and instability, depends significantly upon the military and economic assistance of the U.S. and would not permit, and has not permitted, its citizens,

including corporate citizens such as Arab Bank, to take actions that would jeopardize Jordan's close security and economic ties with Washington.

- If Arab Bank were the "Preferred Channel" for the Transfer of Terrorist Funds, as Plaintiffs Allege, Israeli Intelligence and Security Forces Would Have Been Aware of that Fact and Would Have Forced the Bank to Permanently Cease its Operations in the Palestinian Territories

  o *Maj. Gen. (ret.) Uri Sagie*

  Maj. Gen. Sagie served in the IDF for 35 years in various senior positions, including as the former Director of Military Intelligence, responsible for national Israeli intelligence assessment and analysis. Maj. Gen. Sagie was responsible for the formation of a commission comprised of Aman—the IDF's Military Intelligence, Israeli Security Agency ("ISA") and Mossad experts, designated to collect information and research the financial infrastructure of terror organizations and individual activists, including sources, money-raising schemes, money-transfer methods and vehicles, and banking channels.

  Maj. Gen. Sagie will testify about the structure and effectiveness of Israel's various intelligence authorities, and the cooperation between them to obtain the intelligence necessary to detect and thwart hostile activities against Israel, as well as the financing of such activities. He will also testify about the ability of these agencies to detect any activity by Arab Bank of the sort alleged by the Plaintiffs, as well as the certainty that the knowledge of such activities would have resulted in the closure and the prosecution of the Bank and the prosecution of any personnel involved in such actions. Maj. Gen. Sagie will also testify about Israel's relations with Jordan and on their mutual interest and joint efforts to identify and battle terror in the region.

  o *Avi Kostelitz*

  Mr. Kostelitz served for more than 25 years in a variety of very senior positions in the ISA, the agency colloquially known in Israel as the "Shin Bet" or "Shabak." His positions included Director of the Intelligence Collecting and Terror Warfare Unit in the West Bank and Jerusalem region, Deputy Commander in the West Bank and Jerusalem region, Commander of the ISA Units in Lebanon, Commander of the Southern Region (including Gaza Strip), and Commander of the Central Region (West Bank and Jerusalem). Mr. Kostelitz also served as a member of the steering committee that was responsible for the peace negotiations between Israel and the Palestinian National Authority following the Oslo Agreement. Mr. Kostelitz's positions were as a "field-man," *i.e.*, as an agent who was active in the field along with other ISA staff and IDF members and who was therefore able to observe directly the nature and effectiveness of Israeli intelligence capabilities and ground operations.

10

Mr. Kostelitz will testify about the ISA's extensive capabilities and activities with regard to the identification and monitoring of terrorist organizations and individuals, the likelihood that the ISA would have known of the continued support by a major business enterprise of terrorism directed against Israeli citizens and the actions that would have been taken against any such enterprise. Mr. Kostelitz may also testify, based on his extensive familiarity with the activities of terrorists and terrorist organizations, on the motivation of suicide bombers.

## PLAINTIFFS' "FRONT ORGANIZATION" THEORY OF LIABILITY

Plaintiffs allege that:

- the structure of HAMAS includes a "political wing [which] supports the so-called 'Dawa' (its social service or humanitarian component)";

- "HAMAS' social services are, in large part, administered by local 'zakat' committees and other charitable organizations . . . [which] are controlled by HAMAS . . . .";

- Arab Bank should be held liable for "knowingly provid[ing] banking services to these charitable committees and affirmatively assist[ing] them in distributing funds to support the Intifada terror campaign"; and

- it was well-known to the "Palestinian population," including Arab Bank, that these charitable organizations are HAMAS fronts.

*See, e.g., Linde* Am. Compl. ¶¶ 280-82, 343-49; *Litle* [Corrected] Second Am. Compl. ¶¶ 518-24.

In response, Arab Bank will establish through expert testimony, among other evidence, that:

- the population of the Palestinian Territories faced an extreme humanitarian crisis throughout the relevant time period;

- these charitable organizations and zakat committees were reasonably believed to be legitimate sources of vital sustenance and other humanitarian assistance in the Palestinian Territories during the period of increased humanitarian crisis at issue;

- these charitable organizations and zakat committees were regulated and licensed by local governing authorities;

- the concept of zakat has a religious and cultural significance that is not associated with terrorism;

11

- the international aid community, including the U.S. Agency for International Development and CARE International, among others, maintains cooperative relationships with charitable organizations and zakat committees in the Palestinian Territories and required these entities to open and maintain bank accounts so that international monetary assistance could be readily deposited and distributed; and

- Israel monitored and approved the humanitarian assistance at issue.

