# EXPERT REPORT OF

# BRIGADIER GENERAL (RET.) ILAN PAZ

**Prepared for:**

**DEWEY & LEBOEUF LLP**
1301 Avenue of the Americas
New York, N.Y. 10019
(212) 259-8000

October 2010

## Table of Contents

I.   Statement of Qualifications .................................................. 3

II.  Questions Presented........................................................... 4

III. Discussion and Analysis .................................................... 5

A.   What was the impact of the security measures
     imposed by Israel on Palestinians in the West Bank
     during the Second Intifada? ...................................... 5

B.   Was there an increased need for humanitarian aid in
     the West Bank during the period of 2000 to 2004? ................. 8

C.   During your service in the West Bank, did you form
     a belief, based on information received from the
     Israeli intelligence community and the Adviser for
     the Palestinian Affairs in the Civil Administration, as
     to whether Arab Bank knowingly provided support
     to terrorists or others who sought to inflict harm on
     Israelis or the State of Israel? ................................................ 10

i

**<u>Exhibits</u>**

Curricula Vitae ........................................................................................ A

Compensation.......................................................................................... B

Publications ............................................................................................. C

Other Expert Testimony........................................................................... D

Listing of Documents Reviewed ............................................................. E

I.     **Statement of Qualifications**

1. I served for 28 years in the Israeli Defense Forces (IDF) and ultimately achieved the rank of Brigadier General. From 1978 to 1995, I served in Israel's Naval Commando unit (commonly referred to in Israel as the SEALs) of which I became the Deputy Commander in 1994.  I later held three positions in the IDF that required me to have extensive and direct contact with the West Bank:  (1) from 1996 to 1997, I served as the Territorial Brigade Commander for the Jenin and Tulkarem districts (located in the Samaria Area); (2) from 2001 to 2002, I served as Territorial Brigade Commander in Ramallah; and (3) from 2002 to 2005, I served as Head of the Civil Administration in the West Bank. Throughout these periods, I was principally concerned with conducting and overseeing security and anti-terrorism activities.  I also had direct communications with the Palestinian Authority (PA), concerning the implementation of the Oslo agreements and I worked closely with the PA's security forces.

2.     During my service, I also served in special units of the IDF, including as Commander of the Special Units of the Israeli Air Force.

3.     As Head of the Civil Administration in the West Bank, I oversaw the implementation of Israeli security and regulatory measures.  I also coordinated between the IDF and the PA on various security and civil issues and liaised between the IDF and the international community regarding the delivery of humanitarian aid within the West Bank.

3

4.      I received a Bachelor of Arts Degree in Middle Eastern History and Israel Studies from the University of Haifa in 1994. I received my military education while serving in the IDF and as a student of International Military Strategy Studies at the École Militaire in Paris in 1999.

5.      Since retiring from the IDF in 2006, I have become a senior strategic consultant to various academic institutions, "think tanks" and non-governmental organizations such as the Economic Corporation Foundation and Peres Center for Peace. I also serve in the management of the Geneva Initiative and the Council for Peace and Security.

6.      My full Curricula Vitae is attached as Exhibit A.

## II.   **Questions Presented**

7.      You have asked me to address the following questions:

**A.      What was the impact of the security measures imposed by Israel on Palestinians in the West Bank during the Second Intifada?**

**B.      Was there an increased need for humanitarian aid in the West Bank during the period from 2000 to 2004?**

**C.      During your service in the West Bank, did you form an opinion or belief, based on information received from the Israeli intelligence community and the Adviser for the Palestinian Affairs in the Civil Administration, as to whether**

**Arab Bank knowingly provided support to terrorists or others who sought to inflict harm on Israelis or the State of Israel?**

8.      My answer to each question is provided below and is based on the totality of my experience as set forth in my Curricula Vitae and this report.

9.      I have formed the opinions and acquired the specialized knowledge presented in this report based on the totality of my military and professional experiences, including first-hand observation and analysis of Israel's security and counter-terrorism measures and the impact of those measures on the living conditions of the Palestinian population in the West Bank.  For security reasons, however, I must limit my responses in a manner that does not reveal information that has been deemed classified by the State of Israel.  Accordingly, my responses are based on my personal experience and observations and information that are public or declassified.

