UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MATI GILL,

                        Plaintiff,

          - against -

ARAB BANK, PLC,

                        Defendant.

**MEMORANDUM AND
ORDER GRANTING IN
PART MOTION TO
DISMISS**

11-CV-3706

**Appearances:**

For the Plaintiff:

        Peter Raven-Hansen
        George Washington University Law School
        Washington, DC

        Gary M. Osen
        Aaron Schlanger
        Osen LLC
        Oradell, NJ

        Joshua D. Glatter
        Ari Ungar
        Osen LLC
        Hackensack, NJ

For the Defendant:

        Kevin Walsh
        Steven J. Young
        Douglas Walter Mateyaschuk
        DLA Piper LLP
        New York, NY

**JACK B. WEINSTEIN, Senior United States District Judge:**

1

Table of Contents

I. Introduction ....................................................................................................................... 2
II. Factual Allegations and Procedural History .................................................................. 13
    A. Factual Allegations in Amended Complaint ............................................................ 13
        1. April 2008 Attack on Plaintiff ......................................................................... 13
        2. History of Bank and of Hamas ......................................................................... 14
        3. Defendant's Provision of Support to Hamas .................................................... 16
        4. Consent Order and the Penalty Paid by Bank's New York Branch ................ 19
    B. Procedural History .................................................................................................. 21
III. Law ................................................................................................................................. 23
    A. Motion to Dismiss Standards .................................................................................. 23
        1. Lack of Subject Matter Jurisdiction ................................................................ 23
        2. Failure to State a Claim ................................................................................... 24
    B. Political Question Doctrine ..................................................................................... 24
        1. General Principles ............................................................................................. 24
        2. In ATA Context ................................................................................................ 27
    C. Anti-Terrorism Act and Civil Liability .................................................................. 28
        1. Civil Remedy Provision Generally .................................................................. 28
        2. Legislative History of Anti-Terrorism Act ..................................................... 30
        3. Civil Remedy Provision: Aiding and Abetting Liability ................................. 35
        4. Civil Remedy Provision: Elements of Cause of Action .................................. 45
           a. General Principles and Act Requirement: Claims Two Through Five .......... 45
           b. Mental State: Claims Two Through Five ...................................................... 46
           c. Causation: Claims Two Through Five .......................................................... 53
        5. Act of War Defense: Procedural and Substantive Considerations ................. 55
    D. Evidentiary Issues .................................................................................................. 72
        1. Consideration of Admissibility at Summary Judgment ................................... 72
        2. Procedural History ........................................................................................... 74
IV. Application of Law to Factual Allegations .................................................................... 77
    A. Political Question Doctrine Does Not Prevent Adjudication .................................. 77
    B. Aiding and Abetting Assertion Not Viable ............................................................ 77
    C. Plaintiff's Other Claims Remain Viable on Present Motion ................................... 78
    D. Act of War Exception Does Not Require Dismissal on Present Motion ................. 79
    E. Evidentiary Issues to be Considered at Summary Judgment .................................. 80
V. Conclusion ...................................................................................................................... 80

## I.    Introduction

This memorandum and order deals with defendant's motion to dismiss on the pleadings, which is granted in part. *See* Part IV.B, *infra*. After further discovery, the court will consider defendant's motion for summary judgment. *See* Scheduling Order, Gill v. Arab Bank, PLC, No. 11-CV-3706 (E.D.N.Y. Aug. 22, 2012), CM/ECF No. 58.

Mati Gill, who possesses American and Israeli citizenship, sues Arab Bank plc (the "Bank"), for money damages.  He was wounded in 2008 by gunshots fired from Gaza into Israel.  The Islamic Resistance Movement ("Hamas") claimed "credit" for the shooting.  Hamas has been officially characterized by the United States government as a "terrorist" organization.  *See* Designation of Foreign Terrorist Organizations, 62 Fed. Reg. 52,650 (Oct. 8, 1997); Exec. Ord. No. 12,947, 60 Fed. Reg. 5079, 5081 (Jan. 25, 1995); *see also Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 63 (D.D.C. 2002).  It is effectively in political and military control of Gaza.  *See, e.g.*, *Zahren v. Gonzales*, 487 F.3d 1039, 1040 (7th Cir. 2007), *vacated on reh'g on other grounds sub nom. Zahren v. Holder*, 637 F.3d 698 (7th Cir. 2011).

The plaintiff asserts five causes of action.  One of these—the first, depending on a theory of aiding and abetting—is dismissed for the reasons stated below.  All of the others will require essentially the same proof of unlawful action, state of mind, and causation.  *See* Part III.C.4, *infra*.

The Bank has moved, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the amended complaint.  A number of complex legal arguments have been raised in support of its motion.  It is contended principally that:

1. The court lacks subject matter jurisdiction over the case pursuant to the political question doctrine;

2.  The plaintiff's claims must be dismissed, pursuant to 18 U.S.C. § 2336(a), since his injuries were suffered during the course of an armed conflict between military forces;

3. Recovery on an aiding-and-abetting theory is precluded; and

    4.   The plaintiff has failed to adequately allege all of the elements of a claim under

the civil remedy provision of the relevant anti-terrorism statute.

*See generally* Memorandum of Law of Defendant Arab Bank plc in Support of Its Motion to

Dismiss the Amended Complaint ("Def Mem."), Gill v. Arab Bank, PLC, No. 11-CV-3706

(E.D.N.Y. Apr. 9, 2012), CM/ECF No. 21.

      The complex factual and legal issues presented preclude disposing of this litigation on

defendant's motion directed at the pleadings.  *See* Parts III and IV, *infra*.  Plaintiff's amended

complaint, except for his aiding and abetting claim, survives a Rule 12 attack.  *See* Parts III.C.3

and IV.B, *infra*; *see also* Part III.C.5, *infra*. The court has instructed the defendant to file a

motion for summary judgment since a factual record is required for a dispositive motion to be

properly considered.  *See* June 28, 2012 Hr'g Tr. 35; *see also* Scheduling Order, Gill v. Arab

Bank, PLC, No. 11-CV-3706 (E.D.N.Y. Aug. 22, 2012), CM/ECF No. 58.

      Asserted by plaintiff are a variety of claims brought pursuant to the federal anti-terrorism

laws.  *See* 18 U.S.C. § 2331 *et seq*.  Courts that have addressed claims brought under the statute

providing a civil cause of action to American nationals injured by terrorist acts have referred to it

generally as the "ATA."  The current version of the applicable civil remedy provision became

federal law as part of the Federal Courts Administration Act of 1992.  *See Boim v. Holy Land*

*Found. for Relief & Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc) (Posner, J.); *Almog v.*

*Arab Bank, PLC*, 471 F. Supp. 2d 257, 265-66 (E.D.N.Y. 2007).  The governing statute will be

referred to as the "Anti-Terrorism Act" or the "ATA."

      The Bank is alleged to have maintained accounts for and provided financial services to

Hamas, its leaders, and its affiliates.  *See* Amended Complaint ("Am. Compl.") ¶ 47, Gill v. Arab

Bank, PLC, No. 11-CV-3706 (E.D.N.Y. Mar. 9, 2012), CM/ECF No. 17.  Plaintiff contends that

the Bank's provision of financial support and financial services to Hamas, its supporters, and its associates caused his injury.

A critical aspect of the litigation is the reliance by plaintiff on the oversight of the Bank exercised by the United States government to prevent aid to terrorists. Executive action and the potential recovery in tort of private plaintiffs are complementary. Both support the government's anti-terrorism policy.

The Bank's New York branch assented to the issuance of a consent order in 2005 by the federal government's Office of the Comptroller of the Currency. It was agreed that the New York branch would thenceforth develop policies to ensure compliance with federal banking and anti-terrorism laws—implying, the plaintiff argues, that it had not done so theretofore. The same year, the New York branch agreed to pay a $24 million civil penalty to the federal government without admitting or denying the government's allegations that it had violated federal banking laws by failing to apply an adequate system of internal controls in clearing fund transfers and by failing to conduct independent testing to allow for the timely identification and correction of failures to comply with federal banking law. In assessing the civil penalty the government claimed—and the Bank neither admitted nor denied—that the Bank did not identify and report suspicious transactions involving the possible support of terrorism. *See* Part II.A.4, *infra*.

Integration of the ATA's criminal provisions with its civil remedy and the national executive's administrative system is central to a unified federal anti-terrorism policy, one aspect of which is the cutting off of funding to terrorists threatening American citizens' safety. It is not yet clear what probative force, if any, the defendant's consent agreement with—and its payment of a penalty to—the government has. For example, can it be assumed that pre-agreement, there

was aid by the Bank, directly or indirectly, to terrorists?  Can it be assumed that post-agreement, aid to terrorists—if any—ceased?

The parties will address these and related issues in their briefs on defendant's motion for summary judgment.  They shall advise the court whether they believe it would be desirable to request the assistance of the United States Attorney for the Eastern District of New York in determining the views of the United States government with respect to the defendant's alleged provision of assistance to terrorist organizations and individual terrorists, particularly Hamas and its affiliates, prior to the time of the shooting.

Two statutory provisions are critical in this litigation.  The first is 18 U.S.C. § 2333, granting federal district courts jurisdiction to hear a terrorism case of this kind brought by an American national.  It provides in relevant part:

> *Any national of the United States injured* in his or her person, property, or business *by reason of an act of international terrorism*, or his or her estate, survivors, or heirs, *may sue therefor* in any appropriate district court of the United States and *shall recover threefold the damages he or she sustains* and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a) (emphasis added).  The statutory terms "national of the United States" and "international terrorism" are terms of art.  *See id.* § 2331.  They are discussed in Part III.C.1, *infra*.

Unsettled is the question of what elements a plaintiff is required to plead and prove to succeed on a section 2333(a) claim.  Raised by the civil remedy provision are a variety of serious interpretive questions.  *See generally Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 656-66 (S.D. Tex. 2010) (collecting cases and summarizing the different approaches applied by courts).

The issues raised in this case require the consideration of a congery of complex, interrelated vectors: a form of *contributing cause*, involving the alleged provision of assistance to

6

Hamas before the shooting, as well as the amount and character of the aid allegedly provided, and its timing—a penny placed in a Hamas collection box many years before an attack would appear to be insufficient, but what more in the way of causation, if anything, is required under the statute is not clear, *see United States v. Nelson*, 277 F.3d 164, 186 (2d Cir. 2002) (noting that "[c]ausation is one of the most famously complicated concepts in language and in law. . . . [T]he modern law of torts employs at least three concepts of cause: 'cause-in-fact' or 'but for' cause, 'proximate' or 'legal' cause, and 'causal link' or 'causal tendency'" (citation omitted)); Part III.C.4.c, *infra*; *proximate cause*, that is, how the strength of the government's policy in providing for liability of those on the periphery in time, space, and influence—both with regard to the injury-creating actor and Hamas' policy and acts possibly involving American nationals— bears on the interpretation of the statute, and its application to particular facts; the *state of mind* of a defendant sufficient for a finding of liability—does it include strict liability, negligence, recklessness, knowledge, or a higher showing of intent, and must it be connected to knowledge or intent that an American national might be injured by a probable act of Hamas; and *probative force*—what the probative value, if any, is of evidence allegedly showing possible assistance to Hamas, discounted by multiple levels of hypotheses linking the defendant's actions to the injury of an American national.  *See, e.g.*, John H. Mansfield & Margaret A. Berger et al., Evidence: Cases and Materials 2-15 (9th ed. 1997) (effect of confluence of steps of proof and probability of hypotheses in a chain of proof); *see also* Parts IV.E and V.E, *infra*.

Less than obvious on the statute's face is whether it provides for "secondary" liability— *i.e.*, recovery for "aiding and abetting" a substantive violation of the ATA, or for conspiracy to commit a substantive violation of that statute.  *See* Part III.C.3, *infra*.

As is explained below, this court concludes that section 2333(a) does not provide for aiding-and-abetting liability. *See id.* But other channels for proving civil liability may provide plaintiffs much of the benefit of the "aiding and abetting" criminal concept. The elements of the ATA cause of action, as they are described in this memorandum and order, are congruent with general tort-law principles. The federal civil remedy, in many cases, and by virtue of the federal material support statutes, provides a civil analog to section 2 of the federal criminal code; that section makes an aider and abettor of a federal crime liable as a principal. *See* 18 U.S.C. § 2; *see also* Parts III.C.3 and III.C.4, *infra*. As indicated in the discussion of section 2333(a)'s provision of treble damages, however, an ATA claim based on theory of strict liability or of negligence is not available to the plaintiff. *See* Part III.C.4.b, *infra*.

In this context, bear in mind that tort and crime were at one time "merged in the old trespass form of action," W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 8, at 37 (5th ed. 1984). The concept of "transferred intent" may have an impact on the developing section 2333(a) tort, so that an intent to help Hamas in shooting an Israeli citizen could be transformed into an intent to assist in shooting Americans. *See, e.g.*, *id.* at 37-39; *see also* Victor E. Schwartz et al., Prosser, Wade, and Schwartz's Torts 28-29 (10th ed. 2000). *But see Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 725 (7th Cir. 2008) (en banc) (Wood, J., concurring in part and dissenting in part). Imputed culpability based on vicarious liability may draw a third party (in this case, the Bank) into liability for the act of a terrorist organization. *See* Restatement (Third) of Torts: Apportionment of Liability § 7, at 69 cmt. j (2000) (noting that "the party who committed the tortious acts . . . and the party to whom liability is imputed are treated as a single unit for the assignment of responsibility"). The concept of "persons acting in concert" may also have a bearing on the Bank's civil liability. *See id.* § 15. In some

circumstances, an organization like the Bank might be thought of as having a principal-agent

relationship with a terrorist group; if a provider of financial services were deemed the principal

and the terrorist organization its agent, the financier might bear responsibility for the terrorist

group's reasonably foreseeable tortious actions even if the group acted primarily on its own

initiative.  *See id.* § 13; *see also id.* § A18, cmt. b.  A civil conspiracy theory might also be used

to tie a third party to the primary actor's liability.  *See* W. Page Keeton et al., Prosser and Keeton

on the Law of Torts § 46, at 322-24.  These matters need consideration as the ambit of the new

ATA tort is developed.

Current tort-law concepts might take up much of the slack left by the elimination of

aiding and abetting as a basis for section 2333(a) liability.  *See* Part III.C.3, *infra*.  The details of

civil and criminal concepts may provide different conceptual and practical problems.  While the

logic of the Supreme Court's leading case regarding federal tort statutes and implicit aiding and

abetting liability arguably suggests that all forms of secondary liability are disallowed when they

are not explicitly provided for in a statute's text, *see Central Bank of Denver, N.A. v. First

Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994) (discussed in Part III.C.3, *infra*), these

questions are currently open in the ATA context.  *But cf.* Evan H. Caminker, *Precedent and

Prediction*, 73 Tex. L. Rev. 1, 6 (1994) (arguing that "[w]hen an inferior court confronts strongly

probative predictive data concerning its superior court's likely future ruling, the inferior court

generally may employ the proxy model [and rule in a fashion consistent with its prediction of

how the superior court would rule]").  The extent to which the law will develop in spelling out

the boundaries of the new section 2333(a) tort is unresolved.  Given that section 2333(a)

provides to plaintiffs injured by acts of terrorism a highly unusual private cause of action—one

that is tied expressly to the criminal law, *see* Part III.C.1, *infra*—and the fact that the ATA's

definitional provision suggests that recovery on *some* theory (or theories) of secondary liability may be available, *see* 18 U.S.C. § 2331(1)(A) (noting that "the term 'international terrorism means activities that . . . *involve* violent acts or acts dangerous to human life" (emphasis added)), wariness in extending the reasoning of *Central Bank* to circumscribe ATA liability seems warranted, especially in ruling on a motion to dismiss directed at the pleadings.

The second provision of the ATA necessitating substantial consideration requires the court to determine whether plaintiff's injury was caused by an "act of war" as defined by the statute. 18 U.S.C. § 2336 states in relevant part that:

> No action shall be maintained under section 2333 of this title for injury or loss *by reason of an act of war.*

18 U.S.C. § 2336(a) (emphasis added).

The term "act of war" is defined at some length. *See id.* § 2331(4). But the federal courts differ with respect to the exception's meaning and applicability in terrorism cases. *See* Part III.C.5, *infra*.

A factual issue, closely related to the causation question raised by the interpretation of 18 U.S.C. § 2333, requires consideration: how will the plaintiff be able to prove that it was a Hamas gunman who shot him, as he alleges, and how will the shooting be connected to the defendant? *See* Order, Gill v. Arab Bank, PLC, No. 11-CV-3706 (E.D.N.Y. Apr. 18, 2012), CM/ECF No. 23. The evidentiary issues implicated by these questions are touched upon in Parts IV.E and V.E, *infra*.

