

DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
www.dlapiper.com

Kevin Walsh
kevin.walsh@dlapiper.com
T  212.335.4571
F  212.884.8463

October 17, 2012

**BY ECF AND HAND DELIVERY**

Hon. Jack B. Weinstein
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    *Mati Gill v. Arab Bank, PLC*, 11-CV-3706 (JBW) (VVP) (E.D.N.Y.)

Dear Judge Weinstein:

      We represent Arab Bank plc (the "Bank"). We write in response to the Court's directive that the parties address what, if any, "probative force" the 2005 consent order (the "Order") between the Federal Branch of the Bank and the Office of the Comptroller of the Currency (the "OCC") and the 2005 "Assessment of Civil Money Penalty" (the "Assessment") issued by the Financial Crimes Enforcement Network ("FinCEN") (ECF No. 44) have in connection with the resolution of the Plaintiff's claims.[1] The Court specifically instructed the parties to respond to the following issues:

> (1.)    "It is not yet clear what probative force, if any, the defendant's consent agreement with—and its payment of a penalty to—the government has. For example, can it be assumed that pre-agreement, there was aid by the Bank, directly or indirectly, to terrorists? Can it be assumed that post-agreement aid to terrorists—if any—ceased? The parties will address these and related issues in their briefs on defendant's motion for summary judgment."

> (2.)    "They shall advise the Court whether they believe it would be desirable to request the assistance of the United States Attorney for the Eastern District of New York in determining the views of the United States government with respect to the defendant's alleged provision of assistance to terrorist organizations and individual terrorists, particularly Hamas and its affiliates, prior to the time of the shooting [that injured the Plaintiff on April 4, 2008]."

---

[1] For the convenience of the Court, the Order is attached hereto as Exhibit 1.



Hon. Jack B. Weinstein
October 17, 2012
Page Two

*Gill v. Arab Bank, PLC*, --- F. Supp. 2d ---, 2012 WL 4026941, at *3 (E.D.N.Y. Sept. 12, 2012).[2]

    For the reasons stated below, neither the Order nor the Assessment has any relevance to the Plaintiff's claims.

  **I.**  **The Order And Assessment Have No Probative Force Here.**

    The Order and the Assessment were executed and issued after an examination and investigation of Arab Bank's New York branch ("Arab Bank-New York") by the OCC in 2004-2005, after the *Linde* complaint was filed. No other branches of the Bank are the subject of either the Order or the Assessment. The Order and Assessment identify "deficiencies in the Bank's internal controls" but contain no findings that the Bank provided financial services to terrorists.

    The Bank did not admit to any wrongdoing when it consented to the Order and Assessment. (Assessment at 3; Order at 2.) Indeed, neither the Order nor the Assessment contains any determination of knowing or intentional misconduct on the part of the Arab Bank-New York, as is required to establish a violation of the "material support" provisions of Anti-Terrorism Act, 18 U.S.C. §§ 2339A-C, under which the Plaintiff is asserting his claims. *Gill*, 2012 WL 4026941, at *28 ("'If primary liability is at issue, the criminal material support statutes apply,' and each of these criminal statutes has its own requirements regarding knowledge and intent." (quoting *Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 664 (S.D. Tex. 2010))). Nor do the Order and Assessment contain any findings of recklessness on the part of Arab Bank-New York or any of its employees.

    The Order and Assessment contain no determination that Arab Bank-New York knowingly, intentionally or recklessly provided financial services to Hamas, the issue now before this Court, or indeed, to any designated terrorists, or those known to be terrorists. To the contrary, the Order and Assessment acknowledge that the Bank "largely complied with the requirement to cease clearing funds transfers once the [Treasury Department] designated an entity as a 'specially designated terrorist,' 'specially designated global terrorist,' or 'foreign terrorist organization.'" (Assessment at 7.)[3]

---

[2] In its recently filed motion for summary judgment, the Bank stated that it would "address these issues, as well as the Court's request for guidance with respect to soliciting the views of the United States Government, at greater length in a separate letter [to be filed] no later than October 17, 2012." (Mem. of Law in Supp. of Def. Arab Bank plc's Mot. for Summ. J., at 13 n.6, Oct. 12, 2012 (ECF No. 163).)

