# Exhibit 1

**#2005-14**
*also Terminates* **#2005-13**

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| **In the Matter of:** ) | |
| ) | |
| The Federal Branch of Arab Bank PLC, ) | AA-EC-05-12 |
| New York, New York ) | |
| ) | |

### CONSENT ORDER

The Acting Comptroller of the Currency of the United States of America ("Comptroller"), through her national bank examiners and other staff of the Office of the Comptroller of the Currency ("OCC"), is conducting an examination and investigation of the New York branch of Arab Bank PLC (the "New York Branch" or "Branch"), a Federal branch of Arab Bank PLC, Amman, Jordan ("Arab Bank"), and has identified deficiencies in the Branch's internal controls, particularly in the area of Bank Secrecy Act and Anti-Money Laundering compliance. The findings of the examination and investigation have been made known to the Branch.

The New York Branch, by and through its General Manager ("GM") duly authorized by Arab Bank, has executed a "Stipulation and Consent to the Issuance of a Consent Order," ("Stipulation and Consent") dated February 24, 2005, that is accepted by the Comptroller. By this Stipulation and Consent, which is incorporated by reference, the New York Branch has consented to the issuance of this Consent Order ("Order") by the Comptroller.

## COMPTROLLER'S FINDINGS

(1)     The Branch conducts a substantial funds transfer business, including a significant number of transactions for participants that did not and do not have accounts at the Branch but whose transactions were originated by or received by other offices of Arab Bank and its affiliates or by other entities.

(2)     The inadequacy of the Branch's controls over its funds transfer business is especially serious in light of the high risk characteristics of many of the transactions.  Banks conducting funds transfer business must have in place a level of systems and controls to monitor the transactions for compliance with laws that is commensurate with the risk level of the institution's business.

(3)     The Branch, in material respects:

(a)     Failed adequately to implement a program to monitor funds transfers for suspicious activity (unsafe and unsound practices that violated 12 C.F.R. § 21.21);

(b)     Failed adequately to obtain sufficient information on funds transfers to determine whether it was obligated to file SARs (unsafe and unsound practices that violated 12 C.F.R. § 21.11); and

(c)     Failed adequately to audit or manage the implementation of a program to monitor money transfers for suspicious activity (unsafe and unsound practices that violated 12 C.F.R. § 21.21.)

As a result of the examination and investigation - during which Arab Bank and Branch management cooperated and facilitated the Comptroller's review of transactions, accounts and existing Branch systems and controls -  and pursuant to the authority vested in her by the Federal

Deposit Insurance Act, as amended, 12 U.S.C. § 1818, and the International Banking Act of 1978, as amended, 12 U.S.C. § 3102(b), 3102(g) & 3108(a), the Comptroller hereby orders that:

## ARTICLE I
## CAPITAL EQUIVALENCY DEPOSIT

(1)     Effective immediately, the Branch shall increase its Capital Equivalency Deposit ("CED") to, and thereafter maintain its CED at, an amount at least equal to the greater of:

(a)     200% of its insured deposits determined under Schedule O of the Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks for the period ending December 31, 2004, or

(b)     20% of all liabilities required to be included in computing the CED under 12 C.F.R. § 28.15.

(2)     All assets in the CED must be free from any security interest, lien, charge, right of setoff, credit or preference in connection with any claim by the depository bank or any other party (other than the OCC).

(3)     Within three (3) days, the Branch shall take such actions necessary to revise the account agreement for the CED with the depository bank, in a manner acceptable to the OCC, so that:

(a)     the OCC is a party to the agreement;

(b)     the CED may not be reduced in aggregate amount without the prior written consent of the OCC; and

(c)     the agreement complies with 12 C.F.R. § 28.15(d) in all other respects.

-- 3 --

## ARTICLE II
## ASSET MAINTENANCE REQUIREMENT

(1)     Effective immediately, and at all times thereafter, the Branch shall:

(a)     maintain total assets of no lower quality than those at the Branch on the date of this Order, and meeting the criteria of 12 C.F.R. § 28.20, in an amount at least equal to $420 million; and

(b)     limit the amount of liabilities to nonrelated parties to an amount no greater than that reported on Schedule K of the Branch's Report of Asset and Liabilities of U.S. Branches and Agencies of Foreign Banks for the period ending December 31, 2004, which amount totaled $295 million at such date.

(2)     In computing eligible total assets, all real estate holdings, as well as the exclusions required under 12 C.F.R. § 28.20(d) shall be excluded.

(3)     Effective immediately and at all times thereafter, the Branch shall maintain Liquid Assets of no lower quality than those at the Branch on the date of this Order, and meeting the criteria of 12 C.F.R. § 28.20, in an amount at least equal to the amount of Liquid Assets reported by the Branch on its Report of Assets and Liabilities of U.S. Branches and Agencies of Foreign Banks for the period ending December 31, 2004.

(4)     All assets used to meet the asset maintenance requirement must be free from any security interest, lien, charge, credit or preference in connection with any claim by any party, except for the security interests granted to the OCC, to the Federal Deposit Insurance Corporation ("FDIC") and to the Federal Reserve Bank of New York.

(5)     Unless a more specific requirement is imposed by this Article, the Branch shall comply with the requirements of 12 C.F.R. § 28.20.

