# Exhibit 2

HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

COURTNEY LINDE, et al.

        Plaintiffs,

- v -

ARAB BANK, PLC,

        Defendant.

CV-04-2799 (NG)(VVP)
and all related cases[1]

---

# EXPERT REPORT OF PAUL ALLAN SCHOTT

PREPARED FOR:

DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, N.Y. 10019
(212) 259-8000

February 17, 2011

---

[1] Litle, et al. v. Arab Bank, PLC, Case No. CV 04-5449 (E.D.N.Y. 2004) (NG) (VVP); Coulter, et al. v. Arab Bank, PLC, Case No. CV 05-365 (E.D.N.Y. 2005) (NG) (VVP); Almog, et al., v. Arab Bank, PLC, Case No. CV 04-5564 (E.D.N.Y. 2004) (NG) (VVP); Afriat-Kurtzer, et al., v. Arab Bank, PLC, Case No. CV 05-388 (E.D.N.Y. 2005) (NG) (VVP); Bennett, et al. v. Arab Bank, PLC, Case No. CV 05-3183 (E.D.N.Y. 2005 (NG) (VVP); Roth, et al. v. Arab Bank, PLC, Case No. CV 05-3738 (E.D.N.Y. 2005) (NG) (VVP); Weiss, et al. v. Arab Bank, PLC, Case No. CV 06-1623 (E.D.N.Y. 2006) (NG) (VVP); Jesner, et al. v. Arab Bank, PLC, Case No. CV 06-3689 (E.D.N.Y.) (NG) (VVP); Lev, et al. v Arab Bank, PLC, Case No. CV 08-3251 (E.D.N.Y. 2008) (NG) (VVP); and Aguerenko, et al., v. Arab Bank, PLC, CV 10-626 (E.D.N.Y. 2010) (NG) (VVP).

## Exhibits

Curriculum Vitae of Paul Allan Schott ................................................................A

List of Publications (Prior Ten Years) ................................................................B

List of Expert Testimony (Prior Four Years) ......................................................C

List of Documents and Materials Considered ....................................................D

HIGHLY CONFIDENTIAL

I.

## Statement of Qualifications[2]

I have a bachelor's degree from Kent State University, a Juris Doctor from Boston University School of Law, and an LL.M. from Georgetown University Law Center.

I have more than 35 years of experience regulating and representing banks, bank holding companies, financial holding companies, savings and loan associations, savings and loan holding companies, and United States branches and agencies of foreign banks, as an attorney for the federal government, as an attorney in private practice, and as a consultant.

I have served as Chief Counsel to the Office of the Comptroller of the Currency ("OCC"), Assistant General Counsel for Banking and Finance for the United States Treasury Department, and Senior Attorney for the Federal Reserve Board (the "Fed"). I have also been in private practice, as an attorney, and as a consulting partner with the bank regulatory advisory group of PricewaterhouseCoopers LLP, and its predecessor, Coopers & Lybrand LLP, where I was National Director for Bank Regulatory Services.

For the past eight years, I have served as a consultant for the World Bank in its Financial Market Integrity Department with respect to international standards for fighting money laundering and terrorist financing, and I frequently lecture on these topics.

I have authored the book, *Reference Guide on Anti-Money Laundering and Combating the Financing of Terrorism,* which is a joint publication of the World

---

[2] My full curriculum vitae is annexed hereto as Exhibit A.

HIGHLY CONFIDENTIAL

Bank and International Monetary Fund. In addition, I have co-authored the book, *Fighting Money Laundering and Terrorist Financing: A Practical Guide for Bank Supervisors*, which is published by the World Bank. Other publications I have authored in the past ten years are identified in Exhibit B, attached hereto.

HIGHLY CONFIDENTIAL

## II.

### Scope of Services and Questions Presented

I have been retained by Dewey & LeBoeuf LLP, counsel for Arab Bank plc, ("Arab Bank" or "Bank") to address the following questions:

- What was the U.S. federal statutory and regulatory framework for anti-money laundering ("AML") and combating the financing of terrorism ("CFT"), both with regard to civil compliance requirements and criminal liability, that was applicable to Arab Bank's New York branch ("ABNY") during the timeframe relevant to this litigation (1995-2004)?

- What is my assessment of whether ABNY complied with applicable statutory and regulatory requirements during the relevant timeframe?