In support of these defenses, Arab Bank will introduce the following expert testimony:

- The Need for and Legitimacy of the Humanitarian Assistance Provided by Community-Based Charitable Organizations

  o *Mr. Edward G. Abington, Jr.*

  Mr. Abington served for more than thirty years in the United States Foreign Service, principally in the Middle East. He has served as both a Central Intelligence Agency ("CIA") analyst and as Deputy Assistant Secretary at the Bureau of Intelligence and Research, U.S. Department of State.

  From 1993 through 1997, Mr. Abington served as U.S. Consul General in Jerusalem, where he was the senior American representative in contact with President Arafat and other members of the Palestinian National Authority, following its establishment in 1994. Mr. Abington helped negotiate various Israeli-Palestinian agreements implementing the 1993 Oslo Agreement, including the 1997 Hebron Agreement, and received the Distinguished Honor Award from then-Secretary of State Madeline Albright.

  Mr. Abington will testify about economic conditions and humanitarian needs in the Palestinian Territories during the relevant time period as they relate to the issues in these cases, as well as the resources that were available to address these humanitarian needs. He will also specifically address the relationship between the U.S. and Israeli policy-making bodies with regard to these resources at issue, the assessment by U.S. agencies of zakat committees and community-based charities, and the U.S. government's related humanitarian and political activities within the Palestinian Territories, to place in context the Plaintiffs' allegations regarding the nature of these aid organizations.

- The Role and Importance of Palestinian Charities in the Distribution of Humanitarian Assistance

  o *Jonathan Benthall*

  Mr. Benthall is an Honorary Fellow in the Department of Anthropology, University College, London, and is self-employed as an independent social researcher. His social research is concentrated on issues of relief and development aid, particularly

on the interface between relief and development aid and Islamic institutions. Mr. Benthall was employed between 1974 and 2000 as Director of the Royal Anthropological Institute of Great Britain and Ireland, and was Founding Editor between 1985 and 2000 of the bimonthly journal <u>Anthropology Today</u>.

Mr. Benthall has been engaged since February 2005 as an adviser to the Graduate Institute of International and Development Studies, Geneva, Switzerland, on a project, funded by the Swiss Federal Department of Foreign Affairs, Human Security Division, to help remove unjustified obstacles to the work of Islamic charities, first as author of a feasibility study and subsequently as a member of the Core Team set up to implement the project. He has conducted research on humanitarian aid since 1991 and on Islamic charities since 1993, including overseas fieldwork in various regions including Jordan, and in the Palestinian Territories in 1996 and in 2009.

Mr. Benthall will testify about the role of charitable and non-governmental aid organizations in the Palestinian Territories, including their origins, their organization, governance, operation and the needs to which they typically respond. He will also provide his assessment of the standing and achievements of zakat committees operating within the Palestinian Territories during the period from 2000 to 2004. He has published extensively on these topics.

o   ***Prof. Shaul Mishal***

Prof. Mishal is a professor of political science at Tel Aviv University and the founder and director of the Center for Israeli Arab Studies. Prof. Mishal has also taught, as either a visiting professor or visiting scholar, at Harvard University and at Yale University, and currently serves as senior advisor to the Department of Political Planning of the Israeli Foreign Ministry and to Israel's Ministry of Defense. He has authored many books and articles on Israeli-Palestinian relations, issues concerning terrorism, and the history and structure of Hamas.

Prof. Mishal will testify about the organization and operation of Hamas and other organizations designated by Israel as Unlawful Organizations and the difficultly of detecting Hamas operatives and affiliated entities, among other topics, with a particular emphasis upon Plaintiffs' allegations regarding these entities.

o   ***Professor Beverly Milton-Edwards***

Professor Milton-Edwards is Professor in the School of Politics, International Studies and Philosophy at Queens's University, Belfast. Her research has concentrated on Middle Eastern politics, Islamic politics, the Palestinian-Israeli conflict, and terrorism and political violence generally.