## III.    Discussion and Analysis

**A.**    What was the impact of the security measures imposed by Israel **on Palestinians in the West Bank during the Second Intifada?**

10.      By way of general background, the Civil Administration in the West Bank and Gaza Strip (Gaza) was established in 1981 to oversee "all regional civil matters" and "to maintain a proper governance and public order."  The Civil Administration derives its

authority from the General Officer Commanding (GOC) of the IDF's Central Command and operates according to the orders of the Coordinator of Government Activities in the Territories (COGAT), which is a unit of the Israeli Defense Ministry.

11.    Until the implementation of the Oslo agreements, the Civil Administration operated as a type of "government" with control over all of the Occupied Territories.   The Oslo agreements, however, limited Israeli control by dividing the Occupied Territories into three zones, referred to as Areas A, B and C, and granted Israel partial control over Area B and full control over Area C.   Without accounting for Jerusalem, Areas A and B comprised somewhat less than half of the land in the Occupied Territories; 97% of the Palestinian population lived within these areas.   Area C comprised somewhat more than half of this land, in which 100% of the Israeli population and 3% of the Palestinian population lived.   Under the provisions of the Oslo agreements, as of 2000 and following the signature of a Definitive Agreement, the division into Areas A, B and C was to be abandoned, the PA was to maintain full control over the Palestinian State [which was to be comprised of Area A, significant portions of Area B and some portion of Area C, to be agreed upon by the parties]. In fact, the Definitive Agreement was not signed. In 2002, following serious outbreaks of violence, Israel conducted security operations within Area A and reestablished its security and civil presence in Areas A and B, in addition to maintaining its full control over Area C.   Since then, Israel has gradually reinstated the control of the PA in Areas A and B.

12.   While I was Head of the Civil Administration for the West Bank, I tried to find a balance between Israel's security needs and the needs of the local Palestinian population.  However, to the extent that the delivery of humanitarian and related assistance to local Palestinian communities conflicted with Israel's security interests, Israel's security interests took precedence.

13.   Israel's security interests were at the forefront of my agenda during my tenure in the West Bank due to the eruption of violent conflict between Israel and the Palestinians, widely known as the "Second Intifada."  During the Second Intifada, which started in September 2000, Palestinian extremists committed many acts of violence against Israelis. Israel countered this violence with its own military operations.  One of those operations, known as Operation Defensive Shield, took place in 2002 and was a large-scale military operation undertaken in an effort to curb the proliferation of violence against Israeli interests.    Throughout and following Operation Defensive Shield, the Civil Administration remained in contact with the PA and the Palestinian population in the West Bank.

14.   During the Second Intifada, while serving as Territorial Brigade Commander and later as Head of the Civil Administration, I participated in and was in charge of making decisions that impacted the daily life of Palestinians living in the West Bank and implemented measures in an effort to prevent terrorist attacks.  Also during this period, I maintained daily contact with IDF intelligence units, the Israel Security Agency (ISA) and the police.  Some of the security measures

implemented in response to real and perceived threats, while aimed to combat the danger of violence, had negative implications for the Palestinian population as a whole.  These security measures included road blocks, check points, movement restrictions, curfews, closures, administrative detentions and certain other measures.

15.   As a result of these measures, the PA was unable to function normally and Palestinian unemployment in the West Bank reached catastrophic levels.  Accordingly, the need for humanitarian assistance was great.  For example, by 2003, approximately half of the West Bank population relied on food assistance from the World Food Program.

16.   The poverty and subjugation resulting from these security measures caused distress, resentment, humiliation, depression, anger and hopelessness among the Palestinians.  In many ways, this climate of despair within the Palestinian population had the unintended consequence of assisting terrorist organizations in recruiting people to take up arms against Israel.