Much of the relevant law is unsettled. Cases similar to the instant one have been treated with a wide variety of analyses with varying results. *See, e.g.*, *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 687-98 (7th Cir. 2008) (en banc) (Posner, J.) (concluding that the ATA does not provide for secondary liability, and discussing at length the elements of a claim

against an alleged primary violator in case in which plaintiff's decedent holding American and Israeli citizenship was shot and killed in Israel); *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1008-21 (7th Cir. 2002) (first panel opinion) (concluding that the mere provision of funds to a terrorist group is insufficient to violate the ATA, and that the ATA allows for claims based on theory of secondary liability), *overruled in part sub nom. by Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d at 685 (en banc); *Rothstein v. UBS AG*, 772 F. Supp. 2d 511, 513-18 (S.D.N.Y. 2011) (determining that individuals injured—and survivors of individuals who were killed—by terrorist attacks in Israel lacked standing to sue a bank that had allegedly assisted Iran in providing financial support to Hamas); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 40-57 (D.D.C. 2010) (discussing the elements of an ATA claim generally, and concluding that the ATA allows for claims premised on theory of secondary liability); *Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 656-66 (S.D. Tex. 2010) (summarizing the federal courts' disagreements regarding the ATA's civil remedy provision, and concluding that plaintiffs who alleged that defendant companies had illegally purchased oil from Iraq—and that the funds were used by Iraq's government to finance terrorism—had failed to sufficiently plead scienter); *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 266-69 (E.D.N.Y. 2007) (describing generally elements of ATA civil claim); *Stutts v. De Dietrich Group*, No. 03-CV-4058, 2006 WL 1867060, at *2-6 (E.D.N.Y. June 30, 2006) (granting motion to dismiss made by banks accused of violating the ATA by providing letters of credit to corporations that sold chemical weapons manufacturing equipment to Iraq, because provision of letters of credit was not international terrorism and for failure to sufficiently allege proximate cause); *Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 162-67 (D.D.C. 2006) (refusing to dismiss ATA claims on basis of act of war exception); *Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1, 6-11 (D.D.C. 2005)

(concluding that school bus bombing was not an act of war for purposes of ATA since an attack on children was clear violation of the laws of war); *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 580-90 (E.D.N.Y. 2005) (discussing elements of civil ATA claim and concluding that the ATA permits claims premised on secondary liability).

Congress primarily accomplished two objects in enacting section 2333(a) and the accompanying civil remedy provisions. First, it explicitly granted exclusive jurisdiction to federal district courts in certain terrorism cases. *See* 18 U.S.C. §§ 2333(a), 2338. Second, it constructed a new federal substantive tort, requiring, according to the common law tradition, the fashioning by courts of the contours of this new addition to plaintiffs' anti-terrorism arsenal. The new tort is essentially a subspecies of the common-law tort of battery. It is supplemented principally by the material support provisions of federal criminal law. In the context of the ATA, then, tort and criminal law have become closely intertwined; this is consistent with their historic roots. *See* Oliver Wendell Holmes, Jr., The Common Law 39 (1881) (noting that the appeal, one of the earliest forms of a private legal action in Europe, "may be said to have had a criminal as well as a civil aspect"); *see also* Julius Goebel, Jr., Cases and Materials on the Development of Legal Institutions 62-82 (1946) (describing the development of criminal and tort law in Norman and English jurisprudence).

The confluence of complicated governing legal doctrines affecting this country's anti-terrorism policy requires courts to tread carefully in making both procedural and substantive determinations in civil cases such as the instant one. The statutory and common-law right of the individual to recovery in tort must not be underestimated. *See, e.g.*, John C.P. Goldberg & Benjamin C. Zipursky, Rights and Responsibility in the Law of Torts, *in* Rights and Private Law 251, 262 (Donal Nolan & Andrew Robertson eds., 2012). It is necessary, under the statute, to

shape individual tort rights to fit into the comprehensive existing legal framework governing this country's struggle against terrorism, particularly when recovery is sought as a result of terrorist violence affecting American nationals who are abroad.

This country is now involved in a world-wide battle with a range of enemies, spanning from those organized on the largest scale, supported by nations, to individuals motivated by egocentric hatred. The resulting struggle has led to the development of new military techniques, new concepts of criminal law projected abroad, and new civil tort liability problems, both procedural and substantive. In applying general tort law theory to requite injured individuals' damages, as is illustrated in this case, new wine must be carefully poured into old civil litigation bottles.

For the reasons indicated below, defendant's motion to dismiss the complaint is granted in part and denied in part.

## II.     Factual Allegations and Procedural History

### A.  Factual Allegations in Amended Complaint

#### 1.   April 2008 Attack on Plaintiff

A citizen of the United States and of Israel, plaintiff was employed in the spring of 2008 as an aide to Avi Dichter, Israel's then minister of public security. *See* Am. Compl. ¶ 6-7; *see also Matar v. Dichter*, 563 F.3d 9, 11 (2d Cir. 2009) (noting that Dichter formerly served as "director of the Israeli Security Agency . . ., one of that country's main security and intelligence services"). In early April 2008, the minister, joined by the plaintiff, led a delegation of foreign visitors on a tour of Israel. *See* Am. Compl. ¶ 8.

13

The delegation stopped at an observation point in Israel overlooking Gaza, one of the two territorial units that comprise the Palestinian proto-state.  *See id.*  Shots fired at the party from Gaza wounded the plaintiff, who crawled to safety.  *See id.* ¶¶ 9-10.

Shortly after the attack, a speaker purporting to represent Hamas took "credit" on the internet and via other media for the shooting.  Responsibility for the assault was also taken by another Palestinian terrorist group.  *See id.* ¶¶ 11-12.  It is alleged by the plaintiff that the Israeli government eventually learned that a Hamas-affiliated group had carried out the attack at Hamas' direction.  *See id.* ¶¶ 14-15.

### 2.  History of Bank and of Hamas

A brief summary of the plaintiff's contentions regarding the Bank's background and that of Hamas provides helpful context in analyzing the critical factual issues regarding their alleged relationship.

Defendant is a chartered Jordanian bank; its headquarters are located in that country and its common stock is publicly traded on the Amman stock exchange.  *See id.* ¶ 17.  It is owned and controlled by the shareholders of Arab Bank Group, a Jordanian holding company.  *See id.*  The Bank owns, controls, and operates branches and offices worldwide.  Several of these outposts are located in Palestinian Authority-controlled territories.  *See id.*  The Bank has an office located in the State of New York; it is registered to conduct business in this state and does so.  *See id.*

Plaintiff claims that the Bank and the holding company—which is alleged to own the majority of the Bank's stock—are controlled by members of the Shoman family.  *See id.* ¶¶ 17, 19.  It is contended that the family has a long history of hostility towards both the United States and Israel.  *See id.* ¶¶ 31-33.  The late A.H. Shoman, the family's patriarch and the founder of the

Bank, allegedly expressed publicly his animus towards the United States for its support of Israel. *See id.* ¶¶ 30-33. His son, A.M. Shoman, served as chairman of the Bank from 2000 until his death in 2005; he is alleged to have personally played an important role in collecting funds that were to be distributed to the families of suicide bombers associated with Hamas and its affiliates. *See id.* ¶¶ 19, 34-37.

Hamas is said to be organized into two parts. The first component is essentially a political party. It provides social services to the residents of the Palestinian territories. The second is a paramilitary wing. It is responsible for suicide bombings, shootings, and rocket attacks designed to pressure Israel politically, and, ultimately, to destroy that country as a Jewish state. *See id.* ¶¶ 21-23, 26.

It is alleged that Hamas' two components work in concert. *See id.* ¶ 23. Plaintiff contends that money ostensibly contributed to Hamas' social services and charitable organizations eventually inures to the benefit of the paramilitary apparatus. *See id.* ¶¶ 24-25. Funds held by Hamas' charitable and social organizations allegedly are used to recruit those willing to carry out attacks and to provide them with training and equipment. *See id.* ¶ 25. It is claimed that Hamas' civil side provides salaries for the organization's paramilitary operatives and leadership. *See id.*

It is contended that Hamas is responsible for many attacks since September 2000 targeting civilians in Israel. *See id.* ¶ 29. As already pointed out, the United States government has determined that Hamas and at least some of its associated civil affiliates are terrorist organizations. *See id.* ¶ 28; *see also Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 63-64 (D.D.C. 2002) (describing the administrative process by which it was determined that Hamas is a terrorist group).

### 3.   Defendant's Provision of Support to Hamas

The lion's share of plaintiff's amended complaint is devoted to providing details

regarding the Bank's alleged provision of banking services directly and indirectly to Hamas.

These services are alleged to have supported that organization's terrorist activities.

Plaintiff contends that defendant "knowingly supported terrorists and terrorist

organizations in two ways.  First, it provided (and continues to provide) financial services—

including account services and funds transfers—to Hamas organizations and Hamas leaders.

Second, it administered the distribution of 'martyrs' payments' to families of suicide bombers as

well as [the families of] Hamas terrorists held in Israeli or Palestinian custody."  Plaintiff's

Memorandum of Law in Opposition to Defendant Arab Bank PLC's Motion to Dismiss the

Amended Complaint 10-11, Gill v. Arab Bank, PLC, No. 11-CV-3706 (E.D.N.Y. May 21, 2012),

CM/ECF No. 31.  It is asserted that the Bank's second course of action encouraged potential

suicide bombers and Hamas terrorists to attack, since they knew that their families would be

provided for in the event of their detention or death.

The voluminous allegations can be broken down into categories for purposes of analysis.

It is contended that:

1.  The Bank beginning in the late 1990s knowingly maintained accounts for—and

accepted wire transfers on behalf of—Hamas (or its proxies), well-known Hamas

leaders, and other Hamas operatives, despite the facts that (1) Hamas was named

as a beneficiary of wire transfers made, (2) the United States government

determined that some individual account holders to whom transfers were made

were Hamas-affiliated terrorists, and (3) some account holders to whom transfers

were made were prominent members of the paramilitary side of Hamas.  *See* Am. Compl. ¶¶ 48-112.

2.  Defendant maintained accounts for and provide financial services to individual terrorists and terrorist front organizations affiliated with Hamas, despite the facts that:

    a.  The United States government determined in 1995 that Hamas was a terrorist organization, *see id.* ¶¶ 117-120;

    b.  The government of the Palestinian territories shut down in 1997 the Palestinian-territory-based offices of sixteen Hamas-affiliated organizations, including that of the Texas-based Holy Land Foundation for Relief and Development (the "Holy Land Foundation"), to which the Bank provided banking services, *see id.* ¶¶ 121;

    c.  The United States government determined in 2001 that the Holy Land Foundation was a terrorist organization and later indicted it in the United States District Court for the Northern District of Texas for providing material support to terrorism, *see id.* ¶¶ 122-23, 150-51;

    d.  The German government in 2002 closed the German offices of the Al Aqsa Foundation, a European organization to which the defendant is alleged to have provided banking services, on the ground that it was a Hamas front, *see id.* ¶¶ 124-27; and

    e.  The United States government determined in 2003 that a number of the Hamas-related organizations and individuals to whom the Bank provided financial services were connected to terrorism.  *See id.* ¶¶ 130-38.

3.  The Bank maintained accounts for and provided financial services to Hamas-affiliated charitable organizations located in the Palestinian territories; those organizations, referred to by the plaintiff as Hamas' "agents," *see id.* ¶ 158, are alleged to have subsequently distributed funds to Hamas and its operatives to support Hamas' paramilitary activities.  *See id.* ¶¶ 157-74.  Information readily available to the defendant demonstrated that these organizations were Hamas affiliates.  *See id.* ¶ 159.

4.  The Bank provided banking services to the Saudi Committee in Support of the Intifada Al Quds (the "Saudi Committee")—a private charity registered with the Kingdom of Saudi Arabia—so that the committee could covertly provide substantial funding to Hamas for terrorist activities.  *See id.* ¶¶ 175-78.  The Saudi Committee, with the help of the defendant and of Hamas front organizations, provided millions of dollars to the families of suicide bombers; money was also provided by way of front organizations to the families of individuals killed by Israeli security forces during the commission or attempted commission of terrorist acts.  *See id.* ¶¶ 179-83.  The Saudi Committee paid and transmitted by way of the Bank and Hamas affiliates direct payments to prominent terrorists and their relatives; death benefits were paid directly to the families of suicide bombers and the families of Palestinians killed in violent confrontations with Israeli security forces.  *See id.* ¶¶ 177, 184-96.  Both the Saudi Committee and the Hamas-affiliated organizations that ultimately transmitted the funds advertised the availability of Saudi Committee monies in an attempt to induce prospective terrorists into committing violent acts on Hamas' behalf.  *See id.* ¶ 197.  The

Saudi Committee's financial support is crucially important to Hamas' terrorist activities.  *See id.* ¶ 199.

5.  Defendant knowingly provided financial services to the Lebanon-based Al-Shahid Foundation ("Al-Shahid") and to the Gaza-based Al-Ansar Society ("Al-Ansar"); those organizations work in conjunction to pay benefits directly to the families of suicide bombers and Israeli prisoners in order to encourage the continuation of violence against Israeli civilians.  *See id.* ¶¶ 200-01.  Al-Shahid transferred money to Al-Ansar; these funds were then distributed to the families by way of the Bank's branches in the Palestinian territories.  *See id.* ¶ 202, 209.  Al-Ansar placed advertisements in local newspapers encouraging eligible residents of the Palestinian territories to collect from their local Bank branch funds that were available.  *See id.* ¶ 204.  Its website encouraged terrorist acts and provided summaries of the funding that was distributed.  *See id.* ¶¶ 205-10.  The website of Al-Shahid also provided lists of payees.  *See id.* ¶ 203.  Al-Ansar distributed millions of dollars to the families of suicide bombers and Israeli prisoners.  *See id.* ¶¶ 210-11.

### 4.  Consent Order and the Penalty Paid by Bank's New York Branch

It is undisputed that the New York branch of Arab Bank in 2005 consented to the issuance of an order by the United States' Office of the Comptroller of the Currency, and that in that same year the New York branch agreed to pay a $24 million civil penalty to the United States Department of the Treasury to settle claims asserted against it by the Comptroller of the Currency and the Treasury Department's Financial Crimes Enforcement Network.  *Compare id.*

¶ 17, *with* Answer to the Amended Complaint ¶ 17, Gill v. Arab Bank, PLC, No. 11-CV-3706 (E.D.N.Y. July 12, 2012), CM/ECF No. 40.

The allegations in the Financial Crimes Enforcement Network's assessment—which were neither admitted nor denied by the Bank's New York branch—may be useful to the reader in supplementing the allegations in the amended complaint, but they were not relied upon by the court in ruling on the present motion.

It was charged by the Treasury Department that the New York branch of the Bank failed adequately to establish a system of controls to comply with federal banking law. The substance of the government's allegations regarding those allegedly deficient controls and the Bank's possible connection to terrorism is illustrated by the following excerpts from the agreement pursuant to which the New York branch consented to pay the civil penalty:

> Arab Bank – New York failed to implement an adequate system of internal controls to comply with the Bank Secrecy Act and manage the risks of money laundering and terrorist financing involving funds transfers for originators and beneficiaries without accounts at Arab Bank – New York. Arab Bank – New York served as a clearing institution for a substantial volume of funds transfers in United States dollars. The Arab Bank Group and a number of correspondent institutions operated in jurisdictions that posed heightened risks of money laundering and terrorist financing.
>
> . . . .
>
> [D]uring the period from 2000 through 2004, management of an Arab Bank affiliate in the Palestinian Territories received, from regulatory authorities in the Palestinian Territories, orders that focused explicitly on funds transfers to a number of beneficiaries with accounts at members of the Arab Bank Group in the Palestinian Territories. In addition, regulatory authorities in the Palestinian Territories issued circulars containing the names of suspected criminals and ordered institutions holding accounts of the suspected criminals to either freeze the accounts or place the accounts on a watch list. Despite the heightened risk of illicit activity, Arab Bank – New York failed to implement procedures for obtaining this type of information from other members of the Arab Bank Group, to mitigate the risk and ensure compliance with the Bank Secrecy Act.

Assessment of Civil Money Penalty 4-5, Gill v. Arab Bank, PLC, No. 11-CV-3706 (E.D.N.Y.

July 20, 2012), CM/ECF No. 44.

The Treasury Department also asserted that Arab Bank's New York branch failed to

report, as required, transactions that might have been connected to terrorism:

> The Financial Crimes Enforcement Network has determined that Arab Bank –
> New York violated the suspicious transaction reporting requirements of the Bank
> Secrecy Act and regulations issued pursuant to that Act. . . .
>
> . . . .
>
> [D]esignations of individuals and entities as terrorists by the United States
> Government provide critical information for financial institutions to use in
> assessing terrorist financing risk.  Once a designation occurred, Arab Bank – New
> York failed to review recent activity, occurring prior to the designation and
> associated with the designated entities, to identify potentially suspicious activity.
> Had such a review been conducted, it would have uncovered originators and
> beneficiaries – with possible ties to the designated entities – that had recently
> engaged in potentially suspicious activity.  Arab Bank – New York failed to
> review information in its possession that would have shown it was clearing funds
> transfers for individuals and entities dealing with subsequently designated
> terrorists and terrorist organizations, failed to analyze this information, and failed
> to file suspicious activity reports.
>
> Arab Bank – New York did not file the majority of its suspicious activity reports
> referencing terrorist financing until after the Office of Comptroller of the
> Currency commenced a review of its funds transfer activity in July 2004.  An
> adequate anti-money laundering program would have allowed Arab Bank – New
> York to file suspicious activity reports in a timely manner.