[3] Arab Bank-New York processed, on average, 500,000 fund transfers per year before 2005, when it agreed to suspend its funds transfer activities. (Assessment at 3.) The Bank has acknowledged fewer than five occasions on which, due to innocent machine or human error, Arab Bank-New York failed to block fund transfers for individuals or organizations designated on the OFAC blacklist. These failures



Hon. Jack B. Weinstein
October 17, 2012
Page Three

The deficiencies identified by the OCC and FinCEN, in findings with which the Bank did not agree, related to the Bank's automated systems for retrospectively monitoring electronic funds transfers already executed by it for indicia of suspicious activity, so that any such activity could be reported to the regulators. (Assessment at 4 ("The Bank Secrecy Act requires a program reasonably designed to ensure compliance with, among other things, the requirement to report suspicious transactions.").) The Assessment concluded that "Arab Bank-New York focused [in its monitoring activities] on direct customers of Arab Bank-New York, as opposed to originators and beneficiaries without accounts at Arab Bank-New York." (*Id.*) The narrow issue of non-compliance as found by the OCC therefore concerned Arab Bank-New York's failure to utilize an adequate automated system to monitor the names of originators and beneficiaries of *non-customers* in order to determine whether there was any suspicious activity on the part of those *non-customers* that should be reported. *See id.*; *see also* Decision & Order, at 3, March, 24, 2006 (Pohorelsky, M.J.) ("The focus of the OCC investigation was on the procedures implemented by the bank, not on terrorist activity.").

In other words, on every occasion when Arab Bank-New York received a funds transfer from one of its correspondent banks, the OCC expected it to monitor the banking activities of the customer of its correspondent, or "customer's customer." The OCC concluded that to conduct such retrospective monitoring of "customer's customers," Arab Bank-New York should have performed searches of "Congressional testimony, indictments in the United States, and well-publicized research and media reports," and that, had it done so, it would have been able to "identify a number of potentially suspicious funds transfers" involving "names *similar*" to those that had appeared on transfers that had been previously processed through Arab Bank-New York, and reported those prior transfers to the regulators.[4] (Assessment at 7 (The OCC thus faulted the Bank for not retrospectively monitoring fund transfers for the benefit of non-customers who were not designated on any U.S. blacklist at the time of processing, but later became designated; it expressly noted that "[a]t the time of the funds transfers that it reviewed at

---

were disclosed upon detection to the appropriate regulators. (*See* Statement Of Def. Arab Bank plc Of Material Facts As To Which There Is No Genuine Dispute Pursuant To Local Civ. R. 56.1, at ¶¶ 27-28, 488, 508-23 (ECF No. 164 (the "Rule 56.1 St.")).) None of these self-reported incidents provides any evidence of the type of knowing, intentional or reckless conduct that constitutes an ATA violation. In fact, the remedial measures taken by the Bank in response to these failures demonstrate the Bank's commitment to sound compliance practices.

[4]    Obviously, banks cannot perform these types of internet searches in real time before executing an automated funds transfer; "the volume of [international] payments, the speed at which payments must move, and the indistinguishability of payments combine to make it virtually impossible to identify and intercept payments unless the originator, the recipient or both are identified as problematic in advance and are clearly identified in the transmittal information." (Rule 56.1 St. ¶ 52.) The screening of electronic funds transfers against official blacklists can reliably be accomplished only by computer.



Hon. Jack B. Weinstein
October 17, 2012
Page Four

Arab Bank-New York, neither [OFAC] nor the Department of State had designated the originators or beneficiaries.").)