(6)     Commencing on the second day after the effective date of this Order and thereafter on each day on which the Branch conducts business, the Branch shall provide the Deputy Comptroller for Special Supervision ("Deputy Comptroller") with a daily written report of its assets, including the types, current value, and location of all assets. The GM, or his written designee in his absence or unavailability, shall attest to the validity of the report.

(7)     For purposes of this Article, the term "Liquid Assets" –

    (a)     means assets denominated in dollars and held in the United States;

    (b)     includes:

        (i)     cash

        (ii)     balances due from non-related depository institutions,

        (iii)     Federal Funds sold with non-related depository institutions,

        (iv)     securities purchased under agreements to resell,

        (v)     investment securities eligible for investment by national banks and Federal branches under 12 C.F.R. Part 1, but

    (c)     does not include encumbered or pledged assets by lien, preference or otherwise; nor any other asset pledged as security in any financial transaction with the Branch, the Bank, or any subsidiary or affiliate of the Bank, or any other party, except for the security interests granted to the OCC, to the Federal Deposit Insurance Corporation ("FDIC") and to the Federal Reserve Bank of New York.

### ARTICLE III
### RESTRICTIONS ON FUNDS TRANSFERS

(1)     Effective immediately, the Branch shall cease engaging in all funds transfer activities, unless the funds transfer is permitted under this Article. The Branch may complete any funds transfer already in process.

(2)     Until a lower level of activity is required under the Conversion Plan in Article VII, the Branch may conduct only the following funds transfers:

(a)     transfers to receive funds or assets necessary to maintain the Branch's compliance with Articles I and II of this Order;

(b)     transfers related to the sale, purchase, or transfer of Branch assets, provided that the Branch continues to hold the amount of assets required under Articles I and II of this Order;

(c)     transfers related to the repayment, renewal, or transfer of Branch liabilities, provided that the Branch continues to hold the amount of assets required under Articles I and II of this Order;

(d)     transfers effecting payment of Branch obligations to creditors, vendors, and other accounts payable, provided that the Branch continues to hold the amount of assets required under Articles I and II of this Order;

(e)     transfers effecting receipt of payments owed to the Branch;

(f)     transfers out of customer deposit accounts at the Branch existing on the date of this Order, and transfers necessary to accommodate customer transactions in customer transaction deposit accounts at the Branch existing on the date of this Order, provided that the Branch continues to hold the amount of assets required under Articles I and II of this Order;

(g)     transfers necessary to effect sending or receipt of payment on letters of credit and bankers' acceptances outstanding at the Branch on the date of this Order, provided the transaction is accompanied by documentation fully and accurately describing the underlying trade transaction and in compliance with Article V, and

provided further that the Branch continues to hold the amount of assets required under Articles I and II of this Order;

(h)     transfers necessary to effect sending or receiving payments related to loan and loan commitments outstanding at the Branch on the date of this Order, provided that the Branch continues to hold the amount of assets required under Articles I and II of this Order;

(i)     transfers necessary to effect sending or receiving payments related to the foreign exchange, interest rate or other futures contracts, options, and swaps outstanding at the Branch on the date of this Order, provided that the Branch continues to hold the amount of assets required under Articles I and II of this Order;

(j)     any payment related to an interbank transaction in which Arab Bank is a counterparty acting as a principal, and not as an agent for a customer, entered into prior to the date of this Order with an unrelated bank, and the instructions for payment at maturity were established at the time the transaction was initiated.  The Branch shall cause Arab Bank, within seven (7) days after the date of this Order, to identify any such transactions that have not yet matured and to instruct the bank counterparty to redirect the payment to a correspondent bank account;

(k)     payments related to settlement of sales of securities held by the Branch in custody for other Arab Bank branches or affiliates;

(l)     payments related to settlement of obligations of Arab Bank branches with Visa International, provided that no such payments shall occur on or after forty-five (45) days after the date of this Order;

       (m)    payments under the United States Department of Agriculture's Commodity Credit Corporation Export Credit Guarantee Program (GSM-102) and Intermediate Export Credit Guarantee Program (GSM-103), other U.S. Government export programs, and other U.S. Government programs under which the Branch is specified as an approved bank assignee or as the U.S. dollar payment bank;

       (n)    other transfers necessary to carry out the Conversion Plan; and

       (o)    other transfers with the prior written supervisory non-objection of the OCC.

(3)    Notwithstanding the foregoing, a funds transfer shall be permitted under this Article only if:

       (a)    the transfer does not result in the Branch's assets falling below the types and amounts required under Articles I and II;

       (b)    the transfer is supported by written documentation or other information maintained at the Branch that fully satisfies the Branch's compliance with the Bank Secrecy Act and its implementing regulations and the USA PATRIOT Act and its implementing regulations and complies with the requirements of 12 C.F.R. § 28.18(a) and (c); and

       (c)    the transfer is inputted at the Branch by Branch personnel under the direct supervision of Branch management.

(4)    Commencing on the second day after the effective date of this Order and thereafter on each day on which the Branch conducts business, the Branch shall provide the Deputy Comptroller with a daily written report of its funds transfer activities. The GM, or his

written designee in his absence or unavailability, shall attest to the validity of the report.  The report shall include:

> (a)    all wire transfers and other transfers by electronic means; and

> (b)    the name of the customer, the type of transaction, and the amount of the transaction.

(5)    The Branch shall immediately notify all customers and counter-parties that its funds transfer activities are restricted, including notifying other financial institutions via SWIFT.