- What is my assessment of the criticisms and impact of the findings of the OCC and the Financial Crimes Enforcement Network ("FinCEN") in their 2005 Orders, with respect to ABNY's AML/CFT compliance program?

My answers to these questions are provided below. In reaching these opinions, I have reviewed a number of transcripts and other documents from the record in this litigation that were provided to me at my request, as well as other materials that I obtained from public sources. The documents and materials that I have considered are listed in Exhibit D annexed hereto.

3

HIGHLY CONFIDENTIAL

The opinions I have stated regarding this matter are as of the date of this report and are based upon the materials I have reviewed as of this date.

I am being compensated at a rate of $600 per hour. My compensation does not depend in any way on the outcome of this litigation.

HIGHLY CONFIDENTIAL

## III.

### Summary of Opinions

A)  During the relevant time period (1995-2004), ABNY implemented a program of policies, procedures and internal controls for anti-money laundering and combating the financing of terrorism consistent with then-existing regulatory requirements and industry standards in the United States.

B)  There is no evidence that the OCC, which conducted regular examinations of ABNY over the relevant time period, or FinCEN, which conducted its own investigation of ABNY, identified any transactions conducted by or through ABNY, or any deficiencies with ABNY's compliance program that resulted in the financing of terrorism.

C)  To the extent the OCC and FinCEN, in 2005, found deficiencies with ABNY's compliance policies and procedures, those findings were premised on previously unarticulated standards and, in any event, do not suggest that ABNY engaged in terrorist financing.

> ABNY adhered to its record-keeping requirements as part of its compliance program.

- *Culture of compliance.* ABNY routinely received from Arab Bank's head office in Amman, Jordan directives and distributions relating to compliance. These included AML instructions to be implemented by Arab Bank branches (March 1998/April 2000),[49] instructions to designate a Money Laundering Reporting Officer[50] and distributions of developments in AML such as reports of FATF, including its Forty Recommendations.[51]

### F. The OCC and FinCEN Orders

Until 2005, ABNY had no significant supervisory issues with the OCC with regard to AML or CFT. My observation in this regard is based upon the fact that all formal enforcement actions by the OCC are required to be made public and an examination of OCC records shows no such enforcement actions had been taken against ABNY.[52] In fact, employees of ABNY stated that the branch had previously received the highest marks from the regulators for compliance.[53]

In 2005, after an examination and investigation, with which ABNY fully cooperated, ABNY entered into consent orders with the OCC and FinCEN, both bureaus

---

[48] July 27, 2005 Deposition of E. Caravanos ("2005 Caravanos Dep.") at 28:18-31:15, 316:14-317:10.
[49] 2007 Billard Dep., Vol. I at 36:25-37:7; *see also* ABPLC000802-808, ABPLC001079-1090.
[50] ABPLC001110, April 2000.
[51] ABPLC005916, February 2000.
[52] In August of 1989, 12 U.S.C. § 1818(u), which established the publication requirement, was enacted into law.
[53] 2007 Billard Dep., Vol. I at 98:14-15; June 3, 2010 Deposition of B. Billard ("2010 Billard Dep.") at 458:23-459:6; 2007 Caravanos Dep. at 45:20-24, 99:2-10.

of the U.S. Department of Treasury, which included as a component a $24 million civil money penalty. In addition, ABNY agreed with the OCC to take certain remedial actions, including, among others, terminating any further funds clearing activities and converting to an agency. Together, these federal authorities concluded that ABNY failed to:

- have adequate internal controls for compliance;
- monitor funds transfer transactions of non-account holders for possible suspicious activity;
- have an adequate independent testing function; and
- report all suspicious activity in a timely manner.

Each of these shortcomings was the result of new compliance requirements that became effective on April 24, 2002, at the earliest.[54] Thus, there was not an issue with compliance prior to that date.

It is also important to note what is not criticized in the orders and, therefore, what ABNY presumably was doing correctly. These areas were:

- Customer identification, verification and due diligence, i.e., KYC;
- Using the OFAC list to block transactions and/or freeze accounts;
- Conducting enhanced due diligence for correspondent bank customers;
- Monitoring the accounts of ABNY account-holders for suspicious activity; and
- Recordkeeping so that transactions could be reconstructed.

---

[54] FinCEN Order at fn. 7; 31 U.S.C. § 5318(h)(1); 31 C.F.R. § 103.120.

The narrow issue of non-compliance for ABNY thus was its failure to have an adequate system in place to monitor the names of originators and beneficiaries of *non-customers* of ABNY in order to determine whether there was any suspicious activity that should be reported.