She is the co-author, with Stephen Farrell, of <u>Hamas: The Islamic Resistance Movement</u> (Cambridge, Polity, 2010), <u>Jordan, A Hashemite Legacy</u> (London, Routledge 2009), and <u>Islam and Violence in the Modern Era</u> (Palgrave, 2006),

among many other articles and books. Professor Milton-Edwards has served, since 2006, as the principal investigator and consultant to EUPOLCOPPS-EU, the Police Coordinating Office for Palestinian Police Support, a project funded by the Governments of the Netherlands and Norway, among other advisory roles that she has held for the EU and other governmental bodies.

Professor Milton-Edwards will testify about the activities of Islamist charities in the Palestinian Territories during the relevant time period, with a focus upon the allegations of Plaintiffs' complaints and from the vantage point afforded by her extensive and direct on-the-ground experience. She will also testify about the history and structure of Hamas and other Islamist groups during the period relevant to Plaintiffs' claims.

- Israel's Monitoring and Approval of the Humanitarian Assistance at Issue

  o *Brig. Gen. (ret.) Ma'da Hasbani*

  Brig. Gen. Hasbani served in the IDF for 30 years in various operational and administrative positions, including as the Deputy Coordinator of Israeli Activities in the Palestinian Territories, Deputy Commander of the Judea and Samaria division, Chief of Staff of Central Command and Deputy Coordinator of Israel's Government activities in the Palestinian Territories. As Deputy Coordinator of Israeli Activities in the Palestinian Territories, he was responsible for commerce and industry issues and for allowing the shipments of humanitarian aid and medical supplies, donated by Israeli and foreign bodies, to the Palestinian Territories, including those sent to zakat committees alleged by Plaintiffs to have been declared by Israel to be Unlawful Organizations.

  Informed by his extensive and first-hand observation of the Israeli-Palestinian conflict, Brig. Gen. Hasbani will testify about the quality and accuracy of Israeli intelligence efforts within the Palestinian Territories to detect and thwart terrorist activities and terrorist financing and the quality and type of information available to Israel concerning the operations of Arab Bank. He will also testify regarding the cooperation between Israel and Jordan to detect and thwart terrorism, and on the applicability of Israel's Unlawful Organization designations to commercial entities, such as Arab Bank, operating in the Palestinian Territories. Brig. Gen. Hasbani will further testify about Israeli policies concerning the Islamic concept of Dawa, as alleged by Plaintiffs and as a legitimate call to religious obligation and charitable giving. He will further testify concerning Israel's policy to allow humanitarian supplies to be provided to, and distributed in, the Palestinian Territories by zakat committees and other community-based charities during the relevant time period.

  o *Brig. Gen. (ret.) Ilan Paz*

  Brig. Gen. Paz served in the IDF for 28 years. From 1996 through 2002, he served as Territorial Brigade Commander in various areas of the West Bank, and then from 2002 through 2005 as Head of Israel's Civil Administration for the West

Bank.    During his service, Brig. Gen. Paz held senior positions in highly
specialized military units, where he was responsible for conducting anti-terror
combat operations.    Brig. Gen. Paz oversaw Israel's security and operational
measures against terrorists and terrorist organizations in the Palestinian Territories,
maintained direct lines of communication with the Palestinian Authority regarding
the implementation of the Oslo agreement and was responsible for the coordination
of humanitarian aid provided to the Palestinian Territories during the Second
Intifada.

Brig. Gen. Paz will testify about the impact of the security measures imposed by
Israel on Palestinians in the West Bank during the Second Intifada and the
increased and legitimate need for humanitarian aid from 2000 through 2004.  He
will also testify that consistent with his position of command and his extensive
receipt of information from both Israeli and Palestinian sources, he would have
learned of any support provided by Arab Bank to terrorists or to others who sought
to inflict harm on the State of Israel or its citizens.  He will offer his opinion as to
the significance of the fact that no such information was ever provided to him.

o    *Lieut. Col. (ret.) Amir Safadi*

Lieut. Col. Safadi served in the IDF for 24 years, including as Head of the District
Coordination Liaison in Ramallah, a unit of the Civil Administration in the West
Bank.  The positions held by Lieut. Col. Safadi afforded him extensive day-to-day
contact with the local Palestinian authorities and population, as well as with
charitable organizations and businesses operating in the West Bank.  One of his
primary responsibilities until 1996 was to receive, evaluate and process requests
submitted by Palestinians for permits to conduct various domestic businesses and
civil activities in the West Bank.  After 1996 and until 2003, Lieut. Col. Safadi was
responsible for the evaluation and approval of requests submitted by Palestinians,
directly to the District Coordination Liaison or on their behalf by the Palestinian
Authority, for permits to conduct cross-border businesses and civil activities.
Lieut. Col. Safadi regularly monitored financial institutions and transactions and
developed extensive familiarity with the ability of Israel to monitor such conduct.