**B.     Was there an increased need for humanitarian aid in the West Bank during the period of 2000 to 2004?**

17.   As an initial matter, it is my unequivocal opinion that Israel has the right to defend itself and its citizens.  However, the impact of some of the security measures imposed by Israel within the West Bank created acute humanitarian needs.   In response, the international community donated money, food, medical care, and many other

8

necessities of life, which the PA was unable to supply.  Accordingly, aid provided by nations, international humanitarian organizations such as the Red Cross, WFP, USAID and UN organizations, and local charitable organizations known as Zakat committees became essential to the survival of the Palestinian population.  In my opinion, it was in the interest of the State of Israel to allow this assistance to flow to the Palestinian population because, in the absence of such assistance, Israel otherwise would have been obligated to assume the financial and logistical burden of providing of such assistance.

18. As the Head of the Civil Administration for the West Bank, which included a unit responsible for local coordination with the international community, I reviewed requests from international organizations, among others, to deliver and distribute aid within the West Bank.  Therefore, I was aware of the increased humanitarian relief activities that were occurring in the West Bank and of the fact that foreign donations were being transferred from around the world (including from Israel and the Arab world) into the West Bank.

**19.** As a consequence of the immense outpouring of international support for the Palestinian population, a Foreign Relations Branch was formed within the Civil Administration on January 1, 2003 to coordinate the inflow and distribution of aid from abroad.

**20.** In addition to the foreign aid, I observed, since my first days in the West Bank (in 1996) and throughout the following years, including during the period of the Second Intifada, that local charity committees also were operating in West Bank to provide social

9

services to the local Palestinian population. During the time I was in the West Bank, these charities continued to provide services to the local Palestinian populations without interference from Israel (except where it was found that persons working in such local charities or, less frequently, a charitable committee, were involved in terror or terror financing, in which case Israel acted immediately to apprehend the persons involved and stop such activity).

21.     Based on the foregoing and my personal observations, it is irrefutable that the humanitarian needs of the Palestinian population were massive during the Second Intifada, especially during the period of 2002 to 2004, and that multiple channels of relief were required to meet those humanitarian needs.


C.     **During your service in the West Bank, did you form a belief, based on information received from the Israeli intelligence community and the Adviser for the Palestinian Affairs in the Civil Administration, as to whether Arab Bank knowingly provided support to terrorists or others who sought to inflict harm on Israelis or the State of Israel?**


22.     As Territorial Brigade Commander and later as the Head of the Civil Administration, it also was my duty to coordinate between the IDF and the PA. As such, I received and had access to intelligence updates regarding activities in the West Bank. I also regularly

participated in security meetings along with other senior military and intelligence officers with regard to the actions of the IDF and other Israeli security units, which worked hard to identify and destruct the terror organizational and financial infrastructure, and to thwart terrorist threats and terrorist activities in the Occupied Territories.

23.    Throughout the relevant period, the IDF, in cooperation with the Israeli intelligence community and the Civil Administration, conducted several actions against organizations and individuals that were suspected of conducting or supporting terrorism.  In the course of these actions, Israel confiscated documents, computers and relevant records from organizations and individuals that it suspected of wrongdoing or had reason to believe possessed relevant information necessary to support its investigation.  Israel also closed down some suspicious organizations and interrogated and arrested those it believed to have committed wrongdoing or posed a threat.  Although, regrettably, Israel was not able to prevent all terror attacks and activities, significant measures were dedicated and efforts were made to prevent and thwart the organization and financing of terror.

24.    In 2004, the IDF conducted a raid at the Arab Bank branch in Ramallah with the cooperation of the Civil Administration.   I participated, as Head of the Civil Administration, in a planning meeting that took place prior to this raid.  Based on intelligence information provided to it, the IDF confiscated funds from certain bank accounts located at the Arab Bank's branch in Ramallah.  I received no information indicating that this raid was aimed at Arab Bank, but rather,

11

it was directed against certain specific accounts which the ISA determined to be suspicious as a result of intelligence-gathering operations. As is evident from the fact that Arab Bank's Ramallah branch remained open after the raid and that no measures were taken against any of its employees or managers, it is my opinion that neither the ISA nor the IDF ever determined that Arab Bank committed wrongdoing or otherwise posed a threat to the security of Israel.