*Id.* at 6-7.

## B.  Procedural History

Plaintiff initiated this litigation in August 2011.  *See* Complaint, Gill v. Arab Bank, PLC,

No. 11-CV-3706 (E.D.N.Y. Aug. 1, 2011), CM/ECF No. 1.  The case was assigned by the Clerk

of the Court using the normal random selection procedures.  Preliminarily, Gill sought: (1) a

determination that his case was related to litigation pending before another judge of this court,

and (2) a transfer of the case to that judge.  *See* Letter of Aaron Schlanger, Gill v. Arab Bank,

21

PLC, No. 11-CV-3706 (E.D.N.Y. Aug. 25, 2011), CM/ECF No. 8.  The Bank opposed the

motion.  As a matter of internal court procedure regarding the distribution of litigation loads, and

with the consent of the judges involved, this case was retained by the judge to whom it had been

randomly assigned.  *See* Order, Gill v. Arab Bank, PLC, No. 11-CV-3706 (E.D.N.Y. Feb. 24,

2012), CM/ECF No. 15.

Plaintiff's amended complaint was filed in March of 2012.  *See* Amended Complaint,

Gill v. Arab Bank, PLC, No. 11-CV-3706 (E.D.N.Y. Mar. 9, 2012), CM/ECF No. 17.  Five

claims to support an award of monetary relief are asserted:

1. The Bank aided and abetted Hamas' infliction of serious bodily injuries to

   plaintiff, in violation of 18 U.S.C. § 2333(a), *see* Am. Compl. ¶¶ 214-24; *see also*

   18 U.S.C. § 2332;

2. The Bank conspired with Hamas to commit acts of violence and committed overt

   acts in furtherance of the conspiracy, in violation of 18 U.S.C. §§ 2332(b)

   and 2333(a), *see* Am. Compl. ¶¶ 225-32;

3. Defendant provided material support to terrorists in violation of 18 U.S.C.

   § 2339A, leading to plaintiff's being injured and supporting a monetary award

   pursuant to 18 U.S.C. § 2333(a), *see id.* ¶¶ 233-39;

4. By providing financial services to Hamas and its agents, the Bank knowingly

   materially supported a foreign terrorist organization in violation of 18 U.S.C.

   § 2339B; it is argued that the defendant's provision of that support led to Gill's

   injury, supporting an award of damages pursuant to 18 U.S.C. § 2333(a), *see id.*

   ¶¶ 240-49; and

5. Defendant violated 18 U.S.C. § 2339C by unlawfully and willfully providing or collecting funds for Hamas with the intention that the funds would be used—or the knowledge that they would be used—to facilitate acts of international terrorism; plaintiff claims that the provision and collection of those funds led to his injury, thereby supporting an award of damages pursuant to 18 U.S.C. § 2333(a). *See id.* ¶¶ 250-55.

Defendant moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim. Extensive briefs were filed. Oral argument was heard in June of 2012. *See* June 28, 2012 Hr'g Tr. 1. At the argument, the court informed the parties that they should conduct expedited discovery, and that a motion by defendant for summary judgment should be promptly made. *See id.* at 35; *see also* Scheduling Order, Gill v. Arab Bank, PLC, No. 11-CV-3706 (E.D.N.Y. Aug. 22, 2012), CM/ECF No. 58. The parties were instructed that discovery in this case should be coordinated with, and supplemented by, discovery conducted in other terrorism-related cases in this court in which the Bank is a defendant. *See* June 28, 2012 Hr'g Tr. 36.

## III. Law

### A. Motion to Dismiss Standards

#### 1. Lack of Subject Matter Jurisdiction

"Dismissal of a case for lack of subject matter jurisdiction under Rule 12(b)(1) is proper when the district court lacks the statutory or constitutional power to adjudicate it." *Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009) (per curiam) (internal quotation marks omitted).

"In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside the pleadings." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008).  When no evidentiary hearing regarding the court's subject matter jurisdiction has been held, all material facts alleged in the complaint are accepted as true; all reasonable inferences are drawn in the plaintiff's favor.  *See Sharkey v. Quarantillo*, 541 F.3d 75, 83 (2d Cir. 2008).

### 2.  Failure to State a Claim

To survive a motion to dismiss made pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Citigroup ERISA Litig.*, 662 F.3d 128, 135 (2d Cir. 2011) (internal quotation marks omitted).  Determining whether a complaint states a plausible claim for relief is a context-specific task that "requires the reviewing court to draw on its judicial experience and common sense." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks omitted).

A court ruling on a 12(b)(6) motion is to "accept as true the facts alleged in the complaint, and may consider documents incorporated by reference in the complaint and documents upon which the complaint relies heavily." *In re Citigroup*, 662 F.3d at 135 (internal quotation marks omitted).  All reasonable inferences are drawn in the plaintiff's favor.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

### B.  Political Question Doctrine

### 1.  General Principles

The Bank contends that plaintiff's claims must be dismissed because the political question doctrine deprives the court of subject matter jurisdiction.  *See* Def. Mem. 3-25.

Referred to by the Court of Appeals for the Second Circuit as a doctrine of "prudential justiciability," the political question doctrine establishes a "policy of judicial deference to the Executive Branch on questions of foreign policy." *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 261 (2d Cir. 2007) (per curiam) (internal quotation marks and bracketing omitted). The doctrine is *not* one of subject matter jurisdiction. It is one of justiciability. It does not implicate a court's power to adjudicate a dispute; instead, it is concerned with the propriety of a court's doing so. *See id.* at 291 (Hall, J., concurring); *see also Baker v. Carr*, 369 U.S. 186, 198-99 (1962).

As a substantive matter, the "political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986). The doctrine "is essentially a function of the separation of powers, existing to restrain courts from inappropriate interference in the business of the other branches of Government." *Nixon v. United States*, 506 U.S. 224, 252 (1993) (Souter, J., concurring in the judgment) (internal quotation marks and citation omitted).

"The outlines of the political question doctrine were described and to a large extent defined in *Baker v. Carr*." *Davis v. Bandemer*, 478 U.S. 109, 121 (1986). "In *Baker*, t[he] Court identified six circumstances in which an issue might present a political question." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1431 (2012) (Sotomayor, J., concurring in part and concurring in the judgment). As the Court of Appeals for the Second Circuit has noted, *see Kadic v. Karadžić*, 70 F.3d 232, 249 (2d Cir. 1995), a "nonjusticiable political question would ordinarily involve one or more of the following factors":

1.  A textually demonstrable constitutional commitment of the issue to a coordinate political department;

2.  A lack of judicially discoverable and manageable standards for resolving it;

3.  The impossibility of decision without an initial policy determination of a kind clearly calling for nonjudicial discretion;

4.  The impossibility of the court's undertaking an independent resolution of the issue without expressing a lack of respect for the coordinate branches of government;

5.  An unusual need for unquestioning adherence to a political decision already made; or

6.  The potential for embarrassment stemming from numerous pronouncements by various departments of government on one question.

*See id.* (discussing *Baker v. Carr*, 369 U.S. 186, 217 (1962)).  The court also remarked in *Kadic* that "[n]ot every case touching foreign relations is nonjusticiable, and judges should not reflexively invoke these [the political question and act of state] doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights."  *Id.* (internal quotation marks and citation omitted).  Instead, "a preferable approach is to weigh carefully the relevant considerations on a case-by-case basis."  *Id.*

In discussing issues raised by the political question doctrine, it has been stated by the Court of Appeals for this Circuit that, while "no one factor is dispositive," the first *Baker* question—whether there is a textually demonstrable constitutional commitment of an issue to another branch of government—is of primary importance.  *See Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2d Cir. 1991); *see also Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004)

(plurality opinion) (noting that the *Baker* "tests are probably listed in descending order of both importance and certainty").

The Court of Appeals for the Second Circuit has been careful to note that "the doctrine is one of political questions, not one of political cases," and it has stated that the "fact that . . . issues . . . arise in a politically charged context" will not suffice to "convert what is essentially an ordinary tort suit into a non-justiciable political question." *Klinghoffer*, 937 F.2d at 49.

## 2. In ATA Context

Courts faced with civil ATA claims have been called upon to determine whether the political question doctrine bars judicial consideration of tort suits against terrorist organizations and those alleged to be their financial backers.

Particularly notable is the Court of Appeals for the Second Circuit's opinion in *Klinghoffer*, which emphasized the fact that "both the Executive and Legislative Branches have expressly endorsed the concept of suing terrorist organizations in federal court," and cited as evidence in support of that proposition an earlier version of 18 U.S.C. § 2333(a). *See id.* at 50. After consideration of the *Baker* factors, it was concluded in *Klinghoffer* that the political question doctrine did not bar the adjudication of the plaintiffs' tort claims. *See id.* at 49-50. While the case is not directly on point since the *Klinghoffer* plaintiffs did not sue pursuant to the Anti-Terrorism Act, *see id.* at 52-54, it is persuasive.

In the years following the enactment of the ATA, other courts have considered whether the political question doctrine precludes judicial consideration of tort claims asserted against terrorists and the financiers of terrorism. They have reached conclusions consistent with that of the Court of Appeals for the Second Circuit in *Klinghoffer*. *See, e.g.*, *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 279-82 (1st Cir. 2005); *Wultz v. Islamic Republic of Iran*, 755 F.

Supp. 2d 1, 25-28 (D.D.C. 2010) (concluding that judicial consideration of ATA suit against Chinese bank accused of providing financial services to terrorist organization was not precluded by the political question doctrine); *Sokolow v. Palestine Liberation Org.*, 583 F. Supp. 2d 451, 455-57 (S.D.N.Y. 2008); *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 295 n.45 (E.D.N.Y. 2007); *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 183-85 (D.D.C. 2004); *Knox v. Palestine Liberation Org.*, 306 F. Supp. 2d 424, 448-49 (S.D.N.Y. 2004).

### C. Anti-Terrorism Act and Civil Liability

#### 1. Civil Remedy Provision Generally

The substantive provisions of the ATA were enacted in 1992. *See Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 265-66 (E.D.N.Y. 2007) (noting that there "have been a series of acts of Congress each entitled the 'Anti-Terrorism Act,'" and describing earlier iterations of the ATA). The statute's civil remedy provision—presently codified as 18 U.S.C. § 2333(a)—was adopted to provide to American victims of terrorism with a federal-court forum in which they could seek monetary redress. *See Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 421 (E.D.N.Y. 2009).

As was pointed out in Part I, *supra*, the ATA's civil remedy provision states:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism . . . may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a). The term "national of the United States" is defined by reference to "section 101(a)(22) of the Immigration and Nationality Act." *Id.* § 2331(2). That statute declares "national of the United States" to mean "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22).

28

Somewhat more complicated is the ATA's definition of "international terrorism."  The definitional provision states:

> (1) the term "international terrorism" means activities that—
>     (A) *involve violent acts* or acts dangerous to human life *that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State*;
>     (B) *appear to be intended*—
>         (i) to intimidate or coerce a civilian population;
>         (ii) to influence the policy of a government by intimidation or coercion; or
>         (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>     (C) *occur primarily outside the territorial jurisdiction of the United States*, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum[.]

18 U.S.C. § 2331(1) (emphasis added).

A plaintiff claiming injury as a result of "international terrorism" as defined by the ATA therefore must plead and prove:

1. That the activities underlying the claim for relief were violent or dangerous to human life, and that they were in violation of any federal or state criminal law, or would have violated any federal or state criminal law had they occurred anywhere in the United States;

2. That those activities appeared to be intended to:

    a. Intimidate or coerce a civilian population;

    b. Influence the policy of a government by intimidation or coercion; or

    c. Affect the conduct of a government by mass destruction, assassination, or kidnapping; and

3. That the activities:

a. Occurred primarily outside the territorial jurisdiction of the United States; or

b. Transcended national boundaries in terms of the means by which they were accomplished, the persons they appeared intended to intimidate or coerce, or the locale in which the perpetrators operated or sought asylum.

For the second and third categories listed above, pleading and proving any of the sub-elements is sufficient—no one is necessary.  For example, a plaintiff who pled and proved that a defendant had engaged in conduct satisfying criteria 1, 2(a), and 3(a) would have sufficiently made out an injury under the civil remedy provision; the same is true, for example, of a plaintiff who pled and proved that a defendant had engaged in conduct satisfying criteria 1, 2(c), and 3(b).

"Any civil action under section 2333 . . . may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent."  *Id.* § 2334(a).  As a general matter, a suit for damages brought pursuant to section 2333 must be instituted "within 4 years after the date the cause of action accrued."  *Id.* § 2335(a); *see also id.* § 2335(b) (providing a limit on the calculation of the limitations period).  The federal courts have exclusive jurisdiction over claims asserted pursuant to section 2333.  *See id.* § 2338.

### 2.  Legislative History of Anti-Terrorism Act

In enacting the ATA's civil remedy provision in 1992 Congress did not explicitly set out the elements that a private plaintiff would be required to plead and prove in order to recover.  Instead, it "intended to *incorporate general principles of tort law* . . . into the [civil] cause of action under the ATA."  *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 55 (D.D.C. 2010)

30

(emphasis added).  As was stated in the Senate Judiciary Committee's report in its discussion of

section 2333:

> This section creates the right of action, allowing any U.S. national who has been
> injured in his person, property, or business by an act of international terrorism to
> bring an appropriate action in a U.S. district court.  *The substance of such an
> action is not defined by the statute, because the fact patterns giving rise to such
> suits will be as varied and numerous as those found in the law of torts*.  This bill
> opens the courthouse door to victims of international terrorism.

S. Rep. No. 102-342, at 45 (1992) (emphasis added).  Given that the ATA does not set out the

elements of a civil cause of action asserted pursuant to section 2333, a general discussion of the

statute's legislative history is useful in interpreting section 2333(a), as well as the ATA's other

provisions.

As an initial matter, the legislative history indicates that the civil remedy provision

became law in large part because of the *Klinghoffer* litigation.  *See Klinghoffer v. S.N.C. Achille

Lauro*, 739 F. Supp. 854 (S.D.N.Y. 1990), *vacated*, 937 F.2d 44 (2d Cir. 1991).  The House

Judiciary Committee Report states in part that:

> The Congress in 1986 passed criminal legislation, the so-called "long-arm"
> statute, which provides extraterritorial criminal jurisdiction for acts of
> international terrorism against U.S. nationals . . . .  The Committee believes that
> there is a need for a companion civil legal cause of action for American victims of
> terrorism.
>
> The recent case of the Klinghoffer family is an example of this gap in our efforts
> to develop a comprehensive legal response to international terrorism.  Leon
> Klinghoffer, a passenger on the Achille Lauro cruise liner, was executed and
> thrown overboard in a 1985 terrorist attack.  His widow, Marily Klinghoffer, and
> family took their case to the courts in their home state of New York.  Only by
> virtue of the fact that the attack violated certain Admiralty laws and that the
> organization involved—the Palestine Liberation Organization—had assets and
> carried on activities in New York, was the court able to establish jurisdiction over
> the case.  A similar attack occurring on an airplane or in some other locale might
> not have been subject to civil action in the U.S.

H.R. Rep. No. 102-1040, at 5 (1992).

The Senate Judiciary Committee Report also provides as a primary reason for the enactment of the ATA's civil remedy provision the need to provide a remedy for American victims of foreign terrorism.  It states in a section titled "Legislative History":

> Title X [of the bill that was passed by the Senate] is known as the Civil Remedies for Victims of Terrorism.  This legislation was first introduced in the 101st Congress (as S. 2465) by Senator Charles Grassley.  On July 25, 1990, the Senate Judiciary Subcommittee on Courts and Administrative Practice held a hearing on the Bill.  It passed the subcommittee on September 25, 1990, and was thereafter incorporated into the fiscal year 1992 Military Construction Appropriations bill.  In Conference, the conferees intended to delete the provisions of Civil Remedies for Victims of Terrorism.  The enrolling clerk, however, erred and the provisions were included in Public Law 101-519 of November 5, 1990.
>
> The Civil Remedies sections of the Military Construction Appropriations Act were repealed in 1991, and Senator Grassley reintroduced the bill, S. 740, in the 102d Congress.  The Senate passed this bill by voice vote on April 16, 1991.
>
> Title X would allow the law to catch up with contemporary reality *by providing victims of terrorism with a remedy for a wrong that, by its nature, falls outside the usual jurisdictional categories of wrongs that national legal systems have traditionally addressed.*  By its provisions for compensatory damages, [treble] damages, and the imposition of liability at any point along the causal chain of terrorism, it would interrupt, or at least imperil, the flow of money.