Arab Bank-New York's alleged failure to review transactions for "names similar" to those discussed in Congressional testimony and other sources as being linked to suspicious activity (*e.g.*, money laundering and terror financing), and its related failure to report any ensuing suspicions to its regulators, was deemed by the OCC and FinCEN to be a compliance deficiency. Notably, however, as one of Arab Bank's experts has observed, "there was no finding that ABNY had any accounts for anyone involved in terrorism, or that ABNY processed any transaction that it should not have processed." (*See* Expert Report of Paul Allan Schott, at 25, Feb. 17, 2011, attached hereto in relevant part as Exhibit 2.)[5]

These criticisms were, moreover, novel at the time. According to the former Chief Counsel of the OCC, "[Arab Bank-New York] was, to my knowledge, the first institution criticized and penalized for the shortcomings described in the OCC and FinCEN Orders, which were based on standards *never previously articulated by the OCC, FinCEN or any other federal regulator.*" (*Id.* at 25 (emphasis supplied).) In this regard, he continued, "[i]t is important to note that although FinCEN was highly critical of [Arab Bank-New York's] compliance efforts with regard to implementation of Section 312 of the USA Patriot Act, FinCEN, itself, did not implement final rulemaking on this statutory provision until February of 2006." (*Id.* (citing 71 Fed. Reg. 495 (Jan. 4, 2006), effective Feb. 3, 2006).) Nor had banks previously been expected to "review public sources of information to investigate names of parties to correspondent banking transactions." (*Id.* at 29; *see also* Expert Report of Anne T. Vitale, at 56-65, Feb. 18, 2011, attached hereto in relevant part as Exhibit 3.)

---

[5]   The *Linde* court instructed the Bank to revise the expert reports of Paul Allan Schott and Anne T. Vitale to remove substantially all of their discussion of the Order and Assessment, including their opinions that the Bank's regulators had never previously issued guidance concerning, or commenced enforcement actions pursuant to, the regulations upon which they relied. Hr'g Tr. 7:13-14, 10:11-17, Dec. 19, 2011 (Gershon, J.) (*Linde* ECF No. 780) ("Ms. Vitale opines, for example: 'To the contrary the evident[iary] record is that ABNY properly screened these transactions against the OFAC list and processed them in the ordinary course of routine correspondent banking.' This is not admissible because these are the very facts that the jury is to determine. . . . If it's determined to be relevant that an OCC consent order was entered into or that a Fincen order was issued (and I note Arab [B]ank has indicated it will challenge the admission of those documents) and if they are proffered to the jury, the defendant cannot avoid whatever weight the jury gives those orders by arguing via expert testimony that the orders shouldn't have been issued."). *But see* Hr'g Tr. 124:9-13, 124:18-19, Oct. 3, 2012 (Weinstein J.) (*Gill* ECF No. 156) ("The rules themselves provide, and the advisory committee went into this at great length, the argument that the expert is giving an opinion that is the duty of the jury to give is no longer relevant in ruling on these matters. . . . [T]he advisory committee couldn't have been clearer on that.").



Hon. Jack B. Weinstein
October 17, 2012
Page Five

Despite being subject to a comprehensive annual examination every year by the OCC since the branch was first established in 1982, moreover, Arab Bank-New York "had no significant supervisory issues with the OCC or FinCEN with regard to [anti-money laundering] or [countering the financing of terrorism]" before the Order and Assessment were issued, as reflected by the absence of any formal enforcement actions before this time on the public record. (*See* Revised Expert Report of Paul Allan Schott, at 26, Jan. 31, 2012 (ECF No. 59-3).) Neither the OCC nor FinCEN included in their consent orders with Arab Bank-New York language stating a finding of willful or systemic violations of law or regulations, or a failure by Arab Bank-New York to correct past deficiencies that had been previously cited by the regulators. (*See* Ex. 2 at 27-28; Ex. 3 at 58.)