(6)    For purposes of this Order,

> (a)    the term "funds transfer" includes the origination of, receipt of, or other participation in the transfer of funds, securities, or other assets by means of internal book entries at the Branch, or through automated clearinghouse transactions, Fedwire, other wire transfers, or any other electronic means; and

> (b)    "already in process" means a payment related to an interbank transaction in which Arab Bank is a counterparty acting as a principal and not as an agent for a customer, the transaction was entered into with an unrelated bank prior to the date of this Order, and the instructions for payment at maturity were established at the time the transaction was initiated.  The Branch shall cause Arab Bank, within seven (7) days after the date of this Order, to identify any such transactions that have not yet matured and to instruct the bank counterparty to redirect the payment to a correspondent bank account.

## ARTICLE IV
## RESTRICTIONS ON DEPOSIT-TAKING

(1)    Effective immediately, the Branch shall not open any new deposit account or renew or rollover any existing deposit account.  The Branch may continue to accept additional

deposits to existing demand and savings accounts until the time arrives for the deposit to be paid-off or transferred under the Conversion Plan.

(2)    Notwithstanding the foregoing, the Branch may open or renew the Affiliate Deposit required under Article VII.

(3)    Commencing on the second day after the effective date of this Order and thereafter on each day on which the Branch conducts business, the Branch shall provide the Deputy Comptroller with a daily written report of its deposits, including any pay-offs, transfers, or other reductions and any increases in existing accounts. The GM, or his written designee in his absence or unavailability, shall attest to the validity of the report.

## ARTICLE V
## BOOKS AND RECORDS

(1)    The Branch shall not destroy, alter, or remove from the Branch's premises any Bank or Branch documents, books and records until further written notice by the Deputy Comptroller.

(2)    Effective immediately, the Branch shall keep all documents, books and records in English, as required by 12 C.F.R. § 28.18.

(3)    The Branch shall maintain and, upon request, immediately make available to the OCC, the FDIC and the Federal Reserve:

(a)    all documents, books, records of the Branch maintained by or at the Branch; and

(b)    all documents, books, and records of non-U.S. offices of Arab Bank, including the Grand Cayman Island branch, that are maintained by or at the Branch.

(4)    Upon request by the OCC, the FDIC or the Federal Reserve, the Branch shall make reasonable efforts to permit the OCC, the FDIC or the Federal Reserve to have access to:

-- 10 --

(a)  documents, books, and records of the Branch maintained by other offices

of Arab Bank and its subsidiaries and its affiliates; and

(b)  documents, books, and records of non-US offices of Arab Bank including

the Grand Cayman branch maintained by such other offices.

(5)  For purposes of this Article, the terms "documents, books and records" shall have

the broadest possible meaning and shall include, without limitation, paper and electronic records

of all kinds, reports, notes, emails, calendars, phone logs, financial instruments, computer tapes

and disks, and digital recording and storage media.

## ARTICLE VI
## COMPLIANCE PROGRAM

(1)  Within thirty (30) days, the Branch shall review, and where necessary develop,

written policies and procedures to ensure compliance with all laws and regulations in all areas

for any business conducted from the date of this Order until the conversion of the Branch,

including but not limited to policies and procedures to ensure compliance with the Bank Secrecy

Act, as amended (31 U.S.C. §§ 5311 - 5330), the regulations promulgated thereunder at 31

C.F.R. Part 103, as amended, and 12 C.F.R. Part 21, Subparts B and C (collectively referred to as

the Bank Secrecy Act). At a minimum, this written program shall establish:

(a)  systems of internal controls and independent testing and auditing to ensure

ongoing compliance with the Bank Secrecy Act;

(b)  procedures for identifying and monitoring high risk accounts;

(c)  adequate controls and procedures to ensure that all suspicious and large

currency transactions are identified and reported with comprehensive procedures

covering all points of cash entry and exit;

(d)     a methodology for ensuring that the Branch's wire transfers and book entry transfers are in compliance with this Order;

(e)     a methodology for verifying that all information required by the Bank Secrecy Act and its implementing regulations, and the USA PATRIOT Act and its implementing regulations, are appropriately documented, filed, and maintained;

(f)     procedures to ensure that records are maintained on monetary instrument transactions and funds transfers, as required by the Bank Secrecy Act;

(g)     procedures to identify and report to appropriate management personnel suspicious activities for which a Suspicious Activity Report ("SAR") is required pursuant to 12 C.F.R. Part 21;

(h)     a training program for all appropriate operational and supervisory personnel to ensure their awareness of and compliance with the requirements of the Bank Secrecy Act and the Office of Foreign Assets Control ("OFAC"), including the currency reporting and monetary instrument and funds transfer recordkeeping requirements, and the reporting requirements associated with SARS;

(i)     guidelines for the provision of an officer who will be responsible for filing Currency Transaction Reports ("CTRs"), Reports of International Transportation of Currency or Monetary Instruments ("CMIRs"), and Reports of Foreign Bank and Financial Accounts ("FBARs");

(j)     guidelines and procedures to identify and report both the shipment and receipt of currency or monetary instruments via common couriers; and

(k)     guidelines, procedures, and systems for compliance with the rules and regulations of the OFAC.

(2)      Upon completion, a copy of the policies and procedures review and any new policies and procedures adopted as a result of the review shall be submitted to the Deputy Comptroller for a prior written determination of no supervisory objection.  The Branch shall not implement any changes that will cause, result, or bring about a significant deviation or material change to the policies and procedures adopted pursuant to this Article, until the Branch has received the prior written determination of no supervisory objection from the Deputy Comptroller.