After a thorough examination and investigation by the regulators, however, there was no finding that ABNY had any accounts for anyone involved with terrorism, or that ABNY processed any transaction that it should not have processed. The regulators' findings were limited solely to ABNY's correspondent banking services, and deficiencies in its controls that, according to the regulators, hindered ABNY's ability to detect and report suspicious activity. In this regard, ABNY was, to my knowledge, the first institution criticized and penalized for the shortcomings described in the OCC and FinCEN Orders, which were based on standards never previously articulated by the OCC, FinCEN or any other federal regulator.

It is important to note that although FinCEN was highly critical of ABNY's compliance efforts with regard to implementation of Section 312 of the USA Patriot Act, FinCEN, itself, did not implement final rulemaking on this statutory provision until February of 2006.[55] On May 30 2002, FinCEN published for comment a proposed rule to implement Section 312, which became effective on July 23, 2002, whether or not regulations were in place to implement the statute.[56] Because of the complexity of the issues raised by the proposed rule, FinCEN did not promulgate a final rule by July 23, 2002.[57] Rather, it issued a final interim rule that was effective on that

---

[55] 71 Fed. Reg. 495 (Jan. 4, 2006), effective Feb. 3, 2006.
[56] 67 Fed. Reg. 37736 (May 30, 2002).
[57] Federal Reserve Board, Supervisory Letter, SR 02-18, July 23, 2002, at 1.

25

The narrow issue of non-compliance for ABNY thus was its failure to have an adequate system in place to monitor the names of originators and beneficiaries of *non-customers* of ABNY in order to determine whether there was any suspicious activity that should be reported.

After a thorough examination and investigation by the regulators, however, there was no finding that ABNY had any accounts for anyone involved with terrorism, or that ABNY processed any transaction that it should not have processed. The regulators' findings were limited solely to ABNY's correspondent banking services, and deficiencies in its controls that, according to the regulators, hindered ABNY's ability to detect and report suspicious activity. In this regard, ABNY was, to my knowledge, the first institution criticized and penalized for the shortcomings described in the OCC and FinCEN Orders, which were based on standards never previously articulated by the OCC, FinCEN or any other federal regulator.

It is important to note that although FinCEN was highly critical of ABNY's compliance efforts with regard to implementation of Section 312 of the USA Patriot Act, FinCEN, itself, did not implement final rulemaking on this statutory provision until February of 2006.[55] On May 30 2002, FinCEN published for comment a proposed rule to implement Section 312, which became effective on July 23, 2002, whether or not regulations were in place to implement the statute.[56] Because of the complexity of the issues raised by the proposed rule, FinCEN did not promulgate a final rule by July 23, 2002.[57] Rather, it issued a final interim rule that was effective on that

---

[55] 71 Fed. Reg. 495 (Jan. 4, 2006), effective Feb. 3, 2006.
[56] 67 Fed. Reg. 37736 (May 30, 2002).
[57] Federal Reserve Board, Supervisory Letter, SR 02-18, July 23, 2002, at 1.

HIGHLY CONFIDENTIAL

date.[58] The interim rule largely repeated the statutory requirements of Section 312 and did not provide specifics on how to satisfy the statutory requirements. The interim rule stated, "Treasury acknowledges that, as a practical matter, banks will be unable to craft and implement final comprehensive due diligence policies and procedures pursuant to the dictates of section 5318 (i) until Treasury issues a final rule."[59] The interim rule went on to state, "in the interim, a reasonable due diligence policy, in Treasury's view, is one that comports with existing best practices standards for banks that maintain correspondent accounts for foreign banks,[60]..."[61] The Clearing House Guidelines, which are referred to in the interim rule as best practices, do not address the issue of originators or beneficiaries of correspondent banks. Thus, the FinCEN criticisms of ABNY are not covered by best practices that are supposed to be a reasonable compliance effort for banks covered by Section 312. As a consequence, during the timeframe relevant to ABNY and this case, there was no guidance with respect to, or articulation of the standard for, Section 312 from Treasury or any other regulator with regard to originators and beneficiaries of noncustomers of a bank and its correspondent banking relationships. In fact, even by 2007, bank examiners were not instructed to determine whether a correspondent bank monitors the originators and beneficiaries of non-customers of the bank in its correspondent banking relationships.[62]

---

[58] 67 Fed. Reg. 48348 (July 23, 2002).
[59] *Id.* at 48350.
[60] Here the interim rule had a footnote referring to, among other things, the New York Clearing House Association L.L.C., Guidelines for Counter Money Laundering Policies and Procedures in Correspondent Banking (March 2002) at www.nych.org ("Clearing House Guidelines") as an example of best practices.
[61] 67 Fed. Reg. 48348 (July 23, 2002), at 48350.
[62] Examination Manual.