Lieut. Col. Safadi will testify about the role charitable organizations played in the
Palestinian Territories during the relevant time period and why the Israeli Civil
Administration permitted them to operate within the West Bank.  With regard to
the Arabic term "shahid" or "shaheed," a term whose meaning has been placed in
issue by the Plaintiffs, *see, e.g.*, *Linde* First Am. Compl. ¶ 368, *Litle* [Corrected]
Second Am. Compl. ¶¶ 421, 436, 520, *Almog* First Am. Compl. ¶¶ 3, 122, 150,
241, Lieut. Col. Safadi will testify concerning the true meaning of that term as used
in Palestinian society.

He will also offer his understanding as to why Arab Bank was granted a permit to
operate in the West Bank and was permitted to continue operating within the West
Bank during the relevant time period.    Lieut. Col. Safadi will testify about his

15

experiences in 1994, when, during the course of performing his duties as Deputy Governor of the Ramallah District in the West Bank, he received and granted a request from Arab Bank to conduct its banking business within the Palestinian Territories. At the time, Lieut. Col. Safadi was responsible for processing the request, conducting due diligence on the Bank's planned activities, and collecting all available intelligence information necessary to evaluate whether these proposed operations would pose a security threat to Israel and its citizens. As part of his continuing responsibilities within the Civil Administration until 2004, it was his duty to monitor the ongoing business activities of Arab Bank after it had established banking branches in the Palestinian Territories.

## PLAINTIFFS' ALLEGATIONS REGARDING THE SAUDI COMMITTEE

Plaintiffs allege that:

- "[i]n order to further encourage, incite and make possible the second *intifada* – including its campaign of systematic suicide bombings and other murderous attacks – the Kingdom of Saudi Arabia in October 2000 established the Saudi Committee . . . .";

- the Saudi Committee "provid[ed] a comprehensive insurance benefit of $5,316.06 for the families of Palestinian terrorists, guaranteeing 'universal coverage' to terrorists and their beneficiaries whenever a terrorist is killed";

- the Saudi Committee provided "[b]enefits . . . as incentives and rewards to the terrorists, prisoners and their families . . . .";

- "this financial support is a key inducement to terror[;] . . . [i]t has encouraged, incited and made possible the terror attacks of the Second Intifada";

- "Arab Bank was intimately aware of and involved with the activities of the Saudi Committee" because Arab Bank's affiliate, Arab National Bank "played a substantial role in collecting funds for the Saudi Committee"; and

- "[b]y knowingly and actively participating in this process, Arab Bank . . . knowingly aided and abetted each and every terrorist act committed by Palestinian terrorists since the formation of the Saudi Committee's universal insurance coverage scheme in October 2000, including those that have injured, harmed or killed Plaintiffs."

*See, e.g.*, *Linde* Am. Compl. ¶¶ 306, 321; *Almog* First Am. Compl. ¶¶ 163-64; *Litle* [Corrected] Second Am. Compl. ¶¶ 444-45, 448, 475.

In response, Arab Bank will establish that:

16

- Saudi Arabia has never been regarded by the U.S. to be a state sponsor of terrorism and has assisted the U.S. in its anti-terrorism efforts;

- the Saudi Committee was formed not to encourage or incite terrorism but rather at the urging of the international aid community, including the U.S., to address the legitimate and critical humanitarian needs of the Palestinian population and to do so in a fully open and transparent manner;

- the Saudi Committee transactions at issue were initiated by an account-holder of Arab National Bank, a bank which pursuant to applicable Saudization laws was not subject to Arab Bank's control;

- contrary to Plaintiffs' allegations, terrorists, including suicide bombers, generally are not motivated by promises of financial payments, including payments to their survivors;

- the violent incidents that are at issue in these actions did not occur because of the conduct of the Saudi Committee, but rather arose as part of the broader Israeli-Palestinian conflict and the continuing conditions of occupation in the Palestinian Territories; and

- alleged expectations of Saudi Committee payments could not have induced the acts alleged by Plaintiffs, given that punitive measures conducted by the IDF and broadly communicated prior to their enforcement—such as the razing of the family homes of suicide bombers and other retributive acts—inflicted extreme and disproportionate economic and psychological harm.