25.    I understand that by a letter dated September 2, 2009 (the "First IDF Letter"), the IDF confirmed the fact that no actions were taken against Arab Bank as a consequence of the raid. I understand that the IDF's letter states that the seizure and confiscation of monies from Arab Bank accounts during the raid "was not based on information that indicated that the [Arab] Bank or any of its employees were involved in any way whatsoever in terrorist activities, or in terror finance, whether regarding the aforementioned Accounts, or in general." I also understand that the IDF confirmed in its letter that "no legal or administrative steps were taken against the Bank or its Directors by the IDF or by the Israeli Defense Authorities, for involvement in acts of terrorism or in terror finance, whether regarding the aforementioned Accounts, or in general." The IDF has stated that "[o]n the basis of all the information that the Defense Authorities have, neither the IDF nor the Israeli Defense Authorities have any intention of taking steps against the Arab Bank for involvement in terrorist acts or in funding terrorism."

I understand that by a letter dated August 22, 2010 (the "Second IDF Letter"), the IDF issued a clarification of the First IDF Letter. The Second IDF Letter confirms the fact that "...the seizure and confiscation of monies from Arab Bank accounts during the raid was not based on information that indicated that the [Arab] Bank or any of its employees were involved in any way whatsoever in terrorist activities, or in terror finance, whether regarding the aforementioned Accounts, or in general." The Second IDF Letter further states that the information related to the identities of the account holders and the use for terror made from these accounts. The Second IDF Letter further re-affirms the fact that no legal or administrative steps have been taken against the Bank or its Directors by the IDF or by the Israeli Defense Authorities, for involvement in acts of terrorism or in terror finance, and that, based on all the information that the Defense Authorities have [as at September 2009], neither the IDF nor the Israeli Defense Authorities have any intention of taking steps against the Arab Bank for involvement in terrorist acts or in funding terrorism. The Second IDF Letter merely clarifies that the First IDF Letter does not rule out the possibility that information pointing to the bank's involvement may exist.

It is my opinion, based on my extensive familiarity with Israel's intelligence operations and capabilities, and the security operations in the West Bank during this time period, that if the IDF or ISA had information regarding the Arab bank's involvement in acts of terrorism or in terror finance, or had concluded that Arab Bank had any

13

involvement in terrorist acts or in funding terrorism, Arab Bank's operations in the West Bank would have been closed and the Bank and its managers would have been prosecuted.

_____
Ilan Paz


Signed before me on 24 October 2010:

_____
Eytan Epstein, advocate
Epstein, Chomsky, Osnat & Co.

14

## EXHIBIT A

## CURRICULUM VITAE

## Brigadier General (Ret.) Ilan Paz

### Contact Information

Tel: +972-(0)4-9841230

Cell: +972-(0)52-5525307 / +972-(0)52-2280220

Email: Ilanpaz@gmail.com

- 2006 - Today Senior strategic consultant to various academic institutions, "think tanks" and non-governmental organizations.

- 2002-2005 I served as Head of the Civil Administration in the West Bank.

- 2001-2002 I served as Territorial Brigade Commander in Ramallah.

- 1996-1997 I served as the Territorial Brigade Commander for the Jenin and Tulkarem districts (located in the Samaria Area).

- 1978-1995 I served in Israel's Naval Commando unit (commonly referred to in Israel as the SEALs).

- 1994 of which I became the Deputy Commander.

### Education

- 1994 Bachelor of Arts Degree in Middle Eastern History and Israel Studies from the University of Haifa.

- 1999 I received my military education while serving in the IDF and as a student of International Military Strategy Studies at the École Militaire in Paris.

## EXHIBIT B

## COMPENSATION

My compensation for my work on this matter is at the rate of $ 650

per hour, plus expenses.

# EXHIBIT C

## PUBLICATIONS

**None.**

## EXHIBIT D

## OTHER EXPERT TESTIMONY

**Prior to this matter, I have testified as an expert witness in the following cases:**

1. **Supreme Court Petition 8887/06 <u>Al Nabuth et al. vs. Minister of Defense et al</u>.**

2. **Magistrate Court (Nazareth) 1168/04 Estate of the Late Nimer Jarar et al. vs. The State of Israel – Ministry of Defense.**

3. **Supreme Court Petition 3969/06 Council Head, Village of Dir Samet et al. vs. Commander of IDF forces in the West Bank et al.**

## EXHIBIT E

## DOCUMENTS REVIEWED

None.