S. Rep. No. 102-342, at 22 (1992) (emphasis added).

The portion of the *Congressional Record* detailing Senator Grassley's 1991 reintroduction of the ATA reads as follows:

> Mr. DASCHLE.  Mr. President, I ask unanimous consent that the Senate proceed to the immediate consideration of S. 740, the Antiterrorism Act of 1991, now at the desk.
>
> . . . .
>
> Mr. GRASSLEY.  Mr. President, last April, I, along with Senator Heflin, first introduced the Antiterrorism Act of 1990 [ATA] S. 740. . . .
>
> This legislation would, for the first time, provide for Federal civil remedies for American victims of international terrorism.
>
> Specifically, the ATA amends title 18 of the United States Code, which extends

American criminal jurisdiction over terrorists.  S. 740 provides that any national of the United States, injured by an act of international terrorism, his estate, heirs, or survivors, may sue in U.S. district court.  The ATA removes the jurisdictional hurdles in the courts confronting victims and it empowers victims with all the weapons available in civil litigation, including: [s]ubpoenas for financial records, banking information, and shipping receipts—this bill provides victims with the tools necessary to find terrorists' assets and seize them.  *The ATA accords victims of terrorism the remedies of American tort law, including treble damages and attorney's fees.*

. . . .

The families of victims of Pan Am 103 testified in support of the ATA and have worked tirelessly for its enactment.  Lisa and Ilsa Klinghoffer, daughters of American Leon Klinghoffer who was murdered by PLO terrorists on the Achille Lauro Cruis[e]liner, also testified in support of Grassley-Heflin.

Last June, a New *York Federal District Court ruled in the Klinghoffer versus PLO case* (after years of litigation), *that the U.S. courts have jurisdiction over the PLO*.  The New York court set the precedent; *S. 740 would codify that ruling and makes the right of American victims definitive*.

. . . .

In fact, in March, the Second Circuit Court of Appeals heard oral arguments in the PLO's appeal of the district court's decision . . . finding jurisdiction in the Klinghoffer case.  Several parties in the case, including the Klinghoffers—and the Anti-Defamation League in an amicus curiae brief—cited and relied upon the ATA in their appellate briefs.

Unfortunately, this law was repealed just a few weeks after oral argument; albeit, on purely technical grounds.  The repeal came despite the strong support in Congress for the law.  However, I am pleased that once again the Senate is unanimously supporting the ATA.

This should send a clear signal to the courts that the repeal of the ATA a few weeks ago was a wholly technical matter and did not in any way reflect Congress' intent on the substance of the legislation.  *Our resolve to fight terrorism and equip victims with civil remedies for terrorists acts is as strong as ever*.

137 Cong. Rec. S4,511 (daily ed. April 16, 1991) (emphasis added, first bracketing in original,

capitalization omitted).

Senator Grassley also spoke on the Senate floor after the Federal Courts Administration

Act of 1992—the bill that included the provisions of the ATA—was reported out of the

conference committee.  He stated:

> Finally, Mr. President, I am pleased that this bill incorporates my legislation to create a new civil action for American victims of terrorism.  The tragedies of Pan Am 103 and the *Achilles Lauro* still burn in our minds.  Those responsible have not been called to account for destroying precious American lives.  This provision, the product of 3 years of effort[,] is now finally coming to fruition.  American victims will be able to bring a claim against a terrorist group for money damages.  The Justice Department had some concerns about protecting its criminal investigations in these kinds of cases.  And we have been able to accommodate the Department's interests.  After all, we agree that *the first and best remedy is to bring these terrorists to justice in our courts of law*.  But often, the terrorists elude justice, as in the *Achilles Lauro* case where Leon Klinghoffer, an elderly American[,] was callously murdered by PLO terrorists.  And in the Pan Am 103 case, two Libyans have been indicted, but have not been apprehended.  While this bill will not permit civil actions against sovereign leaders, *it will allow the victims to pursue renegade terrorist organizations and their leaders, and go after the resource that keeps them in business—their money*.  We all hope that this new provision will not be invoked—that is, that there will not be American victims of terrorism.  But in the event tragedy strikes, *victims will be armed with this civil remedy*.

138 Cong. Rec. S17,260 (daily ed. Oct. 7, 1992) (emphasis added, "Achilles Lauro" italicized in

original).

Relevant in the consideration of the civil remedy provision's legislative history is the

transcript of a July 1990 hearing of the Senate Judiciary Committee's Subcommittee on Courts

and Administrative Practice, at which an earlier iteration of the ATA was discussed at length.

*See generally Antiterrorism Act of 1990: Hearing on S. 2465 Before the Subcomm. on Courts*

*and Admin. Practice*, 101st Cong. 1-137 (1992).  A statement made at the hearing by a former

high-level Department of Justice attorney was singled out for discussion in a case similar to the

present one.  *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 56 (D.D.C. 2010).  That

statement emphasizes the incorporation of principles of American tort law in the civil remedy

provision of the ATA:

> I think that the bill as drafted is powerfully broad, and its intention, as I read it, is to bring focus on the problem of terrorism and, reaching behind the terrorist actors to those who fund and guide and harbor them, bring all of the substantive law of the American tort law system.
>
> *That tort law system generally tracks, and usefully tracks, criminal law doctrines.* There is a notion in the criminal law, for example, of vicarious liability. You may not be the person who pulled the trigger, but if you bought the gun, if you pointed out the victim, if you arranged for the victim to be in a vulnerable place, if you paid the expenses of the hit man, if you encouraged the hit man, all while knowing that that is what the hit man was going to do, then you are criminally liable, and you may be liable as well even if you didn't know for sure, but you had a pretty good idea. You may be criminally liable if you were negligent in your knowledge. You could have known if you tried to find out what he was going to do with the gun, the money, the vulnerable victim, and so forth.
>
> *The tort law system has similar rules where liability attaches to those who knowingly or negligently make it possible for some actor grievously to injure someone else.* As section 2333(a) of this bill is drafted, it brings all of that tort law potential into any of these civil suits.
>
> . . . Let us make *all the tort law in the country available* to see what we can do to sort out these suits, *all the doctrines of vicarious and shared liability*, *joint and several liability*, and so forth, and let us see if we can't nail all the tort-[]feasors down the chain, from the person who starts spending the money to the person [who] actually pulls the trigger.

*Antiterrorism Act of 1990: Hearing on S. 2465 Before the Subcomm. on Courts and Admin.*

*Practice*, 101st Cong. 136-37 (1992) (statement of Joseph A. Morris, former general counsel of

the U.S. Information Agency and the U.S. Office of Personnel Management) (emphasis added).

The reference to mere negligence by Mr. Morris as a basis for ATA liability cannot be accepted

in view of the trebling of damages required by the statute; the same is true of his equation of

criminal law vicarious liability and civil liability.  *See* Part III.C.4, *infra*.

### 3.   Civil Remedy Provision: Aiding and Abetting Liability

The Bank argues that plaintiff's first claim must be dismissed since the ATA does not allow for secondary-liability claims.  *See* Def. Mem. 37-40; *see also* Am. Compl. ¶¶ 214-24.

Decisions are split on whether section 2333(a) allows for claims premised on theories of secondary liability—*i.e.*, whether an ATA plaintiff can recover against a defendant who "aided and abetted" a violation of the ATA, or for a defendant's entry into a conspiracy to violate the ATA without that defendant having committed a substantive violation.  Since the material support statutes already criminalize the provision of aid to terrorists and terrorism, *see* 18 U.S.C. §§ 2339A, 2339B, 2339C, and since section 2333(a) permits a plaintiff to recover for a violation of those criminal provisions, *see id.* § 2331(1), the debate over the availability of secondary liability, in the ATA context, seems to be of relatively modest practical importance.

The key issue regarding secondary liability in this case appears to be straightforward: do federal courts have the power to fashion, pursuant to section 2333(a), the substance of a federal common law tort of aiding and abetting a violation of the ATA?  *Cf. Halberstam v. Welch*, 705 F.2d 472, 476-78 (D.C. Cir. 1983) (describing aiding and abetting liability in the civil context).  Or must a plaintiff rely solely on the combination of the material support statutes and section 2333(a) to prove direct liability for a defendant's own acts?

The general rubric of secondary liability discussed here is analytically distinct from the *combination of statutes* that make it a federal crime to knowingly or intentionally provide material support in order to conspire to unlawfully kill an American national.  *See* 18 U.S.C. §§ 2332(b) (attempt and conspiracy to kill an American national outside of the United States), 2339A(a) (criminalizing the provision of material support or resources used to carry out a violation of 18 U.S.C. § 2332, if the defendant knew that the support would be used for that purpose or intended that it be so used).

The majority of federal courts have concluded that the ATA allows for claims based on a theory of secondary liability—*e.g.*, aiding and abetting.  Only the en banc Court of Appeals for the Seventh Circuit has determined otherwise.  *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 54-57 (D.D.C. 2010) (collecting cases and citing *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 689 (7th Cir. 2008) (en banc) (Posner, J.)).

The leading case on federal tort statutes and the availability of secondary liability thereunder is *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994).  Its effect in ATA cases is disputed by courts and commentators.  *See, e.g.*, *Boim*, 549 F.3d at 689 (stating the "statutory silence on the subject of secondary liability means there is none"); *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 582-85 (E.D.N.Y. 2005) (concluding that the ATA permits claims premised on secondary liability theories); *see also Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 645 & n.16 (S.D. Tex. 2010) (collecting cases addressing the secondary liability issue); Note, *Central Bank and Intellectual Property*, 123 Harv. L. Rev. 730, 732-37 (2010) (discussing the influence of *Central Bank* and areas of federal law in which its reasoning has been applied).

The facts of *Central Bank* are relatively simple.  The Central Bank of Denver served as the indenture trustee for bonds issued by a Colorado public authority to help finance public improvements at a planned residential and commercial development located in Colorado Springs. Eventually, the authority defaulted.  *See Central Bank*, 511 U.S. at 167-68.

The First Interstate Bank of Denver had purchased a substantial portion of the bonds. After the authority's default, First Interstate Bank sued numerous defendants, including Central Bank, for violations of section 10(b) of the Securities Exchange Act of 1934.  The complaint alleged principally that the defendants—with the exception of Central Bank—had violated

section 10(b).  It was claimed that Central Bank was secondarily liable under that section for having aided and abetted the alleged fraud.  *See id.* at 168.

The district court granted summary judgment to Central Bank.  The Court of Appeals for the Tenth Circuit reversed, concluding that securities fraud plaintiffs could proceed, pursuant to section 10(b), against those who aided and abetted primary violators of that section.  *See id.*

The Supreme Court granted certiorari and reversed.  Preliminarily, the Court pointed out that the Securities Act of 1933 and the Securities Exchange Act of 1934 "create an extensive scheme of civil liability," and that it had earlier concluded that Congress, in enacting section 10(b) of the 1934 statute, had impliedly created a private cause of action for securities fraud.  *Id.* at 171 (citing *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971)).  And it noted that section 10(b) provided in relevant part that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> . . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.

*Id.* at 171 (quoting 15 U.S.C. § 78j(b) (1994)) (bracketing in original).  Section 10(b) has since been amended, *see* 15 U.S.C. § 78j(b) (2000), but the changes are immaterial for purposes of the present discussion.

The Court observed that "[l]ike the Court of Appeals in this case, other federal courts have allowed private aiding and abetting actions under § 10(b)."  *Central Bank*, 511 U.S. at 169 (collecting cases).  It pointed out, however, that after a series of decisions "where [it] paid close attention to the statutory text in defining the scope of conduct prohibited by § 10(b), courts and

38

commentators began to question whether aiding and abetting liability under § 10(b) was still available." *Id.*; *see also id.* at 170 (collecting cases).

The Court's ultimate conclusion on the secondary liability question was straightforward: "[b]ecause the text of § 10(b) does not prohibit aiding and abetting, . . . a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." *Id.* at 191. The points made in *Central Bank* in support of the Court's conclusion, as relevant to the instant case, are as follows:

1. The statute's text is the touchstone in determining whether a statute provides for secondary liability;

2. If the statute is silent, then there can be no liability for aiding and abetting since Congress knows how to provide for aiding and abetting liability if it wants to do so;

3. Policy considerations are irrelevant in determining whether a statute provides for secondary liability; and

4. There is no general presumption that federal civil statutes provide for aiding and abetting liability.

*See* Note, 123 Harv. L. Rev. at 732-34 (summarizing the Supreme Court's reasoning). In 2008, the Supreme Court expressly reaffirmed the holding of *Central Bank*. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158 (2008).

"*Central Bank*'s holding is not limited to section 10(b) or the securities laws. The opinion's reasoning is undeniably broad, and nothing in its holding turns on particular features of securities laws." Note, 123 Harv. L. Rev. at 734 (internal quotation marks, bracketing, and footnote omitted). As the Court of Appeals for the Ninth Circuit has stated in rejecting an argument to limit the reach of *Central Bank* to the context of the securities laws, "it is the

39

Supreme Court's *approach* to interpreting the statute, *not the actual statute itself*, that is

significant.  Thus, the fact that the [C]ourt was interpreting a different act of Congress—the

Securities Exchange Act—is inconsequential."  *Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1006

n.1 (9th Cir. 2006) (emphasis added).

It appears that only one federal court—the Court of Appeals for the Seventh Circuit,

sitting en banc—has concluded, following the logic of *Central Bank*, that section 2333(a) does

not allow for claims premised on an aider-and-abettor theory.  *See Wultz v. Islamic Republic of

Iran*, 755 F. Supp. 2d 1, 56 (D.D.C. 2010) (citing *Boim v. Holy Land Found. for Relief & Dev.*,

549 F.3d 685, 689 (7th Cir. 2008) (en banc)).  The conclusion reached by Judge Posner for the

majority of the en banc Court of Appeals for the Seventh Circuit on the secondary liability issue

was emphatic: "statutory silence on the subject of secondary liability means there is none."

*Boim*, 549 F.3d at 689.  It is conceded—even by the courts that have concluded that section

2333(a) provides for secondary-liability claims—that section 2333(a)'s text is silent with regard

to the availability of secondary liability.  *See, e.g.*, *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d

571, 582 (E.D.N.Y. 2005) (noting that "[w]hen it comes to determining the proper defendants for

claims under Section 2333, however, the statute is silent").

The courts that have concluded that section 2333(a) provides for secondary liability have

offered a variety of arguments in support of that conclusion.

It has been contended that "Section 2333 does not limit the imposition of civil liability

only to those who directly engage in terrorist acts."  *Id.*  But this argument is beside the point;

*Central Bank* states essentially that if a statute's text is silent on secondary liability, then there is

none.  *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164,

177, 191 (1994).  And, following the reasoning of *Central Bank*, the fact that section 2333(a)

does not address the aiding and abetting issue would seem to negate its applicability.

The *Linde* court relied expressly on the reasoning of the first panel opinion in the *Boim*

litigation in finding that the ATA allows aiding and abetting as a basis for secondary liability.

*See Linde*, 384 F. Supp. 2d at 583 (quoting *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1019

(7th Cir. 2002) (first panel opinion), *overruled in part sub nom. by Boim v. Holy Land Found. for

Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) (en banc)).  The first *Boim* panel stated that:

> The *Central Bank* analysis provides guidance but is not determinative here for a
> number of reasons.  First, *Central Bank* addressed extending aiding and abetting
> liability to an implied right of action, not an express right of action as we have
> here in section 2333.  Second, Congress expressed an intent in the terms and
> history of section 2333 to import general tort law principles, and those principles
> include aiding and abetting liability.  Third, Congress expressed an intent in
> section 2333 to render civil liability at least as extensive as criminal liability in the
> context of the terrorism cases, and criminal liability attaches to aiders and abettors
> of terrorism.  *See* 18 U.S.C. § 2.  Fourth, failing to extend section 2333 liability to
> aiders and abettors is contrary to Congress' stated purpose of cutting off the flow
> of money to terrorists at every point along the chain of causation.

*Boim*, 291 F.3d at 1019.

These arguments—each of which has been proffered by courts in support of the

conclusion that section 2333(a) provides for secondary liability, *see, e.g.*, *Wultz v. Islamic

Republic of Iran*, 755 F. Supp. 2d 1, 55-56 (D.D.C. 2010)—present problems.

The first contention—resting on a purported distinction between express and implied

rights of action—can potentially be understood as making two points.  The first and weaker of

the two is that, without more, there is a difference, pursuant to *Central Bank*, between express

and implied private rights of action.  But the fact that *Central Bank* dealt with an implied private

right of action is irrelevant.  *Central Bank*'s analysis did not distinguish between express rights

of action and those that are implied.  The dissenting Justices in *Central Bank* explicitly

recognized this. *See Central Bank*, 511 U.S. at 199-201 (Stevens, J., dissenting); *see also Boim*, 549 F.3d at 689 (Posner, J.) (rejecting the first *Boim* panel's argument premised on the distinction between express and implied rights of action, and noting that "as the dissenting Justices in *Central Bank of Denver* had pointed out, the majority's holding was not limited to private actions"). And Congress appears to have agreed with this interpretation, since, in late 1995—roughly a year and a half after *Central Bank* was decided—it enacted 15 U.S.C. § 78t(e). That subsection gives the Securities and Exchange Commission the authority to recover from the aiders, abettors, and facilitators of primary violations of section 10(b). As the en banc majority noted in *Boim*, had *Central Bank* allowed for secondary liability pursuant to section 10(b) in suits that are expressly authorized, Congress' action would have been pointless. *See Boim*, 549 F.3d at 689.