As the Order itself reflects, "management [of the Bank and Arab Bank-New York] cooperated and facilitated the Comptroller's review of transactions, accounts and existing [Arab Bank-New York] systems and controls"; in addition, Arab Bank-New York agreed to take certain remedial actions, including terminating funds clearing activities and converting its New York branch to a federal agency. (Order at 2, 19-20.)[6]

No enforcement actions were taken against any of the Bank's employees as a result of the examination by the OCC and FinCEN, nor did the Department of Justice file any criminal charges against the Bank after it conducted its own independent investigation during the same period. (Ex. 2 at 27.)

II.   **The OCC Has Repeatedly Denied As Irrelevant The Plaintiff's Prior Requests For Privileged Information Relating To The Bank Examination That Immediately Preceded The Order And Assessment.**

As stated in the Bank's recently filed summary judgment motion, the OCC itself answered the question of whether the Order and Assessment are relevant to the litigations pending against the Bank more than seven years ago, when it denied the *Linde* plaintiffs' request that it produce all documents that it had reviewed in connection with its 2004 examination of Arab Bank-New York. (Ltr. from Timothy W. Long, Senior Deputy Comptroller, Office of the

---

[6]   In a recent letter denying Plaintiff's request for the 2004 examination report of the Bank, the OCC expressly referenced remedial actions taken by the Bank in 2005, and noted that "the OCC's examiners' assessment during the 2004-2005 examination is unlikely to depict accurately the situation nearly three years later, in April 2008, when the plaintiff's injury occurred . . . because the Bank agreed to Consent Orders in February 2005 . . . requiring it to cease engaging in fund transfer activities, and to make other significant changes in its operations." (*See* Ltr. from Michael L. Brosnan, Senior Deputy Comptroller, Large Bank Supervision, OCC to Josh D. Glatter, Esq., at 2, Oct. 11, 2012 (ECF No. 178 (the "Oct. 11th OCC Ltr.")).)



Hon. Jack B. Weinstein
October 17, 2012
Page Six

Comptroller of the Currency, to Michael Elsner, Esq., Aug. 3, 2005 (ECF No. 157-2).) At that time, the OCC stated: "[t]he relevancy of the non-public documents you seek from the OCC can also be questioned. It is not clear that the transactions reviewed by the OCC examiners at the New York branch are relevant to the transactions on which plaintiffs' litigation is focused." (*Id.*)[7] If the materials that the OCC reviewed at Arab Bank-New York in 2004 were not relevant to the *Linde* plaintiffs' claims, which arise from injuries sustained during the time period from 2000 to 2004, they are certainly not relevant to this Plaintiff's claims, which pertain to injuries sustained on April 4, 2008—three years after Arab Bank-New York ceased processing electronic fund transfers.

The OCC reaffirmed this decision only last week, when it denied this Plaintiff's request for the production of an unredacted copy of its non-public 2004 bank examination report (the "2004 Examiners' Report"). (*See* Oct. 11th OCC Ltr. at 1-3.) The OCC stated specifically that the 2004 Examiners' Report, which relates to the OCC's examination of Arab Bank-New York that "concluded upon Arab Bank's conversion from a Federal Branch to a Federal Agency on August 19, 2005," does "*not shed any light*" on the relationship between the Bank and those directly responsible for shooting the Plaintiff, and is otherwise "*replete with* frank examiner *opinions*." (*Id.* at 2-3 (emphasis supplied).) The OCC further noted that its examination report "covers several topics (such as credit risk on the bank's loans and trade settlement products, interest rate risk, liquidity risk, the protection of customer information and other vulnerabilities in the bank's information systems) that have no apparent relevance to this litigation." (*Id.* at 2.) The OCC also underscored the large gulf between the time of its 2004 examination and the date on which the Plaintiff incurred his injury: "the OCC examiners' assessment during the 2004-2005 examination is unlikely to depict accurately the situation nearly three years later, in April 2008, when plaintiff's injury occurred." (*Id.*)