(3)      Within forty-five (45) days, the Branch shall develop policies and procedures for conducting new trade settlement transactions ("Trade Settlement Policies and Procedures"). The Trade Settlement Policies and Procedures shall include:

(a)      Standardized policies and procedures for accepting trade settlement transactions;

(b)      Standardized policies and procedures for reviewing and completing each trade settlement transaction; and

(c)      Written policies and procedures establishing guidelines for trade settlement transactions.

(4)      The Branch's Trade Settlement Policies and Procedures shall, at a minimum, include the following:

(a)      All trade settlement transactions, excluding only local deliveries, shall be supported by:

(i)      Original bills of lading or original warehouse receipts signed by an independent warehouse, or, with the prior written non-objection of the Deputy

-- 13 --

Comptroller, duplicate bills of lading or warehouse receipts bearing an original signature or original stamp of the carrier or warehouse, as applicable; and

(ii)     Original commercial invoices.

(b)     Trade settlement transactions calling for local delivery shall be supported by:

(i)     Original warehouse receipts signed by an independent warehouse, or original inspection certificates signed by an independent inspection service, or, with the prior written non-objection of the Deputy Comptroller, duplicate warehouse receipts or inspection certificates bearing an original signature or original stamp of the warehouse or inspection service, as applicable; and

(ii)     Original commercial invoices.

(5)     The Trade Settlement Policies and Procedures shall also include the steps and actions necessary to ensure that the Branch has processes, personnel, and control systems to ensure implementation of, and adherence to, the Trade Settlement Policies and Procedures developed pursuant to this Article.

(6)     Prior to implementation, a copy of the Trade Settlement Policies and Procedures shall be submitted to the Deputy Comptroller for a written determination of no supervisory objection.

(7)     Upon receipt of a written determination of no supervisory objection, the Branch shall immediately implement and thereafter adhere to the Trade Settlement Policies and Procedures.   Prior to implementing any changes that will cause, result, or bring about a significant deviation or material change to the Trade Settlement Policies and Procedures adopted

pursuant to this Article, the Branch shall submit the changes to the Deputy Comptroller for prior written determination of no supervisory objection.

(8)    Nothing in this Article shall be construed to prevent the Branch from complying with the Uniform Commercial Code of any State, the Uniform Customs and Practices for Documentary Credits published by the International Chamber of Commerce, or any other United States laws applicable to trade settlement transactions.

(9)    The Branch shall ensure that its employees and facilities are not used in violation of the Bank Secrecy Act or to facilitate any violation of the Bank Secrecy Act.

(10)    The Branch shall ensure that it has processes, personnel, and control systems to ensure implementation of and adherence to the Bank Secrecy Act Program developed pursuant to this Article and the other requirements of this Article.

## ARTICLE VII
## BRANCH CONVERSION TO AN AGENCY

(1)    Within thirty (30) days, the Branch shall develop and submit a plan acceptable to the OCC for the orderly winding-down and conversion of the Branch to a federal agency ("Agency") with no loss to the Branch's depositors and other third-party creditors and no cost or loss to the FDIC (the "Conversion Plan" or "Plan").  Subject to compliance with the winding down and conversion plan prescribed by this Article and Article VIII, the OCC consents to the conversion of the Branch into an agency.

(2)    Upon completion of the Conversion Plan, the Branch shall submit the Plan to the Deputy Comptroller for a prior written determination of no supervisory objection.  Upon receipt of written supervisory non-objection, the Branch shall, not later than 10 days from receipt of the written supervisory non-objection, implement the Conversion Plan (the "effective date of the Conversion Plan") and begin publication required pursuant to paragraph (7)(b) of this Article.

Prior to implementing any changes that will cause, result, or bring about a significant deviation or material change to the Conversion Plan adopted pursuant to this Article, the Branch shall submit the changes to the Deputy Comptroller for prior written determination of no supervisory objection.

(3)     The Conversion Plan must incorporate the following fundamental requirements:

(a)     Throughout the conversion process, the Branch shall maintain the level and quality of assets required under Articles I and II. In order to maintain the required asset levels, the Branch, prior to making any payment on any liability or other obligation, shall obtain funds from a non-U.S. offices of Arab Bank to the extent needed for the Branch to maintain the required asset level;

(b)     Prior to conversion to a federal agency, the Branch shall pay all depositors, creditors, and holders of other third party liabilities, except those related to activities authorized pursuant to Article VIII, paragraph (3);

(c)     The conversion of the Branch shall take into account the requirements for the voluntary dissolution and liquidation of a national bank under 12 U.S.C. §§ 181, 182 & 3102(j) and 12 C.F.R. § 5.48, as made applicable to Federal branches of foreign banks by 12 U.S.C. § 3102(b) and 12 C.F.R. § 28.22; and

(d)     During the conversion process, notwithstanding the general repayment of all other depositors, the Branch must maintain a deposit or deposits from an affiliate or affiliates in an aggregate amount of at least $500,000 (the "Affiliate Deposit"). The Affiliate Deposit shall not be repaid until immediately prior to the conversion of the Branch to a federal agency.

(4)     The Conversion Plan shall address the elimination of business operations and payment of third party liabilities, so that the operations of the Agency will be limited to those activities permitted under Article VIII.