**HIGHLY CONFIDENTIAL**

**HIGHLY CONFIDENTIAL**

Moreover, in my experience, the OCC would have made a criminal referral to the U.S. Department of Justice ("DOJ") in the case of ABNY because of the size of the penalty, and DOJ would have conducted an independent investigation. DOJ did, in fact, conduct such an investigation.[63] The fact that, after more than six years, no criminal charges have ever been filed against Arab Bank, ABNY or any officer or employee of either entity strongly supports the conclusion that no criminal activity was involved.

Furthermore, no enforcement action was taken by the OCC or FinCEN against any individual officer or employee of Arab Bank or ABNY. In this regard, regulators may take action against officers or employees when individual conduct justifies such action, whether or not such misconduct rises to the level of criminal activity. The lack of any criminal prosecution or further enforcement activity supports the conclusion that no criminal activity on the part of ABNY or its employees was involved. Moreover, I have seen nothing in the record to indicate that criminal activity was involved.

The duty of banks to comply with the federal civil AML/CFT compliance requirements runs only to the federal government, as supervised and enforced by its appropriate agencies. No duty to any third party is created by the failure to comply fully with such requirements. The enforcement actions taken by regulators state precisely what the regulators find the compliance situation to be. In this case, the OCC and FinCEN specified ABNY's compliance shortcomings in their respective orders, and the

---

[63] 2007 Billard Dep., Vol. I at 11:18-15:12; Deposition of T. Pacheco ("Pacheco Dep.") at 227:24-230:23.

OCC required certain remedial actions. The OCC and FinCEN conducted extensive examinations and investigations of ABNY's funds transfer activities, with which Arab Bank and management cooperated with the OCC.[64] There was no finding of any improper transfers or other improper activity. Thus, even taking the criticisms of ABNY by the OCC and FinCEN at face value, the only conclusion that can be drawn from all of this is that ABNY did not satisfy fully its civil AML/CFT compliance requirements.

In fact, however, to the extent the OCC and FinCEN in 2005 found deficiencies with ABNY's compliance policies and practices, certain of those findings were premised on inaccurate statements of the law, previously unarticulated standards and standards of practice not common among banks operating in the U.S. at the time.

As an initial matter, FinCEN cited ABNY for failure to comply with Section 312 of the USA Patriot Act because ABNY was not monitoring correspondent banking transactions prior to June 2002 in accordance with the due diligence mandate of Section 312.[65] Yet the effective date of Section 312 was July 23, 2002, rendering FinCEN's citation inaccurate.[66] Nor was FinCEN's criticism of ABNY for manual monitoring of such transactions between June 2002 and 2004 appropriate, given that no requirement to monitor correspondent banking transactions through automated systems had been previously articulated.

FinCEN, in its penalty against Arab Bank, also set forth certain standards and expectations that had previously not been articulated by FinCEN, the OCC or any U.S. regulator to my knowledge. These included, for example, a requirement to obtain

---

[64] Fed. Branch of Arab Bank PLC, 2005-14, Consent Order (OCC, Feb. 24, 2005) at pg. 2.
[65] FinCEN Order, at 4.
[66] Due Diligence Anti-Money Laundering Programs for Certain Foreign Accounts, 67 Fed. Reg. 48348 (July 23, 2002) (interim final rule implementing Section 312 pending issuance of final rule).

HIGHLY CONFIDENTIAL

information on parties to transactions from bank branches and affiliates outside the United States,[67] and a requirement to review public sources of information to investigate names of parties to correspondent banking transactions being processed through ABNY.[68]

In any event, whether justified or not, whether ABNY had forewarning or not, the criticisms of ABNY by the regulators in 2005 reflected their view that ABNY did not have the necessary internal controls in place to file SARs in a timely manner. There was no finding, indeed not even a suggestion, that ABNY engaged in any terrorist financing.

Dated: New York, NY
February 17, 2011

*[signature]*
Paul Allan Schott

---

[67] FinCEN Order, at 5.
[68] Id.