In support of these defenses, Arab Bank will introduce the following expert testimony:

- The Legitimacy of Saudi Humanitarian Efforts, Including the Saudi Committee Relief Program at Issue

  o ***Robert Lacey***

  Mr. Lacey is an author and historian. Over the last 39 years he has written more than 20 books on different aspects of modern and contemporary history, including two full-length books on Saudi Arabia, The Kingdom (Harcourt Brace Jovanovich, 1981) and Inside the Kingdom (Viking Penguin, 2009). He frequently has been invited to speak in Saudi Arabia at embassies and consulates of the United States, the United Kingdom and other countries on contemporary Saudi issues. He has also conducted cultural training sessions with U.S. businessmen and women assigned to live and work inside Saudi Arabia. In 2008, Mr. Lacey was invited to brief the foreign policy advisers of President George W. Bush on Saudi issues, including the policies and attitudes of the Saudi government towards terrorism. In 2009, he conducted a similar briefing for the staff of President Barack Obama.

17

Mr. Lacey will testify about issues relating to the Saudi Committee, including the circumstances under which it operated, its purposes, and how it sought to accomplish its legitimate objectives. He will testify as to whether there is any evidence that the Committee was formed in order to encourage terrorism and will address the attitude and policy of the Saudi government and senior Saudi religious authorities towards suicide bombers. He will also address why payments by the Saudi Committee were directed toward individuals rather than paid to an organizational entity like the Palestinian Authority.

- Saudi Cooperation with U.S. Anti-Terrorism Efforts

  o ***The Honorable David Rundell***

  Mr. Rundell is a former Charge d'Affaires and Deputy Chief of Mission at the American Embassy in Riyadh. Beginning in 1982, he held numerous mid-level political, economic and commercial positions in both Riyadh and Jeddah. He subsequently had independent assignments as Commercial Counselor, Economic Counselor and Political Counselor in Riyadh. As Economic Counselor, Mr. Rundell worked with the Saudi Arabian Monetary Agency and the Saudi Ministry of Finance to detect and deter terrorist financing. As Political Counselor, he worked with the Saudi Ministries of Interior and Foreign Affairs to detect and deter terrorist attacks, both in Saudi Arabia and abroad. As Deputy Chief of Mission and Charge d'Affaires, Mr Rundell was recognized for his historic role in establishing the Saudi American Joint Commission for Critical Infrastructure Protection. Mr Rundell retired from the Foreign Service in 2009, having spent nearly 15 years in Saudi Arabia. No other American diplomat has a longer record of service in Saudi Arabia than Mr. Rundell.

  Mr. Rundell will testify about the extensive cooperation between the U.S. and Saudi Arabia to detect and deter terrorism and the historic nature of that partnership. He will also testify as to the understanding formed by the U.S. with respect to the purpose and motivation of Saudi humanitarian efforts in the Palestinian Territories.

- The Mentality of Terrorists and Suicide Bombers

  o ***Prof. Diego Gambetta***

  Prof. Gambetta has been a professor of sociology at the University of Oxford and an Official Fellow of Nuffield College since 2003. He is a Fellow of the British Academy and a Fellow of the European Academy of Sociology. He received a Ph.D. in social and political sciences from the University of Cambridge, England, in 1983. From 1984 to 1991, he was a Research Fellow at King's College, Cambridge. In 1992, he moved to the University of Oxford, where he has held a number of positions, first as a university lecturer in sociology and then, from 1995 through 2002, as a reader in sociology and Fellow of All Souls College.

18

Prof. Gambetta has held visiting positions at the University of Chicago, Columbia University, Collége de France in Paris, and Stanford University. His research focus has been the study of violent extremism, including suicide attacks, and he has published a number of books, including Making Sense of Suicide Missions, in 2006 (Ed., Oxford University Press) and numerous articles, including "Why are there so many Engineers among Islamic Radicals?" Archives Européennes de Sociologie, L (2), 201-230 (with Steffen Hertog) and "Reason and Terror," The Boston Review, Spring, 32-36 (published in the UK by Areté, 14, 2004).