The second and stronger argument is somewhat more complex: it might be argued that the legislative history of section 2333(a) suggests that, in the anti-terrorism context, Congress designed the civil remedy provision so as to provide for secondary liability. But this argument does not turn on any distinction between express and implied rights of action. It attempts to bootstrap an argument premised on legislative history into the more general debate over whether the express right and implied right distinction is relevant at all.

The second and fourth arguments made by the first *Boim* panel—based on the legislative history of section 2333(a)—are not compelling. They contain at least three flaws. First, they assume that the hundreds of members of Congress can be said to have acted with a unified intent on this unexpressed point. This is contrary to the realities of the legislative process. *See, e.g.*, Kenneth A. Shepsle, *Congress Is a "They," Not an "It": Legislative Intent as Oxymoron*, 12 Int'l Rev. L. & Econ. 239 (1992). Second, they ignore two important points made by the

42

Supreme Court in *Central Bank*: first, that the statute's text is controlling with regard to the availability of secondary liability, *see Central Bank*, 511 U.S. at 177, 191, and second, that statutory silence with regard to secondary liability means that there is none. *See id.* at 176-77, 182-85.

The third and final problem is that these arguments prove too much. Portions of the legislative history indicate that some proponents of the anti-terrorism statute's civil remedy provision thought that the statute would reach negligent support for terrorism, despite the fact that section 2333(a) provides for treble damages. *See Antiterrorism Act of 1990: Hearing on S. 2465 Before the Subcomm. on Courts and Admin. Practice*, 101st Cong. 136 (1992) (statement of Joseph A. Morris, former general counsel of the U.S. Information Agency and the U.S. Office of Personnel Management). That result would be highly unusual. Treble damages are generally not recoverable in tort for mere negligence. *See* Part III.C.4, *infra*. Similarly, portions of the legislative history suggest that section 2333(a) was intended to provide American victims of terrorism with "*all* the weapons available in *civil* litigation." 137 Cong. Rec. S4,511 (daily ed. Apr. 16, 1991) (statement of Sen. Grassley) (emphasis added). But no one appears to have seriously suggested, for example, that section 2333(a) provides for strict liability, despite the fact that strict liability is a feature of the American law of torts.

The first *Boim* panel's third argument—that "Congress expressed an intent in section 2333 to render civil liability at least as extensive as criminal liability in the context of the terrorism cases, and criminal liability attaches to aiders and abettors of terrorism," *see Boim*, 291 F.3d at 1019—is belied both by *Central Bank* and by the statute cited by the *Boim* panel itself— 18 U.S.C. § 2. The panel cited that provision to support the argument that section 2333(a) was designed to provide for secondary liability. But, as the *Central Bank* Court pointed out, *see*

43

*Central Bank*, 511 U.S. at 176, the fact that Congress has enacted a general criminal aiding-and-abetting statute while *not* specifically providing for secondary liability in the ATA suggests just the opposite—*i.e.*, that section 2333(a) should not be read to provide for secondary liability, since Congress knew how to provide for liability of that sort if it wanted to do so.

It might with some force be argued that *Central Bank* is inapposite pursuant to section 2331(1)(A) itself—*i.e.*, that the ATA expressly provides for aiding and abetting liability. The argument turns on the fact that that subsection states that "the term 'international terrorism' means activities that . . . *involve* violent acts or acts dangerous to human life" that are in violation of a federal or a state criminal law. 18 U.S.C. § 2331(1)(A) (emphasis added); *cf. Boim*, 291 F.3d at 1009-10 (first panel opinion). But it is difficult to believe that section 2331(1)(A)—the ATA's *definitional* provision—was written so as to provide for aiding and abetting liability *sub silentio*, given that Congress has explicitly provided for liability of that type in other contexts. *See Central Bank*, 511 U.S. at 176-77, 182-85; *cf. United States v. Weinstein*, 452 F.2d 704, 711 (2d Cir. 1971) (Friendly, C.J.). The more natural approach would have been to do so expressly.

In the ATA context the secondary liability problem may be of little practical importance. The federal anti-terrorism laws generally criminalize providing material support to terrorists and terrorist groups; a number of statutes provide for what is effectively aiding-and-abetting liability in the terrorism context. *See* 18 U.S.C. §§ 2339A, 2339B, 2339C. This point was recognized explicitly by the en banc majority in *Boim*. *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 692 (7th Cir. 2008) (en banc) (noting that "[t]hrough a chain of incorporations by reference, *Congress has expressly imposed liability on a class of aiders and abettors*" (emphasis added)). Thus, as noted in Part I, *supra*, and Parts IV.B and IV.C, *infra*, while the standalone aiding and abetting claim is dismissed, the functionally equivalent material support concepts

44

provide grounds to support the other claims in the complaint.  *See* Part I, *supra*; *see also* Parts

IV.B and IV.C, *infra*.  It need not be determined at this stage of the litigation whether recovery

pursuant to section 2333(a) is available on other theories of secondary liability, *see* Part I, *supra*;

the plaintiff has not raised other secondary-liability civil claims in his amended complaint.

### 4.  Civil Remedy Provision: Elements of Cause of Action

#### a.  General Principles and Act Requirement: Claims Two Through Five

 "When a federal tort statute does not create secondary liability, so that the only

defendants are primary violators, the ordinary tort requirements relating to fault, state of mind,

causation, and foreseeability must be satisfied for the plaintiff to obtain a judgment."  *Boim*, 549

F.3d at 692 (collecting cases).  This is true even if those requirements are not specifically

enumerated as statutory elements of the tort.  *See Wultz v. Islamic Republic of Iran*, 755 F. Supp.

2d 1, 50 (D.D.C. 2010).  "When applied to an ATA claim, these traditional elements require that

a plaintiff show *intentional misconduct* [of the defendant] and *proximate causation*."  *Id.*

(emphasis added).  The Bank contends that plaintiff fails to plausibly allege that its actions were

a proximate cause of his injuries.  *See* Def. Mem. 32-36.

A successful section 2333(a) claim has been described as having three formal elements:

unlawful *action*, the requisite *mental state*, and *causation*.  *See Boim*, 549 F.3d at 721 (Wood, J.,

concurring in part and dissenting in part).  Each element raises difficult questions.

A brief review of the statute's "action" requirement is useful.  An ATA plaintiff must

plead and prove that he was injured by "an act of international terrorism."  18 U.S.C. § 2333(a).

As was noted in Part III.C.1, *supra*, the ATA's definition of "international terrorism" is

complicated.  An act of "international terrorism" must (1) involve a violent act or an act

dangerous to human life that is in violation of some federal or state criminal law, or that would

be criminal if it were committed within the jurisdiction of the United States or any state, (2)

appear to be intended—as an objective matter—to intimidate or coerce a civilian population,

influence a government's policy by intimidation or coercion, or affect a government's actions by

mass destruction, assassination, or kidnapping, and (3) occur primarily outside of the United

States, or transcend national boundaries in terms of the means by which it is accomplished, the

persons it appears intended to coerce or intimidate, or the location in which the perpetrators

operate or seek asylum.  *See* 18 U.S.C. § 2331(1).

### b.  Mental State: Claims Two Through Five

With regard to the mental state required, to recover pursuant to the ATA's civil remedy

provision, a plaintiff must prove that a defendant acted intentionally, knowingly, or recklessly.

18 U.S.C. § 2333(a) states in part that a prevailing ATA plaintiff "shall recover threefold the

damages he or she sustains and the cost of the suit, including attorney's fees."  Treble damages

"are essentially punitive in nature."  *Vt. Agency of Natural Res. v. United States ex rel. Stevens*,

529 U.S. 765, 784 (2000).  "The very idea of treble damages reveals an intent to punish past, and

to deter future, unlawful conduct."  *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630,

639 (1981).  Such damages are not recoverable in tort for mere negligence, *see, e.g.*, *Consol.*

*Edison Co. of N.Y., Inc. v. Pataki*, 292 F.3d 338, 352 n.6 (2d Cir. 2002); deliberate or reckless

misconduct is required.  *See Molzof v. United States*, 502 U.S. 301, 307 (1992); *Boim v. Holy*

*Land Found. for Relief & Dev.*, 549 F.3d 685, 692 (7th Cir. 2008) (en banc) (citing W. Page

Keeton et al., Prosser and Keeton on the Law of Torts § 2, at 9-10 (5th ed. 1984)).

The courts are split regarding the mental state required for a violation of section 2333(a).

The en banc Court of Appeals for the Seventh Circuit has enunciated an expansive standard:

> To give money to an organization that commits terrorist acts is not intentional
> misconduct *unless one either knows that the organization engages in such acts or*

> *is deliberately indifferent to whether it does or not*, meaning that one knows there is a substantial probability that the organization engages in terrorism but one does not care.

*Boim*, 549 F.3d at 693 (en banc majority opinion) (emphasis added).  Some courts have expressed concern with the *Boim* en banc majority's reasoning:

> [The *Boim* en banc opinion] is so broad that, if taken to its logical extension, it could make any person liable if that person knows that (or is deliberately indifferent to whether) Hamas commits terrorist attacks in Israel, if even $1 of that person's money ends up in Hamas's bank account. . . .  [T]he limits of liability are unclear under [the *Boim* en banc opinion], which *removes a causation requirement and removes an intent, or purpose, or knowledge requirement and only demands awareness that the organization that ends up receiving the funds is a terrorist group*.

*Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 664 (S.D. Tex. 2010) (emphasis added).

It is not clear—at least with regard to intent, purpose, and knowledge—that this statement from *Abecassis* is an accurate description of the practical effect of the *Boim* en banc majority opinion.  As the *Abecassis* court itself recognized, "[i]f primary liability is at issue, the criminal material support statutes apply," and each of these criminal statutes has its own requirements regarding knowledge and intent.  *See id.* (discussing the federal material support statutes, 18 U.S.C. §§ 2339A, 2339B, and 2339C).  18 U.S.C. § 2332, one of the statutes upon which Gill, the plaintiff in the present case, relies, makes it a federal crime to unlawfully kill, attempt to kill, or conspire to kill an American national while that national is outside of the United States.  Section 2332 has its own scienter requirement, as do other state and federal criminal laws.

Except with regard to recklessness, then, the differences between the *Boim* en banc majority and the *Abecassis* court on this point appear to be almost semantic; to recover pursuant to section 2333(a), an ATA plaintiff will have to prove a violation of some federal or state criminal law.  Presumably, it will usually be one or more of the federal material support statutes; each of those statutes, as noted, has its own requirements regarding the requisite mental state.

*See* 18 U.S.C. §§ 2339A (criminalizing the provision of material support to terrorists if the defendant knew that the support would be used in preparation for, or in carrying out, violations of certain criminal laws, or if the defendant intended the support to be so used), 2339B (criminalizing "knowingly" providing, attempting to provide, or conspiring to provide material support or resources to a foreign terrorist organization), 2339C (criminalizing the "willful[]" provision or collection of funds "with the intention that such funds be used, or with the knowledge that such funds are to be used" to carry out terrorist activities).  The majority of the en banc Court of Appeals for the Seventh Circuit conceded the applicability of other statutes' scienter requirements.  *See Boim*, 549 F.3d at 692 (en banc majority opinion) (noting that the *Boim* plaintiffs "have to satisfy the state-of-mind requirements of sections 2339A and 2332"); *cf. id.* at 721 (Wood, J., concurring in part and dissenting in part) (agreeing generally with the mental state requirements set forth by the en banc majority).

A critical question on mental state requires analysis.  It is unclear from the face of section 2333(a) whether, for an ATA plaintiff to recover, it must be proven that the alleged donor or financier knew that the recipient of the funds planned to commit terrorist acts *against Americans*. Two points require discussion.

First, this requirement appears to have been derived by the *Boim* en banc court at least in part from its conjunctive reading of 18 U.S.C. §§ 2332 and 2339A.  With respect to the mental state regarding the victim's nationality required by those provisions, the en banc majority in *Boim* was of the view that a person who made a donation to a terrorist organization knowing that there was a substantial probability that the organization's goals included the targeting of Americans, or that the organization's activities would be likely to injure Americans, could be held liable pursuant to the chain of incorporations on which the plaintiff in that case relied.  *See*

*Boim*, 549 F.3d at 690, 693-94 (en banc majority opinion) (Posner, J.).  Judge Wood, concurring

in part and dissenting in part, concluded that the ATA requires a more substantial showing with

regard to a donor's intent.  *See id.* at 725-26 (Wood, J., concurring in part and dissenting in part);

*see also Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 664 (S.D. Tex. 2010) (stating that an ATA

"defendant must also know (or intend) that the terrorism or terrorist group it is supporting targets

Americans").

      The arguments of Judge Wood and Judge Rosenthal, the author of *Abecassis*, seem to

proceed as follows: Section 2339A provides in part that "[w]hoever provides material support . .

. *knowing or intending* that [it is] to be used in preparation for, or in carrying out, *a violation* of

section . . . 2332 . . . of this title" is guilty of a crime.  18 U.S.C. § 2339A(a) (emphasis added).

Section 2332 criminalizes the unlawful killing of—and other unlawful attacks on—American

nationals while those nationals are outside of the United States; similarly criminalized are

attempted killings of and conspiracies to kill American nationals abroad.  *See id.* § 2332

(subdivisions (a) and (b), homicide, attempted homicide, and conspiracy to commit homicide;

subdivision (c), serious bodily injury).  This combination of statutes, upon which the plaintiff in

*Boim* relied, appears to require—in proceeding from section 2333(a) (the civil remedy provision)

to section 2331(1) (the definitional provision) to section 2339A(a) (the material support

provision) to section 2332 (the criminal provision)—that a donor to, or a financier of, terrorism

know or intend that his support will be used to carry out attacks on American nationals, because

section 2339A(a) criminalizes only the provision of *knowing or intentional* support provided to

carry out a violation of section 2332.  (Section 2339A(a) also proscribes the provision of material

support made in furtherance of a number of other federal crimes; it does not solely address

section 2332 violations.  The plaintiff in the instant case has not stated the particular cross-

reference in section 2339A(a) upon which he apparently relies. *See* Am. Compl. ¶¶ 233-39; *see also* Part IV.C, *infra*.)

The analysis in the two preceding paragraphs on the question of mental state, however, does *not* apply to the second claim of the amended complaint in this case, even though the plaintiff here in his second claim relies upon the defendant's alleged violation of section 2332(b). The plaintiff's second claim explicitly charges the Bank with having entered into a conspiracy to murder Americans abroad; it does not charge the defendant with having provided material support to Hamas and its agents so that they could violate section 2332(b). Plaintiff's second claim is distinguishable from the one that the *Boim* plaintiffs relied upon, which received extensive treatment by the en banc Court of Appeals for the Seventh Circuit—that is, the series of incorporations described above. *See Boim*, 549 F.3d at 690 (en banc majority opinion); *id.* at 721-725 (Wood, J., concurring in part and dissenting in part).

The second and weightier issue regarding a victim's status as an American national— squarely presented in the present case—is whether section 2333(a) requires *generally* that a plaintiff prove that a defendant knew that the group it supported targeted American nationals or that the defendant intended its support to be used to harm American nationals. This appears to be the position of Judges Wood and Rosenthal. *See id.* at 725-26 (Wood, J., concurring in part and dissenting in part); *Abecassis*, 704 F. Supp. 2d at 664. The argument seems to be that since section 2333(a) allows recovery only for acts of international terrorism committed against "national[s] of the United States," a section 2333 plaintiff must show that a section 2333 defendant knew that its actions would result in harm to Americans, or intended that they would. Judge Posner, speaking for the *Boim* en banc majority, was of the view that recklessness is

enough, since treble damages are generally recoverable for reckless misconduct.  *See Boim*, 549 F.3d at 692-95 (en banc majority opinion).

This court is persuaded by the *Boim* en banc majority's reasoning for substantially the reasons stated in its opinion.  *See id*.  It would be bizarre if a section 2333(a) defendant's deliberate ignorance of a plaintiff's (or a plaintiff's decedent's) nationality was meant to be a defense to civil liability.  Recklessness—but not negligence—is sufficient.