IV. **Administrative Decisions, Like The Order And Assessment, Are Routinely Excluded Pursuant To Fed. R. Evid. 403.**

Administrative decisions such as the Order and Assessment are routinely excluded pursuant to Evidence Rule 403. Indeed, administrative decisions can be highly prejudicial in the context of a civil proceeding. Here, a danger exists that the jury may assign undue weight to the Order and Assessment—despite their lack of probative value—which may foreclose deliberation on essential elements of the Plaintiff's claims and the Bank's defenses. *See, e.g., Kyle v. City of New York*, No. 03 CV 3540, 2006 WL 2375462, at *1 (E.D.N.Y. Aug. 15, 2006) ("[e]vidence of administrative decisions containing factual conclusions, that, if taken

---

[7] The Bank respectfully refers the Court to its letters dated October 1st and October 16th, which set forth in greater detail the history of the *Linde* plaintiffs' efforts to seek discovery of the OCC relating to the Order and Assessment. (ECF Nos. 157-2 & 178.)



Hon. Jack B. Weinstein
October 17, 2012
Page Seven

at face value, might reasonably be construed as foreclosing deliberation' on an element of Plaintiff's case pose a significant risk of unfair prejudice to the party against whom it is offered." (internal quotes and citation omitted)); *Hall v. Western Prod. Co.*, 988 F.2d 1050, 1058 (10th Cir. 1993) (no abuse of discretion where district court excluded state agency's report on ground that "the only purpose to be served by admitting [the report] into evidence . . . would be to suggest to the jury that it should reach the same conclusion," particularly where the "the evidentiary matter before the [agency] could be presented to the jury in some other form or fashion"); *Williams v. Nashville Network*, 132 F.3d 1123, 1129 (6th Cir. 1997) (upholding the district court's exclusion of an agency determination, finding that "[a] strong argument can be made that a jury would attach undue weight to this type of agency determination").

The need to exclude the Order and Assessment is especially compelling in light of the criticism of the Bank contained in those documents for allegedly violating "standards never previously articulated by the OCC, FinCEN or any other federal regulator," and "previously unarticulated standards and standards of practice not common among banks operating in the U.S. at the time." (Ex. 2 at 25, 28.) Jurors may, however, nonetheless wrongly conclude that the Order and Assessment constitute a finding of knowing violation on the part of the Bank of established banking regulations designed to combat terror financing. Such a conclusion would greatly compromise the Bank's defense.

V. **Soliciting The Views Of The United States Government.**

As noted above, the Department of Justice investigated the Bank shortly after the *Linde* complaint was filed. (*See* Ex. 2 at 27.) In connection with its investigation, the Department of Justice interviewed employees of Arab Bank-New York and reviewed documents maintained at Arab Bank-New York. No charges were filed. As the Court knows, it is not the practice of the Department of Justice to notify the subject of an investigation that a case file has been closed.

While the Bank does not believe that the Order and Assessment are relevant to the Plaintiff's claims, it welcomes the Court's solicitation of the views of the United States Government and respectfully suggests that the U.S. Attorney be asked to obtain the input of the Department of State, which, as discussed in the Bank's motion for summary judgment, has previously expressed in its internal diplomatic communications informed opinions about the Bank's institutional reputation for preventing money laundering and terrorist financing. As recently as 2008, in connection with making federal funding recommendations, the United States Ambassador to Jordan observed that the Bank was a leader in "countering the financing of terrorism" and that the Embassy did "not have any information that [Arab Bank] or [its] investors have known ties to terrorists, money laundering, corruption, or violations of the law or



Hon. Jack B. Weinstein
October 17, 2012
Page Eight

commercial/developmental considerations." (*See* Decl. of Steven J. Young, Esq., at Exhibit 13, Oct. 12, 2012 (ECF No. 166-12).)

Respectfully submitted,

Kevin Walsh

Encls.

cc: Magistrate Judge Viktor V. Pohorelsky (by hand delivery) (w/encls.)
    All Counsel (by email) (w/encls.)