(5)     The Conversion Plan shall, at a minimum:

(a)     Specify how long the pre-conversion phase will last,  provided, however, the pre-conversion phase shall be no longer than ninety (90) days from the effective date of the Conversion Plan;

(b)     List in detail all deposit liabilities of the Branch and detail how these will be paid or transferred.  Not later than sixty (60) days after the effective date of the Conversion Plan, the Branch shall pay or transfer all deposit obligations.  Prior to paying or transferring deposit liabilities, the Branch shall obtain funds from a non-U.S. office of Arab Bank, if necessary, to maintain the Branch's asset level at or above the amount required by Articles I and II after payment of the deposit liabilities;

(c)     Specify all activities that will continue until the conversion of the  Branch to a federal agency:

(i)     The Plan shall provide that any business will be conducted in compliance with all laws and regulations and with safe and sound banking practices, including but not limited to policies and procedures to ensure compliance with the Bank Secrecy Act, as amended (31 U.S.C. §§ 5311 - 5330), the regulations promulgated thereunder at 31 C.F.R. Part 103, as amended, and 12 C.F.R. Part 21, Subparts B and C;

        (ii)     The Plan shall detail specific timeframes for the cessation of specific business lines, including by transfer to other banks or non-U.S. offices of Arab Bank; and

        (iii)    The Branch shall not enter into any other business not specifically authorized by the Conversion Plan or without the prior written determination of supervisory non-objection by the OCC;

        (d)     Identify all customers, correspondent banks, counterparties and other affected parties and provide that notices be sent to them about the Branch's conversion and the means to be used to end the business relationship or transfer it to another party or a non-U.S. office of Arab Bank;

        (e)     Identify all creditors and other potential claimants.  Establish procedures to provide notice and to publish notice in order to identify all creditors and other potential claimants as set forth in subparagraph (7)(b) of this Article;

        (f)     Describe any activities carried out at the Branch that relate to the administration of Arab Bank's Cayman Islands branch and the Branch's plans to transfer these activities to a non-U.S. office of Arab Bank; and

        (g)     Identify any assets within the Branch's control that are subject to blockage under U.S. foreign asset control regulations and, if any, develop plans to transfer such assets to a U.S. bank in a manner acceptable to the OCC and the Office of Foreign Assets Control.

(6)     The Conversion Plan shall, also at a minimum:

(a)     Specify the date on which the Branch will begin publication of notice of conversion to a federal agency (the "**Publication and Notice Date**"). The Publication and Notice Date shall be the same date as the effective date of the Conversion Plan;

(b)     Specify the time frames, consistent with the minimum time requirements below, in which the Branch proposes to pay creditors and other claimants;

(c)     Specify the sources of funds for payment of creditors and other valid claimants;

(d)     Specify the methodology for receiving, processing, and resolving valid claims; and

(e)     Detail the manner in which the Branch proposes to address any unresolved claims, including contingent liabilities, remaining after all known claims are satisfied.

(7)     The Conversion Plan shall provide that, **immediately upon the Publication and Notice Date**:

(a)     The Branch shall cease conducting any new banking business or holding itself out as available to conduct new banking business, except those activities authorized pursuant to Article VIII, paragraph (3), including accepting new deposits, undertaking other borrowings, making new loans or loan commitments, participating in any new letter of credit or bankers' acceptance activities, engaging in Federal Funds or securities repurchase transactions, or engaging in funds transfer activities, provided that the Branch

(i)     may perform on loan commitments, letters of credit, acceptances, and futures, options, and swaps contracts outstanding on the effective date of the Conversion Plan until the deadline for transferring such activities arrives;

(ii)     may engage in short-term Federal Funds sold transactions with insured U.S. depository institutions; and

(iii)    may conduct funds transfer activities necessary to wind down the Branch's operations under the Conversion Plan.

(b)     The Branch shall provide all customers and known creditors and other potential claimants (including any contingent creditors and claimants) with written notice of the Branch's pending conversion, advise customers of methods and timeframes for transferring their business, and advise creditors and potential claimants of the time and place for filing claims.  The Branch shall publish notice of its conversion in a newspaper of general circulation in New York for the first time, and shall thereafter continue publication daily for 30 days.  The Branch shall notify the FDIC that it has begun proceedings to convert the Branch to a federal agency, has paid or transferred all deposits, except for the Affiliate Deposit, and will inform the FDIC when the conversion process is complete;

(c)     The Branch shall close all correspondent and concentration accounts; and

(d)     The Branch shall submit to the OCC an interim report of the assets and liabilities of the Branch as of the close of business on the date before the effective date of the Conversion Plan.  The GM shall attest to the validity of the report.