Prof. Gambetta will testify as to the motivation of terrorists and will offer his opinion as to whether Plaintiffs' allegations regarding the manner in which terrorists are incentivized are consistent with accepted research and scholarship.

o  ***Pinhas Shmilovitch***

Mr. Shmilovitch served in the ISA for 27 years. He has held various positions in the ISA including as Head of Internal Affairs from 2001 through 2004. From 1997 through 2000, Mr. Shmilovitch led an organizational reform within the ISA and headed a new economic department dedicated to identify, detect and prevent the financial sources and channels of terrorism, both in the Palestinian Territories and international arena. This new department was also responsible for managing international cooperation with foreign intelligence organizations in an effort to identify and prevent terrorist activities and for preventing the flow of funds to terrorist organizations. From 2000 through 2001, Mr. Shmilovitch served as a Desk Instructor in the ISA and was responsible for instructing, qualifying and guiding new Desk Officers on how to collect, process, analyze and prioritize intelligence and how to make judgments based upon such intelligence. From 2001 through 2004, he was Head of Internal Affairs and was responsible for the supervision of ISA interrogations of suspects.

Mr. Shmilovitch will testify as to the capability of the ISA to combat and thwart terrorist activities aimed at Israel or its citizens. He will also testify as to how the ISA viewed, investigated and treated zakat committees located in the Palestinian Territories and whether the ISA generally considered them to be fronts for terrorist organizations during the relevant time period, as they are alleged to be by Plaintiffs, and whether the promise to prospective terrorists or their families of financial reward or compensation provides a significant incentive for terrorist attacks or violence against Israel or its citizens. Mr. Shmilovitch will also discuss whether the Israeli intelligence community in general, and the ISA in particular, considered Jordan and its citizens to be a security threat to Israel during the relevant time period.

o  ***Rafael Lotan***

Mr. Lotan served for 32 years in the ISA, holding several senior positions, almost all of them in the area of interrogations, including as an interrogator of thwarted

19

suicide bombers, money changers, individuals who participated or were suspected of being involved in, or having information regarding, terror attacks or activities against Israel in the Judea and Samaria Region in the West Bank, Chief of the Interrogation Branch in Judea and Jerusalem, Chief of the Jerusalem Interrogation Branch, Deputy Chief of the Interrogation Department for the West Bank, Chief of the Interrogation Department in Judea and Jerusalem, Chief of the Human Relations Department of the ISA, Deputy and, at certain times, Acting Chief of the Interrogation Division of the ISA, Regional Security Director for North America and Deputy Chief of the Counter-Intelligence and Political Subversion Division of the ISA. In the course of his career, Mr. Lotan conducted or oversaw thousands of interrogations.

Mr. Lotan will offer his opinion regarding the varying profiles and motivations of suicide bombers in the Palestinian Territories during the relevant time period. His testimony will include his opinion as to the credibility of Plaintiffs' incentivization allegations and whether the Israeli Government's policy during the relevant time period of demolishing the homes of terrorists' families served as a deterrent against future attacks. Mr. Lotan will also testify that he would have been informed of any involvement by Arab Bank with terrorist financing and will further testify with regard to the significance of the absence of such information.

- <u>The Historical Background to the Second Intifada and Related Civic and Social Issues Arising from the Israeli-Palestinian Conflict and the Circumstances of the Israeli Occupation of the Palestinian Territories.</u>

  o ***Dr. Maya Rosenfeld***

  Dr. Rosenfeld is a sociologist and anthropologist studying the history and politics of Palestinian society and the impact of the Israeli occupation on this society. She has written extensively on these subjects, including authoring <u>Confronting the Occupation; Work, Education and Political Activism of Palestinian Families in a Refugee Camp</u>. She is presently a Research Fellow with the Harry S. Truman Research Institute at The Hebrew University of Jerusalem and is currently conducting a comprehensive study analyzing the development of higher education in the occupied Palestinian territories since 1994. She has conducted extensive field work in both Gaza and the West Bank. She is also an External Lecturer with the Department of Management and Public Policy at the Sapir Academic College, a position she has held since 2004.