Nothing in section 2333(a)'s text or history suggests that a plaintiff must plead and prove, as an element of his cause of action, a defendant's knowledge or intent regarding the plaintiff's (or the plaintiff's decedent's) status as an American national.  Requiring such a showing would seem inconsistent with traditional principles of American tort law; as the en banc majority noted in *Boim*, "[w]hen the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk."  *Id.* at 693 (internal quotation marks omitted).  And requiring such a showing would be perverse in another respect: doing so would make it more difficult, in many terrorism cases, for private plaintiffs to recover in tort than for the government to obtain a criminal conviction.  *See, e.g.*, 18 U.S.C. § 2339A(a).  In short, while section 2333(a)'s reference to "national[s] of the United States" limits the class of plaintiffs capable of pursuing civil recovery under the ATA, it does not require a section 2333(a) plaintiff to prove that the defendant knowingly or intentionally targeted Americans—*i.e.*, that a defendant knew that its support would be used to target Americans, or that it wanted the support to be used for that purpose.

The determination of whether a defendant was at least reckless with regard to the fact that American nationals probably would be harmed as a result of his actions is closely related to, although conceptually distinct from, an analysis of whether a defendant's actions were a

proximate cause of injuries suffered by an ATA plaintiff or an ATA plaintiff's decedent.  These inquiries are fact-specific and positively correlated.  A defendant who is deliberately indifferent to—that is, reckless with regard to—facts that should put him on notice that his actions are substantially likely to result in harm to American nationals will be more likely have his actions be found to be the proximate cause of any subsequent harm to Americans than a defendant who acted ignorantly or with benign intent.

To sum up: Plaintiff's first claim is dismissed because it depended on an aider-and-abettor concept.  *See* Part III.C.3, *supra*.  The others are not dismissed.  The second claim charges the defendant with having entered into a conspiracy with Hamas to murder or attempt to murder American nationals abroad.  *See* Am. Compl. ¶¶ 225-32.  The third, fourth, and fifth claims essentially charge the Bank with having provided substantial material support to Hamas, resulting in harm to the plaintiff.  *See id.* ¶¶ 233-55.

The mental state test to be applied to claims two through five is the following: First, it must be shown that the defendant's alleged actions were reckless, knowing, or intentional. Second, a connection must be made between the defendant's mental state and the potential for harm to American nationals.  If it is proven that the defendant knew, and it was the case, that a terrorist organization it supported intended to injure Americans, *or* that the defendant intended that its support help a terrorist organization in injuring Americans, *or* that the defendant was reckless with regard to the substantial probability of injuries that would likely be suffered by Americans as a result of its and the terrorist organization's actions—*i.e.*, the defendant knew that there was a substantial probability that Americans would be injured as a result of its support of the terrorist organization, but it did not care—then a mental state sufficient for a finding of liability on the part of the defendant will have been shown.  It is not necessary, with regard to

claims two through five, for the plaintiff to show that the defendant knew that American nationals would be harmed as a result of its actions, or that it intended that they would be. Combined recklessness on the part of the defendant and the terrorist organization would be a sufficient basis for liability.

In order for liability to be found, however, the statutory requirement of proximate causation must be satisfied.  *See* Part III.C.4.c, *infra*. A sensible application of the requirement of proximate causation will serve to protect defendants like the "penny donor," *see* Part I, *supra*, as well as others on the fringes of events, even if they acted recklessly.

### c.  Causation: Claims Two Through Five

The question of causation under section 2333(a) is complicated.  "[T]he modern law of torts employs at least three concepts of cause: 'cause-in-fact' or 'but for' cause, 'proximate' or 'legal' cause, and 'causal link' or 'causal tendency.'"  *United States v. Nelson*, 277 F.3d 164, 186 (2d Cir. 2002) (citation omitted).  Judge Posner's opinion for the *Boim* en banc majority has been criticized for having essentially omitted from the elements of the section 2333(a) cause of action any requirement that a plaintiff prove even proximate causation.  *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 721-24 (7th Cir. 2008) (en banc) (Wood, J., concurring in part and dissenting in part); *Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 664 (S.D. Tex. 2010).  This point has some credence: the en banc majority appears to have concluded that, because money is fungible, a defendant's provision of assistance to a terrorist organization does not have to be either a necessary or sufficient cause of the harm suffered by an ATA plaintiff or an ATA plaintiff's decedent in order for a section 2333(a) plaintiff to recover.  *See Boim*, 549 F.3d at 697-98 (en banc majority opinion).

But the point made by Judge Posner for the en banc majority in *Boim* has merit.  The money used need not be shown to have been used to purchase the bullet that struck the plaintiff. A contribution, if not used directly, arguably would be used indirectly by substituting it for money in Hamas' treasury; money transferred by Hamas' political wing in place of the donation could be used to buy bullets.  *See id.* at 698 (en banc majority opinion) (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1130 (D.C. Cir. 2004) (Garland, J.)). The problem can be solved by considering relative amounts of contributions and intentions. Thus, a major recent contribution with a malign state of mind would—and should—be enough, as the *Boim* en banc majority contended.  But a small contribution made long before the event— even if recklessly made—would not be.  The concept of proximate cause is central in imposing a balance.

The text of section 2333(a) suggests that the civil remedy provision was not designed to eliminate the modern requirement in tort that a plaintiff prove proximate cause.  Identical language in the civil remedy provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, has been interpreted by the Supreme Court as requiring a civil RICO plaintiff to show "that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well."  *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992) (analyzing 18 U.S.C. § 1964(c)); *see also Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 989 (2010).

"But for" cause cannot be required in the section 2333(a) context.  In most instances, if a particular contribution was not made, money from other sources could be redistributed to make up for the shortfall, and an attack could take place without a substantial donation.  For this reason the argument of the *Boim* en banc majority has bite: requiring an ATA plaintiff, at least in the

material support context, to prove but-for causation would come up against the basic problem of

the fungibility of money.  This point was recognized both by Judge Posner for the *Boim* en banc

majority and Judge Wood in her separate opinion.  *See Boim*, 549 F.3d at 697-98 (en banc

majority opinion); *id.* at 724 (Wood, J., concurring in part and dissenting in part); *see also*

*Abecassis*, 704 F. Supp. 2d at 665 ("The courts agree that 'but for' causation is not required").

But, as Judge Wood contended in her separate opinion after *Boim* was reheard by the Court of

Appeals for the Seventh Circuit en banc, that fact provides no reason to do away, in section

2333(a) cases, with the ordinary tort-law requirement of requiring a plaintiff to prove proximate

causation.  *See Boim*, 549 F.3d at 721-24 (Wood, J., concurring in part and dissenting in part).  A

section 2333(a) plaintiff alleging material support must prove that a defendant's actions were a

proximate cause of the injury of which he complains.  *See, e.g.*, *Hydro Investors, Inc. v.*

*Trafalgar Power Inc.*, 227 F.3d 8, 15 (2d Cir. 2000) (stating that "[a] proximate cause

determination does not require a jury to identify the liable party as the sole cause of harm; it only

asks that the identified cause be a substantial factor in bringing about the injury").  Temporal and

factual issues will often be crucial, in particular cases, in proximate cause inquiries pursuant to

section 2333(a).

### 5.  Act of War Defense: Procedural and Substantive Considerations

There is an inherent problem in defining an "act of war" in today's world.  Remembering

World War II, we continue to think of one nation's armed forces battling another's as the

prototypical "war".  *Cf. Al-Bihani v. Obama*, 590 F.3d 866, 882 (D.C. Cir. 2010) (Brown, J.,

concurring) ("[L]ooking backward may not be enough in this new war [against terrorism].  The

saying that generals always fight the last war is familiar, but familiarity does not dull the

maxim's sober warning.")  But the conflicts of immediate concern to the United States today

involve many forms of armed attack by individuals and organizations of many varieties

operating all over the world.  These often unstructured and unpredictable attacks present serious

dangers to the United States, its allies, and its people.  This court, within view of the rising

buildings replacing the twin towers destroyed in a terrorist attack on September 11, 2001, can

hardly ignore the realities of modern life; these realities prevent a simple interpretation of the

ATA's act of war defense.  *See* 18 U.S.C. § 2336(a).  The problem is presented here since

defendant contends, in its memorandum in support of its motion to dismiss, that plaintiff's claims

should be dismissed since his injuries were suffered during the course of an armed conflict

between military forces.  *See* Def. Mem. 26-30.

It is important to observe initially that defendant is incorrect insofar as it has argued that

the act of war exception, discussed at some length below, is jurisdictional.  *See* June 28, 2012

Hr'g Tr. 14.  The exception merely provides ATA defendants with an affirmative defense.  *Cf.*

*Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.*, 132 S. Ct. 694, 709 n.4

(2012).  An ATA defendant claiming that a plaintiff's injuries were suffered as the result of an

act of war thus has the burden of proving, by a preponderance of the evidence, that the claimed

act of war was a proximate cause of the plaintiff's injuries.  *See* 18 U.S.C. § 2336(a) ("by reason

of").

The ATA proscribes recovery pursuant to section 2333 for injury or loss resulting from

acts of war. 18 U.S.C. § 2336 provides:

> No action shall be maintained under section 2333 of this title *for injury or loss by
> reason of an act of war*.

*Id.* (emphasis added).  The Anti-Terrorism Act's definitional provision states that:

> (4) the term "act of war" means any act occurring in the course of—
>     (A) declared war;

(B) armed conflict, whether or not war has been declared, between two or more nations; or

(C) *armed conflict between military forces of any origin*[.]

*Id.* § 2331(4) (emphasis added).  Implicated by this seemingly simple provision are a host of legal issues, both procedural and substantive.  Of particular importance to the present litigation is the italicized final subsection, 18 U.S.C. § 2331(4)(C).

Especially troubling as a *procedural* matter is the question of whether dismissal of a complaint pursuant to the act of war exception—or the rejection of a motion to dismiss that seeks dismissal pursuant to the exception—is appropriate before discovery, *i.e.*, at the Rule 12(b)(6) stage.  The problem is labeled "procedural" since it is a product of the doctrines governing the scope of materials properly considered by a district court when a motion to dismiss is made.

The reason for concern is that the relevant questions raised by section 2331 generally and by subsection 2331(4)(C) in particular—whether injury or loss occurred during the course of an "armed conflict," and whether a given organization qualifies as a "military force"—seem at least in part to be factual, requiring adjudication either on summary judgment or by a jury.

It might be contended that a court could take judicial notice of "facts" regarding the status of the disputes in the Middle East and of a given organization's military character; a district court is entitled, at the Rule 12 stage, to consider matters of which judicial notice can be taken.  *See, e.g.*, *Halebian v. Berv*, 644 F.3d 122, 130 n.7 (2d Cir. 2011).  These and similar matters in the ATA context, however, hardly seem appropriate for the exercise of judicial notice.  At the Rule 12 stage the court has virtually no factual record, and the exercise of judicial notice in a case like the instant one is not acceptable.

A federal court "may judicially notice a fact that is not subject to reasonable dispute because it . . . is generally known within the trial court's territorial jurisdiction," or if it "can be

accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The characterization of the status of Hamas' conflict with Israel—*i.e.*, whether it is an "armed conflict" under section 2331(4)(C)—is subject to reasonable dispute; the same is true regarding that paramilitary organization's status as a "military force." *See* 18 U.S.C. §§ 2331(4)(C), 2336(a).

In an attempt to solve this procedural problem, it could be argued that a court may take as true—or, as the defendant argues, that the court *must* take as true, *see* Def. Mem. 28—the allegations in the complaint, and determine whether the act of war exception applies based on those allegations. But this would result in horizontal inequity. A plaintiff who *failed* to allege that a given organization was a military force could get to summary judgment and conduct discovery on that issue, while a similarly situated plaintiff who provided detailed allegations in his complaint regarding the conduct of which he complains would risk dismissal for having thoroughly pleaded his cause of action based on incomplete information available before discovery. It would be strange if similarly situated ATA plaintiffs were forced to opt between chancing dismissal pursuant to the Supreme Court's recent "plausibility" cases, *see, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678-80 (2009), and dismissal of their complaint pursuant to 18 U.S.C. § 2336(a) as a result of having provided detail regarding their ATA claim. One other court appears to have considered—albeit indirectly—this procedural issue. *See Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 164 n.14 (D.D.C. 2006). The application of the act of war exception in a case like the present one raises legal and factual questions best addressed on a motion for summary judgment or at trial.

The *substantive* problems apparent at the present stage are as follows: Section 2336(a) provides that "[n]o action shall be maintained under section 2333 of this title for injury or loss by

reason of an act of war."  The term "act of war" is defined to include, first, "any act occurring in the course of . . . armed conflict, whether or not war has been declared, between two or more nations," and, second, "any act occurring in the course of . . . armed conflict *between military forces of any origin*[.]"  18 U.S.C. § 2331(4)(B)-(C) (emphasis added).

The first definition noted above—exempting from civil recovery acts occurring in the course of "armed conflict, whether or not war has been declared, between two or more nations," *id.* § 2331(4)(B)—is, defendant might argue, potentially germane in this case, since Hamas in 2006 won a majority of the seats in the Palestinian legislature, and Gaza, which Hamas controls, is at least part of a proto-nation.  *See, e.g.*, *Dar-Salameh v. Gonzales*, 468 F.3d 47, 50 (1st Cir. 2006) (noting that Hamas has had "control of the government" of part of the Palestinian territories "since January 2006"); Joshua L. Kessler, *The Goldstone Report: Politicization of the Law of Armed Conflict and Those Left Behind*, 209 Mil. L. Rev. 69, 82-83 (2011) (describing Hamas' control of Gaza).

For purposes of the resolution of the present motion to dismiss, it is sufficient to merely highlight some of the questions that would be raised by an application of section 2331(4)(B) by way of section 2336(a) in the context of the Israel-Hamas conflict, treating the conflict potentially as a war between nations:

1. Is either the Hamas-controlled government of Gaza or the Palestinian National Authority ("PNA") a "nation" for purposes of the ATA?  Are both?  (And even if it were determined that either is so today, would that conclusion be retroactive, *i.e.*, be of relevance to Hamas' alleged conduct in 2008?)  The PNA is an administrative organization that was formed in the early 1990s, pursuant to the Oslo Accords, to provide for limited Palestinian self-governance.  *See, e.g.*,

59

*United States v. El-Mezain*, 664 F.3d 467, 487 (5th Cir. 2011).  It was granted full

membership in the United Nations Educational, Scientific, and Cultural

Organization in 2011, and it applied for membership in the United Nations that

same year.  *See, e.g.*, Larry D. Johnson, *Palestine's Admission to UNESCO:*

*Consequences Within the United Nations?*, 40 Denv. J. Int'l L. & Pol'y 118, 118-

19 (2011).

2.   Assuming that the Gaza government and the PNA are "nations" for purposes of

the Anti-Terrorism Act's act of war exception, was either (or were both) involved

in an "armed conflict" with the State of Israel at the time of the attack?  *See* 18

U.S.C. § 2331(4)(B).

3.   Assuming that the Gaza government and the PNA are "nations" and that either

was (or both were) involved in an "armed conflict" with the State of Israel, does

the ATA exempt from the aegis of the civil remedy provision the actions of a

paramilitary group—Hamas—tied to a nation's dominant political party?

Of primary concern in the instant litigation is the statute's third definition of "act of

war"—"any act occurring in the course of . . . armed conflict between military forces of any

origin[.]"  *See id.* § 2331(4)(C).  The Bank's argument in support of its position centers on that

provision.  *See* Def. Mem. 26-30.  Federal courts have split over the subsection's interpretation

and application.

The statute's definitional provision defines neither "armed conflict" nor "military force."

*See* 18 U.S.C. § 2331.  And the relevant portions of the legislative history are not illuminating.

The Senate Judiciary Committee Report's discussion of the provision that would become 18

U.S.C. § 2336(a) distinguishes between military actions by recognized governments, as contrasted with the actions of terrorist groups. It states:

> This section excludes from the scope of any civil action a claim brought on account of "an act of war." *The intention of this provision is to bar actions for injuries that result from military action by recognized governments as opposed to terrorists*, even though governments also sometimes target civilian populations. Injuries received by noncombatants as a result of open, armed conflict, including civil war, should not be actionable.

S. Rep. No. 102-342, at 46 (1992) (emphasis added). Virtually identical language is included in the relevant House Judiciary Committee Report. *See* H.R. Rep. 102-1040, at 7 (1992).

Raised by this passage are two substantial interpretive problems. First, the ATA as enacted does not limit the scope of section 2336(a) as described in the committee reports. In fact, the statute appears to go further; it includes within the definition of "act of war" any "act occurring in the course of . . . armed conflict between military forces *of any origin*[.]" 18 U.S.C. § 2331(4)(C) (emphasis added). Acts of this type are distinguished explicitly from the actions of recognized governments; the preceding subsection states that the term "act of war" includes "any act occurring in the course of . . . armed conflict, whether or not war has been declared, between *two or more nations*[.]" *Id.* § 2331(4)(B) (emphasis added). Application of the familiar *expressio unius* canon of construction suggests that section 2336(a)—by way of section 2331(4)(C)—limits civil recovery more broadly than the committee reports referenced above suggest. *See, e.g.*, *Doe v. Bin Laden*, 663 F.3d 64, 70 (2d Cir. 2011) (per curiam) (discussing the *expressio unius* canon).