(8)     The Conversion Plan shall provide that, **within 7 days after the Publication and Notice Date:**

(a)     The Branch shall inform its loan commitment customers, its letter of credit customers, and the counterparties on its futures, options, and swaps contracts, except those related to activities authorized pursuant to Article VIII, paragraph (3), of the need

to transfer the relationship to a non-U.S. office of Arab Bank, or to liquidate or settle within a commercially reasonable time but not to exceed the Conversion Date, and commence discussions to effect such transfer or other resolution;

(b)     The Branch shall inform each of its loan customers that the loans will be sold to a non-U.S. office of Arab Bank or to an unaffiliated entity within three weeks, unless the customers repays the loan;

(c)     The GM shall submit to the OCC a Report of Assets and Liabilities of the Branch as of the close of business on the Publication and Notice Date.  The report shall be reviewed by a certified public accounting firm and will include a maturity schedule of all liabilities;

(d)     The GM shall submit a report on the status of the conversion proceedings to the OCC.  The report will include the details of assets and liabilities, and all contingent liabilities, including any pending litigation.  The report will also include the GM's projection of the Branch's operating and administrative expenses until the conversion of the Branch.  Thereafter, the GM shall submit such reports to the Deputy Comptroller on a weekly basis;

(e)     The Branch will pay when due all third-party liabilities on its books that have come due through this date, except those related to activities authorized pursuant to Article VIII, paragraph (3).  Prior to paying liabilities, the Branch shall obtain funds from a non-U.S. office of Arab Bank, if necessary, to maintain the Branch's asset level at or above the amount required by Articles I and II upon such payment; and

(f)     The Branch will reinvest in Liquid Assets the proceeds of all assets that have matured or are sold through this date.

(9)     The Plan shall provide that, **within 21 days after the Publication and Notice Date:**

(a)     The Branch's short-term borrowings (such as repurchase agreements and other borrowings from other banks) shall be repaid.  Prior to repaying such borrowings, the Branch shall obtain funds from a non-U.S. office of Arab Bank, if necessary, to maintain the Branch's asset level at or above the amount required by Articles I and II upon such repayment;

(b)     The Branch will pay when due all other third-party liabilities on its books that have come due through this date, except those related to activities authorized pursuant to Article VIII, paragraph (3).  Prior to paying such liabilities, the Branch shall obtain funds from a non-U.S. office of Arab Bank, if necessary, to maintain the Branch's asset level at or above the amount required by Articles I and II upon payment of such liabilities; and

(c)     The Branch will reinvest in Liquid Assets the proceeds of all assets that have matured or are sold through this date.

(10)    The Plan shall provide that, **within 30 days after the Publication and Notice Date:**

(a)     The Branch will either liquidate or (with the consent of the counterparty) transfer to a non-U.S. office of Arab Bank all remaining foreign exchange, interest rate, and other futures, options, or swap transaction;

(b)     The Branch will settle or (with the consent of the beneficiary) transfer to a non-U.S. office of Arab Bank or to an unaffiliated U.S. bank all letters of credit and

bankers' acceptances, except those related to activities authorized pursuant to Article VIII, paragraph (3);

(c)     The Branch will (with the consent of the counterparty) transfer to a non-U.S. office of Arab Bank all loan commitments;

(d)     The Branch will transfer or sell any remaining loans and other assets (other than Liquid Assets), except those related to activities authorized pursuant to Article VIII, paragraph (3), to a non-U.S. office of Arab Bank, to an affiliate, or to an unaffiliated entity;

(e)     The Branch will pay when due all third-party liabilities on its books that have come due through this date, except those related to activities authorized pursuant to Article VIII, paragraph (3).  Prior to paying such liabilities, the Branch shall obtain funds from a non-U.S. office of Arab Bank, if necessary, to maintain the Branch's asset level or above the amount required by Articles I and II upon such payments;

(f)     The Branch will reinvest in Liquid Assets the proceeds of all assets that have matured or are sold through this date;

(g)     The Branch shall pay any remaining accounts payable, unless the party involved consents to the transfer of the Branch's obligation to a non-U.S. office of Arab Bank.  Prior to paying such accounts payable, the Branch shall obtain funds from a non-U.S. office of Arab Bank, if necessary, to maintain the Branch's asset level at or above the amount required by Articles I and II upon such payments;

(h)     The Branch's administration of Arab Bank's Cayman Islands branch shall end, and the physical operations of Arab Bank's Cayman Islands branch will be moved to a location outside the United States; and

    (i)    As of this date, the Branch will have completed the winding down of its banking business permitted under its branch license, and so the Branch will cease conducting any business other than that permitted for the Agency pursuant to Article VIII and those necessary to complete the cessation of the Branch's operations.

(11)    The Plan shall provide that **no later than 75 days after the Publication and Notice Date:**

    (a)    The Branch shall review any claims filed and determine whether to accept them or disallow them;

    (b)    The GM will submit a preliminary notice of conversion of the Branch to the OCC.  The preliminary notice will include a summary of deposits, other liabilities, and other claims that have been paid; claims that have been filed that the Branch plans to pay; claims that have been filed that remain unresolved; and other contingent liabilities known to the Branch.  The review shall estimate the amount needed to cover claims and contingent liabilities not yet paid and the likelihood of the Branch being liable.  The summary shall be reviewed by a certified public accounting firm; and

    (c)    The GM shall submit a plan that provides the steps the Branch will take to ensure that all remaining agreed claims will be paid prior to 90 days after the Publication and Notice Date.  The plan shall be submitted to the OCC for a written determination of supervisory non-objection.

### ARTICLE VIII
### FINAL CONVERSION TO FEDERAL AGENCY

(1)    The Conversion Plan shall provide that **no later than 90 days after the Publication and Notice Date** the Branch shall proceed with the following final conversion requirements ("Final Conversion Requirements").