  Dr. Rosenfeld will testify about the struggles faced by Palestinian families to raise their children amidst the harsh conditions imposed by occupation. She will address Plaintiffs' contention that alleged affiliations between Palestinian charities and illegal organizations were widely known, and will testify that, to the contrary, it was widely assumed within the Palestinian Territories that charities operating openly under Israeli occupation must therefore be legitimate.

20

o  *Prof. Avi Shlaim*

Prof. Shlaim is a Fellow of St Antony's College and a Professor of International Relations at the University of Oxford. He was the Alastair Buchan Reader in International Relations from 1987 through 1996 and Director of Graduate Studies in International Relations from 1993 through 1995 and from 1998 through 2001. From 1995 through 1997, Prof. Shlaim held a British Academy Research Readership and from 2003 through 2006, a Research Professorship. In 2006, he was elected Fellow of the British Academy.

Prof. Shlaim's main research interest has been the Arab-Israeli conflict. He has written numerous books including Collusion Across the Jordan: King Abdullah, the Zionist Movement, and the Partition of Palestine (Columbia Univ. Press, 1988), The Politics of Partition (Oxford Univ. Press, 1990 and 1998), War and Peace in the Middle East: A Concise History (Viking Press, 1995), The Iron Wall: Israel and the Arab World (W.W. Norton 7 Co., 2000), and Lion of Jordan: King Hussein's Life in War and Peace (Allen Lane, 2007).

Prof. Shlaim will testify concerning the historical background of the Oslo Accords, after the signing of which Arab Bank opened an extensive branch network in the Palestinian Territories which was welcomed, authorized and approved by Israel. He will also testify concerning the historical circumstances that gave rise to the Second Intifada and the social consequences that ensued in its aftermath, to place in context the Plaintiffs' allegations regarding the violence at issue. Prof. Shlaim will also testify as to the special relationship between Israel and Jordan—which has a strong national interest in the success and reputation of Arab Bank, and on their close cooperation in promoting security, stability, peace, and prosperity in the region.

- The Impact of House Razing

  o  *Dr. Jeff Halper*

Dr. Halper is the Director of the Israeli Committee Against House Demolitions. He is an American-born anthropologist who has lived in Israel for more than 40 years. He has written and lectured extensively on the Israeli-Palestinian conflict and, at the request of the U.S. government, has conducted briefings for the U.S. Consulate in Jerusalem, as well as for American diplomats and visiting members of Congress. Dr. Halper was also asked to brief General Anthony Zinni during his mission, in February 2002, to address the escalating violence of the Second Intifada.

Dr. Halper has also addressed various committees and hearings at the United Nations, where his organization has been granted official observer status, has testified on numerous occasions during hearings before the Israeli Knesset and before the British Parliament, and other parliaments and government bodies throughout the world. He has provided many other such briefings throughout the world. Dr. Halper was nominated for the Nobel Peace Prize in 2006.

Dr. Halper will testify, among other topics pertaining to the Israeli-Palestinian conflict, to the economic, social and psychological effects experienced by Palestinians who have lost their homes in connection with Israel's house razing policies. This is directly relevant to Plaintiffs' allegations concerning the alleged economic motivation of suicide bombers.

- The Impact of Saudization Laws on Arab Bank's Relationship with Arab National Bank

  o **Frank Edward Vogel**

  Prof. Vogel served as the Director of Harvard Law School's Islamic Legal Studies Program from 1991 through 2006 and presently holds the position of Honorary Fellow. He has been the recipient of numerous honors and awards, including a National Defense Title VI Fellowship, a Fellowship with the American Research Center in Egypt and a Fulbright-Hays Fellowship in Saudi Arabia.

  Prof. Vogel was the Organizing President of the International Society for Islamic Legal Studies, from 2006 through 2009, and presently serves as a member of its Board. Prof. Vogel is also the Organizing Chair of the Islamic Law Section of the American Association of Law Schools.

  Prof. Vogel also engages in independent research and continues to write extensively, and has served as a consultant to the Library of Congress with regard to issues of Islamic law.

  Prof. Vogel will testify as to the regulation of Saudi banks by the Saudi Arabian Monetary Authority and the impact of Saudization laws on the commercial relationship between Saudi banks and non-Saudi banks, including issues of ownership and control. In this context, Prof. Vogel will specifically address the relationship between Arab National Bank and Arab Bank.