The second interpretive problem raised by the passage in the committee reports does not raise a pure question of law. The issue is more practical: it is often difficult to distinguish between terrorist activity and civil war. And the value judgments required in making such a determination come close to exceeding the boundaries of judicial competence. *Cf.* Stephen C.

Neff, Justice in Blue and Gray: A Legal History of the Civil War 15 (2010) (noting that a "fundamental legal issue that brooded incessantly over the entire 1861-1865 struggle was the question of the legal nature of the conflict—whether it was a case of mere rebellion by disgruntled individuals against the lawful authorities or a war in the true sense of the term").

The additional legislative history brought to the court's attention by the parties—a floor statement made regarding the purpose and effect of the ATA—is not relevant with regard to the interpretation of the act of war exception. *See* 137 Cong. Rec. S4,511 (daily ed. Apr. 16, 1991) (statement of Sen. Grassley).

Given the facts that the statutory text provides no additional guidance, and that the legislative history is of little utility, other tools of statutory interpretation must be utilized in determining whether the actions of a terrorist paramilitary group like Hamas are covered by the act of war exception.

Several contentions on behalf of the defendant—assuming an adequate factual record—might support the conclusion that the activities of a group like Hamas are exempted from civil recovery by the ATA's act of war exception.

As an initial matter, the activities of many paramilitary terrorist groups—for example, the Irish Republican Army, Hamas, or the Tamil Tigers—would potentially seem to fall within the ambit of section 2331(4)(C) pursuant to a commonsense reading of that provision. *Cf. Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012) (noting that "[w]hen a term goes undefined in a statute, [the court] give[s] the term its ordinary meaning"). A group like Hamas might be said colloquially to be in an "armed conflict" with Israel; on this argument, the sticky question seems to be whether a group like Hamas or the Irish Republican Army is a "military" force within the statutory scheme. *See* 18 U.S.C. § 2331(4)(C). And the defense argument that

some paramilitary groups operate in a "military" fashion has some merit; organizations of that sort engage in military training, use weaponry similar to that used by the armed forces of governments, utilize planned tactics and strategy, and so forth.

Unfortunately, most dictionary definitions of the term "military" are, in this context, largely question-begging. *See* Black's Law Dictionary 1082 (9th ed. 2009) (defining the adjective "military" to mean "[o]f or relating to the armed forces, or "[o]f or relating to war"). Some dictionary definitions suggest that the act of war exception might be applicable in the case of terrorist or paramilitary activity. *See* Webster's Third New International Dictionary 1433 (unabridged ed. 1993) (stating in part that the adjective "military" means "of or relating to soldiers, *arms*, or war," "according to the methods and customs of war or of organized fighting men," or "*performed or made by armed forces*" (emphasis added)).

A number of courts interpreting section 2331(4)(C) have sought to define the term by distinguishing between the actions of terrorist or paramilitary groups and the activities of the armed forces *of a nation*. *See Weiss v. Arab Bank*, 2007 WL 4565060, at *4-5 (E.D.N.Y. Dec. 21, 2007); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1333-34 (D. Utah 2006). But this seemingly compelling contention ignores the statute's preceding definition of "act of war"; that subsection provides that the term "act of war" includes "any act occurring in the course of . . . armed conflict, whether or not war has been declared, *between two or more nations*[.]"  18 U.S.C. § 2331(4)(B) (emphasis added).  Given that definition, section 2331(4)(C) would seem to be redundant; by the same reasoning, given the *Weiss* and *Morris* courts' definition of the term "military," section 2331(4)(B) would arguably be mere surplusage. *See, e.g.*, *United States v. Aleynikov*, 676 F.3d 71, 80-81 (2d Cir. 2012) (describing the anti-surplusage canon of statutory interpretation).  Although the anti-surplusage argument, without more, is probably insufficient to

compel the conclusion that the activities of a paramilitary force like Hamas are "military" for purposes of section 2331(4)(C), it tilts in favor of that interpretation.

Construing the statute so—*i.e.*, concluding that in some instances, terrorist or paramilitary activities may be "military" for purposes of section 2331(4)(C)—would not have the practical effect of exempting all organized terrorist activities from the aegis of the ATA. *Cf. United States v. Dauray*, 215 F.3d 257, 264 (2d Cir. 2000) (noting that a "statute should be interpreted in a way that avoids absurd results"). *But see generally* John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387 (2003) (contending generally that the absurdity doctrine is inconsistent with modern textualism). Many prototypically "terrorist" activities—for example, the hijacking of a cruise ship or of a plane, *see Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 47 (2d Cir. 1991)—would still seem to be actionable; that result would be consistent with the statute's legislative history. *See* Part III.C.2, *supra*.

Several arguments support the plaintiff in opposing the defendant's position. It has been contended that a paramilitary group like Hamas or the Irish Republican Army cannot be a "military" force, since concluding otherwise would be contrary to basic purposes of the ATA—the deterrence of terrorist activity and the imposition of financial liability on those who engage in it. *See Weiss*, 2007 WL 4565060, at *5. This purposive argument suffers from at least three problems. First, it does not answer the arguments in favor of the contrary position described above; particularly troubling for the purpose-based argument is the anti-surplusage point. Second, it relies entirely on the legal fiction of legislative intent. The members of Congress who voted for the ATA and the President who signed the ATA may have had shared goals, but those goals are not the law; the statute's text is. *See Vaughn v. Sullivan*, 83 F.3d 907, 910 (7th Cir. 1996); *Lewis v. Grinker*, 965 F.2d 1206, 1221-22 (2d Cir. 1992). *But cf.* Ronald Dworkin, A

Matter of Principle 319-24 (1985); Saul Levmore, *Ambiguous Statutes*, 77 U. Chi. L. Rev. 1073, 1080-81 (2010).  Third, even conceding that statutes can be intended to further general goals, appeals to legislative purpose are of little utility in answering the question "how far?".  Legislation is an exercise in compromise; statutes as complex as this one are not meant to achieve a single goal to the exclusion of all others.  "Statutes do more than point in a direction, such as 'more safety'.  They achieve a particular amount of [an] objective, at a particular cost in other interests."  *Contract Courier Servs., Inc. v. Research & Special Programs Admin.*, 924 F.2d 112, 115 (7th Cir. 1991).  "[N]o legislation pursues its purposes at all costs.  Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law."  *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam) (emphasis in original).

A promising approach with regard to section 2331(4)(C) and its application to the activities of terrorist groups has been enunciated and applied in the United States District Court for the District of Columbia.  Faced with the claim that the ATA's act of war exception barred recovery for horrifying terrorist attacks on civilians—for example, the bombing of a bus occupied by schoolchildren—that court focused not on the meaning of 18 U.S.C. § 2331(4)(C), but on the prefatory language of 18 U.S.C. § 2331(4), which requires that a putative section 2336(a) act of war occur "in the course of" a declared war, an armed conflict, whether or not war has been declared, between two or more nations, or an armed conflict between military forces of any origin.  *See Biton v. Palestinian Interim Self-Gov't Auth.*, 412 F. Supp. 2d 1, 6-12 (D.D.C. 2005); *see also Estate of Klieman v. Palestinian Auth.*, 424 F. Supp. 2d 153, 162-67 (D.D.C. 2006).

The argument is as follows.  For the act of war exception—by way of section 2331(4)(C)—to apply, the challenged act must not simply be a byproduct of "armed conflict between military forces of any origin"; it must also occur "in the course of" that conflict.  *See* 18 U.S.C. § 2331(4).  It has been concluded essentially by the United States District Court for the District of Columbia that the phrase "in the course of" serves to exclude as a matter of law from the protection of section 2331(4)—and, by extrapolation, section 2336(a)—conduct that is in violation of the laws of war, since that phrase has an exclusionary effect in other federal statutes.  That is, it "exclude[s] from the scope of a statutory provision a subset of conduct that, by its nature and substance, deviates from or is not sufficiently related to the general set of conduct otherwise governed by the provision."  *Estate of Klieman*, 424 F. Supp. 2d at 165; *see Biton*, 412 F. Supp. 2d at 8-9 (collecting cases).  Acts in violation of the laws of war, the *Biton* and *Klieman* courts reasoned, are not similar enough to other conduct explicitly covered by the act of war provision to fall within the exception.

This argument—essentially, that not every act that takes place *during* the course of an armed conflict takes place *in the course of* that conflict—is powerful.  It presents, however, a number of problems.  The first is that it does not explain why the laws of war should serve as the relevant limitation in interpreting section 2331(4).  The second problem, related to the first, is that Congress has explicitly referenced the laws of war in other statutes.  *See, e.g.*, 10 U.S.C. §§ 802(13), 818, 821; 18 U.S.C. § 2441.  The fact that it did not in the ATA would thus seem to suggest that it did not plan for the laws of war to be the touchstone in interpreting 18 U.S.C. § 2331(4).   Third, the argument assumes that the laws of war apply to the actions of terrorists; it is not self-evident that this is so.  *See, e.g.*, Allison M. Danner, *Defining Unlawful Enemy Combatants: A Centripetal Story*, 43 Tex. Int'l L.J. 1, 8 (2007) (stating that "[w]ar has long been

seen as the province of sovereign states, and governments have sought to deny terrorists the status of warriors by describing them as criminals").  Finally, the reasoning of the argument would seem to result in horizontal inequity: a plaintiff caught in the crossfire of a gun battle between a paramilitary group and a state—assuming that the law of war applies to the paramilitary group—would be proscribed from recovering, while a plaintiff injured as the result of a terrorist attack targeted directly at civilians would face, in section 2331(4)(C), no barrier to recovery.

The essential problem that the federal courts have faced in interpreting the ATA's act of war provision is that it seems difficult to read as a coherent whole the ATA's legislative history, section 2331(4)(B), and section 2331(4)(C).  Recall that the ATA's legislative history provides that "[i]njuries received by noncombatants as a result of open, armed conflict, including civil war, should not be actionable."  S. Rep. No. 102-342, at 46 (1992).  18 U.S.C. § 2331(4)(B) precludes recovery based on acts "occurring in the course of . . . armed conflict, whether or not war has been declared, between two or more nations," and 18 U.S.C. § 2331(4)(C) does the same with regard to acts "occurring in the course of . . . armed conflict between military forces of any origin[.]"

The two statutory provisions and the legislative history point towards a way to fashion a test for determining, in some cases, whether recovery is barred by the combination of section 2336(a) and section 2331(4)(C).

Consider the following.  The legislative history of the act of war exception suggests strongly that attacks by non-nations primarily directed at civilians were not meant to be protected by section 2331(4)(C).  It also suggests that actions directed primarily at governments were meant to be protected, even if civilians were deliberately or collaterally injured from time to

time.  *See* S. Rep. No. 102-342, at 46 (1992) ("The intention of this provision is to bar actions for injuries that result from military action by recognized governments as opposed to terrorists, even though governments also sometimes target civilian populations.  *Injuries received by noncombatants as a result of open, armed conflict, including civil war, should not be actionable*." (emphasis added)).  Section 2331(4)(B) precludes recovery based on injuries suffered as a result of conflict between nations; the following subsection does the same with regard to injuries or loss suffered as a result of an armed conflict between "military forces of any origin."  18 U.S.C. § 2331(4)(C).

Since the words "armed conflict," *see id.*, seem to pose no substantial interpretive difficulties, the key term in section 2331(4)(C) is "military."  Congress, in using that term, can be said to have designed the statute to contrast the traditional actions of national militaries with those of terrorist groups.  In interpreting section 2331(4)(C), since the legislative history indicates that acts directed primarily at civilian populations were not meant to be protected, it makes sense to conclude that non-national armed forces that primarily target civilians are not "military" forces for purposes of the ATA.

To state the point differently, and assuming that a given injury is suffered during the course of an armed conflict, the term "military" in section 2331(4)(C) serves to prohibit recovery based upon acts taken by forces that, were they affiliated with nation-states, would qualify for protection pursuant to section 2331(4)(B).  Hence, actions taken against a government by a paramilitary force during the course of a "civil war" could receive protection pursuant to section 2331(4)(C).  *See* S. Rep. No. 102-342, at 46 (1992).

The key problem under section 2331(4)(C)—and this is why having a factual record available on a motion for summary judgment is essential—is whether a given paramilitary

group's (here, Hamas') violent actions are targeted to a substantial degree at civilians.  In short, a paramilitary or terrorist group or organization must act as a "military" traditionally (but not universally) does—*i.e.*, in substantial conformance with the laws of war, with attacks directed at civilians making up an incidental rather than substantial portion of its activities—to have its challenged conduct qualify for protection pursuant to section 2331(4)(C).

This interpretation of the statutory term has several virtues in a case like the present one. First, it accords with commonly-accepted definitions of the word "military," while still protecting in appropriate cases the actions of organizations not affiliated with a nation-state.  The latter point was the key problem with the interpretation offered in *Weiss* and *Khadr*; those cases effectively read section 2331(4)(C) out of the ATA.  *See Weiss v. Arab Bank*, 2007 WL 4565060, at *4-5 (E.D.N.Y. Dec. 21, 2007); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1333-34 (D. Utah 2006).

Second, it allows courts to reach in many cases the merits of arguments made pursuant to section 2331(4)(C); there will be no need to rely on the prefatory phrase—"in the course of"— since the test for determining whether an armed group is a "military" force relies explicitly and with support from the legislative history on an organization's substantial conformance with the laws of war.

Third, and most importantly, this interpretation of the term "military" serves to give effect, in appropriate cases, to section 2331(4)(C).  The conduct of organizations not qualifying as "nations" pursuant to section 2331(4)(B) will, in appropriate cases of armed operations primarily directed against a nation's regular armed forces, not serve as a basis for recovery under section 2333.

The title of subsection 2336(a) bears on the problem.  It is supportive of this interpretation.  The Supreme Court has stated that "statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute."  *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (internal quotation marks omitted).  The "title of a statute or section can aid in resolving an ambiguity in the legislation's text."  *I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991).

18 U.S.C. § 2336(a) is titled "Acts of war."  It has been historically understood that only nation-states are capable of committing acts of war.  *See* Black's Law Dictionary 1583 (6th ed. 1991); *see also* Benjamin J. Priester, *Who is a "Terrorist"? Drawing the Line Between Criminal Defendants and Military Enemies*, 2008 Utah L. Rev. 1255, 1305 (noting that "al Qaeda engages in armed conflict much *like* a state: it carries out acts of violence against states that would constitute acts of war *if committed by agents of a state*" (emphasis added)).  But, as noted above, section 2336(a) reaches at least in some cases the conduct of non-state actors; that is the point of section 2331(4)(C).  Why would Congress place a subsection exempting acts taken by non-state actors in a section referring to "[a]cts of war"?  *See* 18 U.S.C. § 2336.  That would make little sense, given the suggestion in the legislative history that the act of war exception was designed to bar civil recovery for acts taken by traditional militaries, *see* S. Rep. No. 102-342, at 46 (1992), unless the "military forces" referred to in subsection 2331(4)(C) behaved as traditional military forces do.

This point is supported by application of the *ejusdem generis* rule.  *See, e.g.*, *United States v. Turkette*, 452 U.S. 576, 581 (1981).  Sections 2331(4)(A) and 2331(4)(B) indisputably have the effect of exempting from civil recovery actions taken by nation states that are "acts of war" in the traditional sense.  Since non-state actors have not traditionally been understood to be

capable of committing acts of war, section 2331(4)(C) only coheres with the two preceding

subsections if a "military force[]" referenced therein acts as states traditionally do when

committing acts of war.  Section 2331(4) operates in conjunction with section 2336(a) to bar

recovery when a suit is brought alleging misconduct that falls within a certain limited universe of

action.  Section 2331(4)—with its three subsections—sets forth the classes of potential

defendants whose actions are protected.

Finally, two plausible objections must be addressed.  First, it cannot correctly be asserted

that the above-articulated interpretation will have no practical applications.  Some non-national

armed groups across the world direct their actions at governments, not civilians.  Recovery based

upon the acts of organizations of that sort, assuming that their activity is in substantial

conformance with the laws of war, appears to be barred.  This is why the interpretation accords

with the discussion of civil war provided in the legislative history.  *See* S. Rep. No. 102-342, at

46 (1992).  Second, it might be argued that the interpretation offered above suffers from one of

the same problems referenced in discussing the approach used by the United States District Court

for the District of Columbia—*i.e.*, it assumes that the law of war applies to the actions of groups

whose conduct will be protected by section 2331(4)(C).  But this contention is unpersuasive.

The interpretation of the term "military" does not assume that the laws of war *apply* to the

actions of paramilitary groups of this type.  It simply requires that, in order for recovery to be

proscribed pursuant to the ATA, those non-national groups act in substantial conformity with the

laws of war, even though the laws of war do not, arguably, mandate that they to do so.

If the general practice of a group not acting as part of a "nation's" forces is to take actions

that would violate the laws of war to any substantial degree if they were committed by a nation,

then it cannot be said, under section 2331(4)(C), to be a "military" force covered by the act of

war exception to civil recovery.  This conclusion has particular relevance in the instant case, since shots were apparently fired into a group of civilians who were taking no aggressive action.