-- 24 --

(2)     The Final Conversion Requirements shall include:

(a)     The Branch shall pay all remaining agreed claims. Prior to paying such claims, the Branch shall obtain funds from a non-U.S. office of Arab Bank if necessary to maintain the Branch's asset level at or above the amount required by Articles I and II upon such payments;

(b)     The Branch shall repay the Affiliate Deposit;

(c)     The Branch will notify the FDIC that all depositors have been paid and the conversion of the Branch is complete;

(d)     The Branch will withdraw from the New York Clearinghouse CHIPS system and any other such systems and will close its accounts with the Federal Reserve Bank of New York;

(e)     The GM shall submit a final report concerning deposits, other liabilities, and other claims that have been paid and remaining contingent creditors. The report shall be reviewed by a certified public accounting firm; and

(f)     The GM shall submit a final notice of conversion of the Branch to a federal agency to the OCC and shall seek the prior written supervisory non-objection to convert the Branch to a federal agency. Upon receipt of written supervisory non-objection, the Branch shall convert to a federal agency ("Conversion Date") and provide the Federal Reserve with written notice pursuant to 12 C.F.R. § 211.24(a)(7).

(3)     After conversion, the activities of the Agency shall be limited to those activities specifically authorized in writing by the Deputy Comptroller and as authorized pursuant to 12 C.F.R. § 28.11(h). The Agency shall maintain a CED in the amount of at least $5 million.

(4)     The Agency will continue to maintain the Branch's books and records in the United States so long as the Agency is in existence and for a period of at least ten years after it closes, and will provide for OCC access to such books and records.

(5)     After conversion, the Agency shall be responsible for all of the Branch's remaining obligations as of the Conversion Date, including contingent liabilities, for which the existence or amount of the Branch's liability had not been established prior to the Conversion Date.

(6)     After conversion, the Agency shall maintain assets in an amount at least equal to the total amount of assets at the Branch at the Conversion Date.  In lieu of maintaining assets at the resulting Federal agency as required in Articles I and II, the Agency and Arab Bank may obtain a letter of credit or other guarantee ("letter of credit") that will guarantee the payment by Arab Bank to the Agency of amounts needed to pay claims on the pre-existing Branch and on the resulting Federal agency that later become established.  Provided:

(a)     The letter of credit shall be in an amount equal to the total amount of assets at the Branch at the Conversion Date, less the amount of assets that must be maintained at the Agency as determined by the OCC;

(b)     The terms of the letter of credit shall provide that it may be drawn on by the Agency if the Agency becomes obligated to pay a claim on the Branch or the Agency.

(c)     The letter of credit shall be issued by a bank acceptable to the OCC; and

(d)     The letter of credit shall be for a period of time sufficient to cover all contingent liabilities of the Branch and the Agency, or automatically renewable; must be irrevocable; and must be on other terms acceptable to the OCC, such acceptance shall not be unreasonably withheld.

-- 26 --

(7)     Prior to making a claim pursuant to the terms of the letter of credit, the Agency shall provide the OCC with at least three (3) days prior notice.

(8)     Arab Bank shall assume all of the remaining obligations of the Branch as of the Conversion Date, including contingent liabilities, for which the existence or amount of the Branch's liability had not been established prior to the Conversion Date, and thereafter Arab Bank shall pay off, compromise, settle or resolve any such contingent liabilities or claims at no loss to the Branch or the FDIC.   The form and manner of Arab Bank's assumption of the Branch's contingent liabilities must satisfy all legal requirements under the National Bank Act and the International Bank Act, and must be acceptable to the OCC.

(9)     The obligations of Articles I and II shall terminate and the Branch may pay or transfer all assets to Arab Bank or its affiliates or subsidiaries, upon written determination of supervisory non-objection by the OCC.   In seeking such supervisory non-objection, the Agency shall demonstrate to the OCC's satisfaction compliance with subparagraph (6) and (8) of this Article.

## ARTICLE IX
## ADMINISTRATIVE APPEALS AND EXTENSIONS OF TIME

(1)     If the Branch determines that an exception to any provision of this Order is in its best interests, or requires an extension of any timeframe within this Order, the Branch shall submit a written request to the Deputy Comptroller requesting relief.

(2)     Any written requests submitted pursuant to this Article shall include a statement setting forth in detail the special circumstances that prevent the Branch from complying with any provision, that require the Deputy Comptroller to exempt the Branch from any provision, or that require an extension of any timeframe within this Order.   All such requests shall be accompanied by relevant supporting documentation.

(3)     The Deputy Comptroller's decision in granting the request is final and not subject to further review.

## ARTICLE X
## GENERAL PROVISIONS

(1)     Although the Branch, through the GM, is required to submit certain proposed actions and programs for the review or approval of the Deputy Comptroller, the GM and the Branch have the ultimate responsibility for proper and sound management of the Branch as well as compliance with all of the provisions contained in this Order.

(2)     It is expressly and clearly understood that if, at any time, the Comptroller deems it appropriate in fulfilling the responsibilities placed upon him/her by the several laws of the United States of America to undertake any action affecting the Branch, nothing in this Order shall in any way inhibit, estop, bar or otherwise prevent the Comptroller from so doing.

(3)     It is expressly and clearly understood that nothing herein shall preclude any proceedings brought by the Comptroller to enforce the terms of this Order, and that nothing herein constitutes, nor shall the Branch contend that it constitutes, a waiver of any right, power, or authority of any other representatives of the United States or agencies thereof, including the Department of Justice, to bring other actions deemed appropriate.