To establish its act of war defense, the Bank will have to prove by a preponderance of the evidence that Hamas does not, as described above, target civilians to any substantial degree.  It could be argued that this test is of little use, since the designation by the Secretary of State of a terrorist organization (here, Hamas and some of its affiliates) will usually include a finding that the organization targets civilians.  *See, e.g.*, Exec. Order No. 13,224, 66 Fed. Reg. 49,079, 49,080 (Sept. 25, 2001) ("(d) the term 'terrorism' means an activity that . . . involves a violent act or an act dangerous to human life . . . and . . . appears to be intended . . . to intimidate or coerce a civilian population").  This objection is not persuasive, since a third-party donor (here, the Bank) could, as a defendant in an ATA civil suit, prove that the organization alleged to have committed an act of violence did not primarily target civilians.  This avenue of proof would be available to it as a matter of due process; a determination by the government that an organization is a terrorist group should not, it seems, have a preclusive effect against a donor-defendant in a subsequent section 2333(a) action against it.

### D.  Evidentiary Issues

#### 1.  Consideration of Admissibility at Summary Judgment

A number of evidentiary questions were raised at the hearing on defendant's motion to dismiss the complaint.  These issues can best be addressed on a motion for summary judgment.

Federal district courts generally are not entitled to consider at the Rule 12 stage the fact that a pleading contains references to documents that may eventually be ruled inadmissible in evidence.  *See Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991).

The admissibility of evidence may be properly considered in the context of a motion for summary judgment in opposition to which the plaintiff has attempted to adduce the proof upon which he would rely at trial.  *See* Fed. R. Civ. P. 56(c)(1)(B); *Ricciuti*, 941 F.2d at 124.  "If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]"  Fed. R. Civ. P. 56(e)(3).

The Court of Appeals for the Second Circuit has stated that "[a] district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence.  The principles governing admissibility of evidence do not change on a motion for summary judgment."  *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (internal quotation marks and citation omitted).  It was pointed out in *Presbyterian Church of Sudan* that:

> Rule 56[] . . . provides that affidavits in support of and against summary judgment shall set forth such facts as would be *admissible in evidence*.  Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.  It is difficult to see how a court can decide a summary judgment motion without deciding questions of evidence[.]

*Id.* (internal quotation marks and citation omitted, emphasis in original).  The Court of Appeals for this Circuit has made it clear that district court's obligation to consider the admissibility of evidence at the summary judgment stage extends to proposed expert testimony.  *See, e.g.*, *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008).

A "defendant may move for summary judgment on the ground that the plaintiff has failed to adduce any evidence of an element of plaintiff's claim, and if the plaintiff fails in response to contest this assertion or adduce such evidence, defendant, without more, will prevail."  *Giannullo v. City of New York*, 322 F.3d 139, 141 n.2 (2d Cir. 2003) (citing *Celotex Corp. v.*

*Catrett*, 477 U.S. 317 (1986)); *see also id.* at 144-45 (Kearse, J., dissenting).  As the Supreme

Court put the matter in analyzing an older but substantially identical version of Rule 56:

> Under Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  *In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.*  The moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex*, 477 U.S. at 322-23 (internal quotation marks omitted) (emphasis added).

### 2.  Procedural History

The court in April 2012 issued an order setting a date for oral argument on defendant's

motion to dismiss. The order also stated that:

> A week before the hearing, plaintiff shall indicate who he believes shot him, and what evidence on this issue he plans to submit.  *Cf. Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

Order, Gill v. Arab Bank, PLC, No. 11-CV-3706 (E.D.N.Y. Apr. 18, 2012), CM/ECF No. 23.

Submitted by the plaintiff in accordance with the court's April 2012 order was a letter

brief.  *See* Letter of Gary M. Osen, Gill v. Arab Bank, PLC, No. 11-CV-3706 (E.D.N.Y. June 19,

2012), CM/ECF No. 35.  It stated in relevant part that:

> Plaintiff currently anticipates that he will present the following evidence demonstrating Hamas's responsibility for the attack:
>
> 1.  Hamas's multiple, consistent and corroborative contemporaneous claims of responsibility, including the communiqués identified in the Complaint, and other articles and reports, such as the *Filastin* [a Hamas-run newspaper] report discussed above.

2.  A videotape of the [a]ttack itself as it occurred . . . which the *Qassam Brigades* itself posted.

3.  Expert testimony that will: (a) authenticate Hamas's communiqués and videotapes in satisfaction of Fed. R. Evid. 901; (b) authenticate the relevant Hamas internet sites and publications; (c) consider a variety of materials, including Hamas's own statements, media reports (including those identifying specific alleged perpetrators of the [a]ttack), "pattern-and-practice" information[,] and any court records, or official statements of the Israel government reflecting its investigation of the [a]ttack, as may be, or become, available.

a.  Though Plaintiff has not yet identified specific Rule 26(a)(2)(B) testifying expert witnesses for this case, it is likely that he will identify two witnesses who have previously offered expert opinions on similar issues.  Below we summarize these expert witnesses' prior testimony.

i.  In the *Linde v. Arab Bank* lawsuit, the plaintiffs have offered the expert testimony of Evan Kohlmann to authenticate websites and to explain the history of Hamas's on-line "footprint" and media operations.  Mr. Kohlmann has been previously certified as an expert witness by multiple federal courts (including courts in this Circuit) on terrorism issues.

ii.  The *Linde* plaintiffs have also offered the expert witness testimony of Ronni Shaked.  Mr. Shaked is a researcher, author of an authoritative text on Hamas, and Palestinian Affairs correspondent for Israel's largest daily newspaper.  He has also previously provided expert testimony in multiple terrorism lawsuits.  In *Linde*, Mr. Shaked assessed whether certain attacks were attributable to Hamas. Similar expert testimony was deemed admissible in *Boim v. Holy Land Found. for Relief and Dev. Inc.* in the Northern District of Illinois (and affirmed by the Seventh Circuit sitting *en banc*), and other civil terrorism lawsuits.

b.  Plaintiff may also offer expert testimony describing Hamas's history generally, including its 2007 seizure of power in Gaza, and "footprint" thereafter, and its operations.  Plaintiff may, therefore, also present expert testimony by an additional expert witness proffered by the *Linde* plaintiffs: Dr. Matthew Levitt, director of the Washington Institute for Near East Policy terrorism studies program.  Dr. Levitt is also a former FBI analyst and Deputy Assistant Undersecretary for Intelligence and Analysis at the U.S. Treasury Department. He has been certified as an expert witness by numerous federal courts and has also testified in foreign litigation.

*Id.* at 3-4 (footnote and capitalization omitted).

Discussed by the court and the parties at oral argument on defendant's motion to dismiss

was the proof that the plaintiff sought to proffer regarding the identity of the shooter:

MR. RAVEN-HANSEN [for plaintiff]: . . . Let me address causation. . . .

First, as to the attributions to Hamas.  The evidence that we allege in the complaint is first the video of the actual shooting itself showing the sniper in a ski mask raining fire on a civilian bus.  The video was then broadcast within a day or two.

. . . .

It was taken in Gaza looking over the border . . . looking at the bus, which is in Israel.

. . . .

It was then posted within a day on the al-Qassam Brigade website.  Al-Qassam is the military wing of Hamas.  So the question is the contemporaneousness of the taking of the video and its availability to Hamas . . . .

. . . .

[A]t the same time Hamas, the al-Qassam Brigade issues narrative language in English communication taking responsibility for the attack.

THE COURT:  *But how can that be used against the bank?*

MR. RAVEN-HANSEN:  Well, the first question I was answering, trying to answer is whether Hamas was responsible for the attack.

THE COURT:  Well, that's the problem . . . [i]n your chain of factual issues.  Was it Hamas?

. . . .

Because Hamas says it was, how can that be used against the Arab Bank?  It might be used against Hamas, assuming we have attribution and it is a Hamas person authorized to make the statement who makes it, assuming all of that, . . . perhaps it could be used against Hamas as an admission, *but how against the Arab Bank*?

MR. RAVEN-HANSEN:  Well, your Honor, our expert will testify that there is a pattern.

. . . .

He will be testifying that there is a pattern to the Hamas attacks and their claim of attribution, that the website is regularly used and maintained by Hamas.

. . . .

MR. WALSH [for defendant]:  Well, we'll certainly need expert testimony [and *Daubert* hearings] if the sole proof is going to come through [plaintiff's proposed expert].  I should note, your Honor, that [the expert] has appeared in the related actions at the Linde actions, and we have filed a Daubert challenge to him.  All of his research is done on the internet.

June 28, 2012 Hr'g Tr. 18-22 (emphasis added).

## IV.   Application of Law to Factual Allegations

### A.  Political Question Doctrine Does Not Prevent Adjudication

The Bank contends that the court lacks subject matter jurisdiction pursuant to the political question doctrine.  *See* Def. Mem. 3-25.

As was previously noted, *see* Part III.B.1, *supra*, the political question doctrine is one of justiciability.  It is not jurisdictional.  And, with regard to the merits of defendant's argument, the Court of Appeals for the Second Circuit has made it clear the doctrine provides no basis for dismissal of the plaintiff's complaint; civil ATA suits are expressly authorized by Congress.  *See Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49-50 (2d Cir. 1991).

### B.  Aiding and Abetting Assertion Not Viable

For the reasons set forth above in Part III.C.3, *supra*, section 2333(a) of the ATA does not permit claims premised on a theory of aiding and abetting.  The court substantially agrees with the reasoning on this issue of the majority of the en banc Court of Appeals for the Seventh Circuit.  *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 688-90 (7th Cir. 2008) (en banc) (Posner, J.).

77

The theory of aiding and abetting is "significant primarily in criminal cases." *Id.* at 691; *see also* 18 U.S.C. § 2. When a theory of aiding and abetting liability is raised in a criminal case, the jury is asked whether the defendant participated in the crime charged as something he wished to bring about, whether he knowingly associated himself with the criminal venture, and whether he sought by his actions to make the criminal venture succeed. *See* 1 Leonard B. Sand et al., Modern Federal Jury Instructions—Criminal § 11-2 (2009). Although an ATA plaintiff cannot recover from a defendant solely on the theory that the defendant aided and abetted a substantive violation of the ATA, substantially identical questions to the ones described above will, as a practical matter, require consideration in civil material support cases. *See* Parts I and III.C.3, *supra*.

Plaintiff's first claim for relief, based explicitly on a theory of aiding and abetting, is dismissed. *See* Am. Compl. ¶¶ 214-24.

### C. Plaintiff's Other Claims Remain Viable on Present Motion

Plaintiff's second, third, fourth, and fifth claims are not dismissed on the pleadings.

The second claim adequately alleges a civil conspiracy between Hamas and the Bank to violate 18 U.S.C. § 2332, and section 2333(a)'s other elements have—as a matter of pleading— been adequately alleged. *See id.* ¶¶ 225-32; *see also* 18 U.S.C. § 2332(b). Substantial problems of proof regarding the existence and nature of the alleged agreement may be presented. These will be addressed at the summary judgment stage. There may be problems with regard to the probative force of the plaintiff's proposed evidence and proximate cause.

The third claim adequately alleges that the Bank violated 18 U.S.C. § 2333(a)—by way of 18 U.S.C. § 2339A—by providing material support to Hamas. *See* Am. Compl. ¶¶ 233-39. The requisite act has been alleged; drawing all inferences in plaintiff's favor, as is required on

the present motion, plaintiff has alleged essentially that the Bank provided material support to Hamas with at least the knowledge that its support would be used to carry out violent attacks on American nationals.  Proximate causation has been alleged, but it may present problems at summary judgment.  The plaintiff has not yet made it clear upon which of section 2339A(a)'s cross-references he relies.  If it is section 2332, then the higher showing regarding mental state that was required by Judge Wood and Judge Rosenthal may be applicable.  *See* Part III.C.4.b, *supra*.

The fourth claim alleges sufficiently that plaintiff was injured by the Bank's knowing violation of 18 U.S.C. § 2339B(a)(1).  *See* Am. Compl. ¶¶ 240-49.

The fifth and final claim alleges plausibly that plaintiff was injured by the Bank's willful violation of 18 U.S.C. § 2339C(a)(1)(B).  *See id.* ¶¶ 250-55; *see also* 18 U.S.C. § 2339C(b)(2)(C)(iii).

### D.  Act of War Exception Does Not Require Dismissal on Present Motion

As was noted in Part III.C.5, *supra*, defendant's arguments made pursuant to 18 U.S.C. § 2336(a) based on the act of war defense are not dispositive at the Rule 12 stage.  A factual record is needed to pass on this issue.  The Bank may renew its argument on its motion for summary judgment.

Firing shots across the border at a group of civilians touring an observation point appears not to be in accordance with the laws of war, and would not, on the present record, seem to come within the ambit of the ATA's act of war exception.  *See* Part III.C.5, *supra*.  And, since Hamas has been designated by the United States government as a terrorist group rather than as a government or a nation, it seems to be one of the terrorist groups to which this nation is opposed, with its nontraditional, unpredictable acts of violence large and small.  These acts arguably serve

to put many American nationals in continuing danger.  To declare Hamas' shootings of

American civilians acts of war at this stage—and a defense under the statute—would be to put

abstract analysis above a good sense of the situation, *see* Karl N. Llewellyn, *Remarks on the*

*Theory of Appellate Decision and the Rules or Canons About How Statutes Are to Be Construed*,

3 Vand. L. Rev. 395, 401 (1950), with no reliable evidentiary basis.  Such a view on a motion

directed at the pleadings, without a detailed factual record, is not consonant with the Federal

Rules of Civil Procedure.

### E.  Evidentiary Issues to be Considered at Summary Judgment

As was suggested at oral argument on defendant's motion to dismiss plaintiff's amended

complaint, several difficult evidentiary questions will need to be decided on the motion for

summary judgment.

### V.  Conclusion

The clear, present, and serious dangers now posed to the nation by terrorist acts cannot

excuse a lack of due process in applying civil law, in properly shaping the contours of the new

section 2333(a) tort, and in providing adequate procedural tools and protections to all parties.  At

the same time, the courts must enforce by appropriate procedures the civil remedies provided by

Congress.  In this connection, the court rejects the contention that *any* reckless contribution to a

terrorist group or its affiliate, no matter how attenuated, will result in civil liability, without the

demonstration of a proximate causal relationship to the plaintiff's injury.  *Compare Boim v. Holy*

*Land Found. for Relief & Dev.*, 549 F.3d 685, 695 (7th Cir. 2008) (en banc) (the "black letter

[requirement of proof of causation] is inaccurate if treated as exceptionless"), *and id.* at 695-98

(en banc majority opinion) (causation requirement appears to be eliminated by statute), *with id.*

at 721-24 (Wood, J., concurring in part and dissenting in part) (proof of proximate or sufficient

causation essential), *and Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 665 (S.D. Tex. 2010) (same).

Development of the section 2333(a) tort shows a curious reversion to ancient law.  Much

of our common law grew out of the roots of criminal-civil liability, gradually forming distinct

branches.  The applicable federal anti-terrorism law is, in a sense, reverting to archaic forms.

The factual theory—applicable to each of plaintiff's four remaining claims—to be

explored on the motion for summary judgment, might be listed in sequential form by the parties

as follows:

1. The Bank probably was acting with the knowledge that funds it was making
   available to Hamas' political branch would probably substantially be leaked to
   Hamas' military branch;

2. The military branch of Hamas probably intended to use these funds to harm
   Israeli citizens;

3. The Bank probably was aware, given the intermingling of Hamas' funds and
   Hamas' intent to harm Israeli citizens, that American citizens who were in close
   proximity to Israelis would probably be harmed;

4. Hamas probably utilized these comingled funds—given the fungibility of
   money—to purchase guns and ammunition, and to induce prospective terrorists to
   carry out its attacks;

5. Hamas probably directly or indirectly authorized the person who shot the plaintiff
   to shoot over the border from Gaza into Israel, and helped supply him with
   armaments purchased with its fungible assets; and

6. The shooter, probably carrying out his direct or indirect instructions, actually fired the shot that injured plaintiff, without regard to whether the targets of his gunfire were Israelis or Americans—*i.e.*, he was at least reckless with regard to their nationality.

Plaintiff would seemingly have to produce evidence supporting at least each of the hypotheses suggested above. Resolution of these and related problems will have to await the Bank's forthcoming motion for summary judgment.

The Bank's motion to dismiss the amended complaint is granted in part by dismissing plaintiff's first claim for relief, and is denied in all other parts. The accompanying defense motion to strike portions of the amended complaint has no merit and is denied. *See, e.g., Salcer v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2d Cir. 1984), *vacated on other grounds*, 478 U.S. 1015 (1986).

The litigation shall proceed promptly as directed in the court's August 22, 2012 scheduling order. No amendment of the pleadings will be permitted, since the full theory of the case for the plaintiff has been adequately presented in the amended complaint.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date: September 12, 2012
Brooklyn, New York