(4)     All reports, information, and documentation required under this Order and any other correspondence related to this Order shall be sent by overnight mail, e-mail, hand delivery, or facsimile to:

> John W. Quill
> Deputy Comptroller for Special Supervision
> Office of the Comptroller of the Currency
> 250 E Street, S.W.
> Washington, D. C.  20219
> Facsimile Number: (202) 874-5214
> E-mail Address: John.Quill@occ.treas.gov

(5)     Any time limitations imposed by this Order shall begin to run from the effective date of this Order.

(6)     The provisions of this Order are effective upon issuance of this Order by the Comptroller, through her authorized representative whose hand appears below, and shall remain effective and enforceable, except to the extent that, and until such time as, any provisions of this Order shall have been amended, suspended, waived, or terminated in writing by the Comptroller.

(7)     It is expressly and clearly understood that upon conversion to a federal agency, the Agency shall succeed to all obligations of the Branch and the provisions of this Order shall be enforceable against the Agency to the same extent as to the Branch.

(8)     This Order is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. § 1818(b), and expressly does not form, and may not be construed to form, a contract binding on the Comptroller or the United States.

(9)     The terms of this Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements or prior arrangements between the parties, whether oral or written.

(10)    Upon the effective date of this Order, the Consent Order dated February 8, 2005 shall terminate.


IT IS SO ORDERED, this 24th day of February 2005.


*/s/ Timothy W. Long*                                                    *2/24/05*
Timothy W. Long                                                          Date
Senior Deputy Comptroller
Midsize/Community Bank Supervision
Office of the Comptroller of the Currency

**UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
OFFICE OF THE COMPTROLLER OF THE CURRENCY**

**In the Matter of:**                                     )
                                                          )
The Federal Branch of Arab Bank PLC                       )        AA-EC-05-12
New York, New York                                        )
                                                          )
                                                          )

**STIPULATION AND CONSENT TO THE ISSUANCE
OF A CONSENT ORDER**

The Acting Comptroller of the Currency of the United States of America ("Comptroller")

has agreed to a consent order with the New York branch of Arab Bank, PLC, (the "New York

Branch" or the "Branch"), a Federal branch of Arab Bank, PLC, Amman, Jordan, ("Bank")

pursuant to 12 U.S.C. § 3101 *et seq.,* and is considering whether to initiate proceedings pursuant

to 12 U.S.C. § 1818(b).

The Branch, in the interest of compliance and cooperation, consents to the issuance of a

Consent Order, dated February 24, 2005 ("Order").

In consideration of the above premises, the Comptroller, through her authorized

representative, and the New York Branch, by and through the Executive Vice President and

Regional Manager, duly authorized by the Bank, hereby stipulate and agree to the following:

Article I

Jurisdiction

(1)      The Branch is a Federal branch licensed and examined by the Comptroller

pursuant to the International Banking Act of 1978, as amended, 12 U.S.C. § 3101 *et seq.*

1

(2)     The Comptroller is "the appropriate Federal banking agency" regarding the Branch pursuant to 12 U.S.C. §§ 1813(q), 1818(b) and 3108(b).

## Article II

### Agreement

(1)     The Branch, without admitting or denying any wrongdoing, hereby consents and agrees to the issuance of the Order by the Comptroller.

(2)     The Branch further agrees that said Order shall be deemed an "order issued with the consent of the depository institution" as defined in 12 U.S.C. § 1818(h)(2), and consents and agrees that said Order shall become effective upon its issuance and shall be fully enforceable by the Comptroller under the provisions of 12 U.S.C. §§ 1818(i) and 3101 *et seq.*

(3)     Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the Comptroller may enforce any of the commitments or obligations herein undertaken by the Branch under its supervisory powers, including 12 U.S.C. § 1818(i), not as a matter of contract law.  The Branch expressly acknowledges that neither the Branch nor the Comptroller has any intention to enter into a contract.

(4)     The Branch also expressly acknowledges that no officer or employee of the Office of the Comptroller of the Currency has statutory or other authority to bind the United States, the U.S. Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Comptroller's exercise of its supervisory responsibilities.

## Article III

### Waivers

(1)     The Branch, by signing this Stipulation and Consent, hereby waives:

2

(a)     the issuance of a Notice of Charges pursuant to 12 U.S.C. § 1818(b);

(b)     any and all procedural rights available in connection with the issuance of the Order;

(c)     all rights to seek any type of administrative or judicial review of the Order; and

(d)     any and all rights to challenge or contest the validity of the Order.

## Article IV

### Other Action

(1)     The Branch agrees that the provisions of this Stipulation and Consent shall not inhibit, estop, bar, or otherwise prevent the Comptroller from taking any other action affecting the Branch if, at any time, he/she deems it appropriate to do so to fulfill the responsibilities placed upon him/her by the several laws of the United States of America.


IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as her representative, has hereunto set his hand on behalf of the Comptroller.

_/s/ Timothy W. Long_ _____     _2/24/05_ _____
Timothy W. Long                                          Date
Senior Deputy Comptroller
Midsize/Community Bank Supervision
Office of the Comptroller of the Currency

3

IN TESTIMONY WHEREOF, the undersigned, the Executive Vice President and

Regional Manager, duly authorized by the Bank, has hereunto set his hand on behalf of the

Branch.


| _/s/_ | _2/24/05_ |
|---|---|
| Nofal S. Barbar | Date |

Nofal S. Barbar
Executive Vice President and Regional Manager
Arab Bank, PLC
On behalf of Arab Bank, PLC, New York Branch

4